**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **No. 1:18-cv-8865-AJN-GWG** |
| **ELON MUSK** | : | |
| **Defendant.** | : | |

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF AN ORDER TO SHOW CAUSE**

## TABLE OF CONTENTS


TABLE OF CONTENTS ....................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................iii

SUMMARY ....................................................................................................................1

FACTS ............................................................................................................................2

A. The SEC's Case Against Musk ......................................................................2

B. The SEC's Settlements with Musk and Tesla ..................................................2

C. Tesla's Enactment of an Executive Communications Policy ..........................4

D. Musk's Publication of a Tweet Containing Information Material to Tesla and its Shareholders Without Pre-Approval ..........................................5

STANDARD OF REVIEW ..............................................................................................6

ARGUMENT ....................................................................................................................7

A. The Court's Final Judgment Is Clear and Unambiguous. ...............................7

B. Musk's Admission that He Did Not Obtain Pre-Approval for his 7:15 Tweet Is Clear and Convincing Evidence that He Violated the Court's Final Judgment. ......................................................................................8

C. Musk Has Not Diligently Attempted to Comply with the Court's Final Judgment. .....................................................................................................11

CONCLUSION. ..............................................................................................................13

# TABLE OF AUTHORITIES

## CASES

*Badgley v. Santacroce*, 800 F.2d 33 (2d Cir. 1986)....................6

*Donovan v. Sovereign Sec. Ltd.*, 726 F.2d 55 (2d Cir. 1984)....................7, 9

*In re Martin-Trigona*, 732 F.2d 170 (2d Cir. 1984)....................6

*Paramedics Electromedicina Comercial, Ltda. V. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, (2d Cir. 1984)....................7

*Shillitani v. United States*, 384 U.S. 364 (1966)....................6

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980)....................6

*SEC v. Durante*, 641 Fed. App'x 73 (2d Cir. 2016)....................7

## STATUTES

Securities Exchange Act of 1934 § 10(b) [15 U.S.C. § 78j(b)]....................2

## RULES

17 C.F.R. § 240.10b-5....................2

## SUMMARY

Plaintiff United States Securities and Exchange Commission (the "SEC") respectfully moves this Court for an order to show cause why Defendant Elon Musk should not be held in contempt for violating the clear and unambiguous terms of the Court's October 16, 2018 Final Judgment as to Defendant Elon Musk (the "Final Judgment").

On September 27, 2018, the SEC filed a complaint against Musk, the Chief Executive Officer of Tesla, alleging that he published a series of false and misleading statements to millions of people, including members of the press, using the social media platform Twitter. *See* Complaint as to Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. No. 1. Two days later, on September 29, 2018, Musk agreed to settle the SEC's charges. *See* Consent and Proposed Final Judgment as to Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. Nos. 6-1, 6-2.

On October 16, 2018, this Court entered a Final Judgment against Musk that, among other things, ordered Musk to comply with procedures implemented by Tesla that would require Musk to seek pre-approval of any written communications, including social media posts, that contained or reasonably could contain information material to Tesla or its shareholders. *See* Final Judgment of Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. No. 14, at 13-14. The SEC required this provision as a term of its settlement with Musk in order to prevent Musk from recklessly disseminating false or inaccurate information about Tesla in the future.

On February 19, 2019, Musk tweeted, "Tesla made 0 cars in 2011, but will make around 500k in 2019." Musk did not seek or receive pre-approval prior to publishing this tweet, which was inaccurate and disseminated to over 24 million people. Musk has thus

violated the Court's Final Judgment by engaging in the very conduct that the pre-approval provision of the Final Judgment was designed to prevent.

## FACTS

### A. The SEC's Case Against Musk

On September 27, 2018, the SEC charged Elon Musk, CEO and then-Chairman of Tesla, with violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5] based on a series of false and misleading statements he published on Twitter about a potential transaction to take Tesla private.

On August 7, 2018, Musk tweeted to his then over 22 million Twitter followers that he could take Tesla private at $420 per share (a substantial premium to its trading price at the time), that funding for the transaction had been secured, and that the only remaining uncertainty was a shareholder vote. The SEC's complaint alleged that, in truth, Musk had not discussed specific deal terms with any potential financing partners and that he knew the potential transaction was uncertain and subject to numerous contingencies. Musk's tweets caused Tesla's stock price to jump by over six percent on August 7 and led to significant market disruption.

### B. The SEC's Settlements with Musk and Tesla

Two days after the SEC filed its complaint against Musk, it reached settlement agreements with both Musk and Tesla. As one of the terms of his settlement, Musk agreed to comply with procedures implemented by Tesla that would require him to seek pre-approval of any written communications, including social media posts, that contained or reasonably could contain information material to Tesla or its shareholders. Consent of

Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. No. 6-1, at 3. In turn, Tesla, as one condition of its settlement with the SEC, agreed to implement mandatory procedures to oversee and pre-approve Musk's Tesla-related written communications that reasonably could contain information material to the company or its shareholders. Consent of Defendant Tesla, Inc., 1:18-cv-8947-AJN-GWG, Dkt. No. 3-1, at 4.

As the SEC noted in the parties' Joint Submission in Support of Approval and Entry of Proposed Consent Judgments, these settlement terms were tailored to prevent future violations of the type alleged by the SEC against Musk. 1:18-cv-8865-AJN-GWG, Dkt. No. 13, at 5-7. Specifically, the terms of the SEC's settlements with both Musk and Tesla were designed to prevent Musk from disseminating misleading or inaccurate information via Twitter or other means in the future.

On October 16, 2018, this Court entered a Final Judgment against Musk that ordered him, among other things, to:

> comply with all mandatory procedures implemented by Tesla, Inc. (the "Company") regarding (i) the oversight of communications relating to the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and (ii) the pre-approval of any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders.

Final Judgment of Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. No. 14, at 13-14. On the same day, the Court entered a Final Judgment against Tesla (the "Tesla Judgment") that ordered the company, among other things, to:

> implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and to pre-approve any such written communications that contain, or reasonably could contain, information material to the Company

> or its shareholders. The definition of, and the process to determine, which of Elon Musk's communications contain, or reasonably could contain, information material to the Company or its shareholders shall be set forth in the Company's disclosure policies and procedures.

Final Judgment of Defendant Tesla, Inc., 1:18-cv-8865-AJN-GWG, Dkt. No. 14, at 15.

### C. Tesla's Enactment of an Executive Communications Policy

Consistent with the Court's Tesla Judgment, on December 11, 2018, Tesla adopted a "Senior Executives Communications Policy" (the "Policy"). *See* Tesla Senior Executives Communications Policy (Dec. 11, 2018), attached hereto as Exhibit 1. The Policy states:

> Written Communications that contain, or reasonably could contain, information material to Tesla or its stockholders must, prior to posting or other publication, be submitted to Tesla's General Counsel and Disclosure Counsel (or in the event of the General Counsel's unavailability, Tesla's Chief Financial Officer and Disclosure Counsel) for pre-approval. Authorized Executives are not authorized to post or publish Written Communications that contain, or reasonably could contain, information material to Tesla or its stockholders without obtaining pre-approval.

*Id.* at 1. Musk, as Tesla's CEO, is included within the Policy's definition of "Authorized Executives." *Id.* The Policy's definition of "Written Communications" also specifically includes information communicated via Twitter and other social media platforms. *Id.*

The Policy provides a non-exclusive list of examples of information that may be "material to Tesla or its stockholders," which includes "projections, forecasts, or estimates regarding Tesla's business." *Id.* at 1-2. Finally, Tesla's Policy requires that

> [i]f an Authorized Executive (i) further edits a pre-approved Written Communication, or (ii) desires to release a Written Communication more than two (2) days, after receipt of written pre-approval, such Authorized Executive will re-confirm the pre-approval in writing in accordance with this Policy prior to release.

*Id.* at 2. On December 13, 2018, Tesla certified its compliance with the provision of the Court's Tesla Judgment requiring it to implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding Tesla and pre-approve any such written communications that contain, or reasonably could contain, information material to Tesla or its shareholders.

### D. Musk's Publication of a Tweet Containing Information Material to Tesla and its Shareholders Without Pre-Approval

At approximately 7:15 PM ET on February 19, 2019, Musk published the following statement via Twitter: "Tesla made 0 cars in 2011, but will make around 500k in 2019" (the "7:15 tweet"). This statement was disseminated to Musk's now over 24 million Twitter followers, including members of the press, and was publicly available to anyone with Internet access. A few hours later, at 11:41 PM ET, Musk published another tweet correcting his 7:15 tweet: "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week. Deliveries for year still estimated to be about 400k" (the "11:41 tweet").

On February 20, 2019, SEC staff asked Musk and Tesla to confirm whether Musk had complied with Tesla's pre-approval procedures as required by the Court's Final Judgment before he published the 7:15 and 11:41 tweets. *See* February 20, 2019 Letter from C. Crumpton to S. Farina, attached hereto as Exhibit 2, at 1; February 20, 2019 Letter from C. Crumpton to B. Bondi, attached hereto as Exhibit 3, at 1. On February 22, 2019, in correspondence on behalf of both Musk and Tesla, counsel confirmed that Musk's 7:15 tweet had not been pre-approved, as required by Tesla's Policy and the Court's Final Judgment. February 22, 2019 Letter from B. Bondi to C. Crumpton, attached hereto as Exhibit 4, at 3. According to counsel, immediately upon seeing

Musk's 7:15 tweet for the first time *after* Musk had published it, Tesla's "Designated Securities Counsel"[1] arranged to meet with Musk, and they drafted Musk's corrective 11:41 tweet together. *Id.* The first sentence of the 11:41 tweet acknowledged that Musk's 7:15 tweet was not accurate: "***Meant to say*** annualized production rate at end of 2019 probably around 500k, ie 10k cars/week" (emphasis added).

In their response to the SEC's February 20, 2019 requests for information, Musk and Tesla acknowledged that they "are cognizant of the applicable policies and procedures mandated by the Final Judgments where a written communication contains, or reasonably could contain, material information." Exhibit 4, at 3.

## STANDARD OF REVIEW

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *In re Martin–Trigona*, 732 F.2d 170, 173 (2d Cir. 1984) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). This power serves to "protect[ ] the due and orderly administration of justice and [to] maintain[ ] the authority and dignity of the court." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). Moreover, "[t]he purpose of civil contempt, broadly stated, is to compel a reluctant party to do what a court requires of him." *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986).

A court may hold a party in contempt for failure to comply with a court order if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to

---

[1] Tesla's Policy defines "Disclosure Counsel" as "Tesla's in-house securities law attorney who has been designated by the Disclosure Controls Committee of the Tesla Board of Directors . . . to assist in reviewing Written Communications in accordance with this Policy." It appears that Exhibit 4 uses the term "Designated Securities Counsel" synonymously with "Disclosure Counsel."

comply in a reasonable manner." *See SEC v. Durante*, 641 Fed. App'x 73, 76 (2d Cir. 2016) (citing *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004)). Significantly, a violation need not be willful in order to find contempt. *Donovan v. Sovereign Sec. Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984).

## ARGUMENT

### A. The Court's Final Judgment Is Clear and Unambiguous.

The provision of the Court's Final Judgment requiring Musk to obtain pre-approval before publishing written statements containing material information about Tesla is clear and unambiguous. Indeed, in his letter to the SEC staff, Musk admitted that he is "cognizant of the applicable policies and procedures mandated by the Final Judgments where a written communication contains, or reasonably could contain, material information." The relevant provision of the Court's Final Judgment orders Musk to:

> comply with all mandatory procedures implemented by Tesla, Inc. (the "Company") regarding (i) the oversight of communications relating to the Company made in any format, including, but not limited to, posts on social media (*e.g.*, Twitter), the Company's website (*e.g.*, the Company's blog), press releases, and investor calls, and (ii) the pre-approval of any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders.

Final Judgment of Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. No. 14, at 13-14. Musk was provided with this exact language prior to agreeing to settle with the SEC and consented to the Court's entry of a judgment containing this provision. *See* Consent and Proposed Final Judgment as to Defendant Elon Musk, 1:18-cv-8865-AJN-GWG, Dkt. Nos. 6-1, 6-2.

Likewise, the Policy implemented by Tesla governing Musk's communications regarding the company is equally clear and unambiguous. Under that Policy, Authorized Executives are required to obtain pre-approval prior to publication of all written communications that contain, or reasonably may contain, information material to Tesla or its shareholders. *See* Exhibit 1, at 1. There can be no confusion that this Policy applies to Musk because he is identified by name as an Authorized Executive subject to the Policy. *Id.* Likewise, there is no question that "Written Communications" include statements via Twitter, as Tesla's Policy explicitly says so. *Id.*

Finally, it is clear that the information in Musk's 7:15 tweet—a statement of the number of cars Tesla would make in 2019—was at least reasonably likely to be material to Tesla and its shareholders and therefore required to be pre-approved. Tesla's Policy lists "projections, forecasts, or estimates regarding Tesla's business" as an example of a subject that may be material to Tesla and its shareholders. *Id.* Musk's failure to comply with Tesla's Policy, and thus the Court's Final Judgment, was not a result of a lack of clarity in either the Policy or the Final Judgment.

### B. Musk's Admission that He Did Not Obtain Pre-Approval for his 7:15 Tweet Is Clear and Convincing Evidence that He Violated the Court's Final Judgment.

Musk has admitted that he did not seek pre-approval of his 7:15 tweet, as required by the Court's Final Judgment and Tesla's Policy. Instead, Musk has claimed that he did not believe that he needed to seek and obtain pre-approval for his 7:15 tweet because he thought he was simply recapitulating information that had already been pre-approved in connection with two Tesla communications that took place 20 days earlier on January 30,

2019, specifically Tesla's Fourth Quarter & Full Year 2018 Update and its earnings call. *See* Exhibit 4, at 3.

A violation of a court order need not be willful in order to find contempt. *Donovan*, 726 F.2d at 59. Even so, Musk's claim that he did not believe he was required to seek pre-approval of his 7:15 tweet is undermined by the clear and unambiguous provision of Tesla's Policy that states:

> If an Authorized Executive (i) further edits a pre-approved Written Communication, or (ii) desires to release a Written Communication more than two (2) days, after receipt of written pre-approval, such Authorized Executive will re-confirm the pre-approval in writing in accordance with this Policy prior to release.

Exhibit 1, at 2. According to Tesla's Policy, any edits to a pre-approved Written Communication or even releasing a verbatim pre-approved Written Communication more than two days after it has been pre-approved requires that the pre-approval be reconfirmed. Even if the exact substance of the 7:15 tweet had been pre-approved 20 days before, Musk cannot credibly claim that he thought he was not required to obtain pre-approval again under the plain terms of the Policy.

In fact, the written communication in the 7:15 tweet was not pre-approved 20 days earlier or at any time. Musk's claim that he thought he was simply restating information from the January 30 communications is not credible. Musk is the CEO of Tesla and undoubtedly familiar with the details of Tesla's production projections. The information in Musk's 7:15 tweet was obviously different from information that had been pre-approved in connection with the January 30 communications. In Tesla's Fourth Quarter and Full Year 2018 Update, the company stated:

> Model 3 production volumes in Fremont should gradually continue to grow throughout 2019 and reach a sustained rate of 7,000 units per week

> by the end of the year. We are planning to continue to produce Model 3 vehicles at maximum production rates throughout 2019. Inclusive of Gigafactory Shanghai, where we are initially aiming for 3,000 Model 3 vehicles per week, **our goal** is to be able to produce 10,000 vehicles per week on a sustained basis. Barring unexpected challenges with Gigafactory Shanghai, we are **targeting annualized** Model 3 output in excess of 500,000 units **sometime between Q4 of 2019 and Q2 of 2020.**

Tesla Fourth Quarter & Full Year Update (Jan. 30, 2019), attached hereto as Exhibit 5, at 5 (emphasis added). There was no pre-approved written communication anywhere in the January 30 communications that stated that Tesla would make around 500,000 cars in the 2019 year.

In addition to not being pre-approved as required by the Court's Final Judgment Musk's 7:15 tweet was evidently inaccurate. This undoubtedly explains why Tesla's Securities Counsel, upon seeing the tweet for the first time along with the general public via Musk's Twitter feed, immediately arranged to meet with Musk and draft the corrective statement that Musk tweeted out over four hours later.

Musk's 7:15 tweet contained information about Tesla's 2019 production that was material to Tesla and its shareholders. As a result, his failure to obtain pre-approval prior to publishing the tweet was a violation of the Court's Final Judgment. Musk's admission that he failed to seek or obtain pre-approval is clear and convincing evidence of the violation.

Moreover, Musk's violation of the Final Judgment is not merely a technical one. As a result of his failure to comply with the Court's Final Judgment and seek pre-approval of his 7:15 tweet, he once again published inaccurate and material information about Tesla to his over 24 million Twitter followers, including members of the press, and made this inaccurate information available to anyone with Internet access.

### C. Musk Has Not Diligently Attempted to Comply with the Court's Final Judgment.

Musk has not made a diligent or good faith effort to comply with the provision of the Court's Final Judgment requiring pre-approval of his written communications about Tesla. Less than two months after the Court entered its Final Judgment, Musk publicly indicated that he was not serious about compliance with this provision. On December 9, 2018, the CBS television program *60 Minutes* aired an interview of Musk by Lesley Stahl that had taken place the previous week. *Tesla CEO Elon Musk: The 60 Minutes Interview*, https://www.cbsnews.com/news/tesla-ceo-elon-musk-the-2018-60-minutes-interview (Dec. 9, 2018). During the interview, Stahl asked Musk about Tesla's oversight of his tweets after his settlement with the SEC:

Lesley Stahl: Have you had any of your tweets censored since the settlement?

Elon Musk: No.

Lesley Stahl: None? Does someone have to read them before they go out?

Elon Musk: No.

Lesley Stahl: So your tweets are not supervised?

Elon Musk: The only tweets that would have to be say reviewed would be if a tweet had a probability of causing a movement in the stock.

Lesley Stahl: And that's it?

Elon Musk: Yeah, I mean otherwise it's, "Hello, First Amendment." Like Freedom of Speech is fundamental.

**Lesley Stahl: But how do they know if it's going to move the market if they're not reading all of them before you send them?**

**Elon Musk:** **Well, I guess we might make some mistakes. Who knows?**

**Lesley Stahl:** **Are you serious?**

**Elon Musk:** **Nobody's perfect.**

Lesley Stahl: Look at you.

Elon Musk: I want to be clear. I do not respect the SEC. I do not respect them.

Lesley Stahl: But you're abiding by the settlement, aren't you?

Elon Musk: Because I respect the justice system.

*Id.* (emphasis added).

At the time of this interview, Tesla had not yet implemented its Court-mandated procedures governing oversight of Musk's tweets about Tesla. But before the Policy even took effect, Musk's statements in the interview, "I guess we might make some mistakes," and "Nobody's perfect," support the view that he did not intend to diligently attempt to comply with the Policy or, in turn, the Court's Final Judgment.

In fact, in response to the SEC's February 20 request for information, Musk and Tesla state that, since Tesla's Policy was implemented in December 2018, Musk's tweets have been reviewed *after* their publication, but there is no suggestion that Musk has sought or obtained pre-approval of any tweet prior to publishing it. *See* Exhibit 4, at 2 (providing examples of written communications that have been pre-approved that do not include any of Musk's tweets; noting that Designated Securities Counsel has reviewed "past written communications."). While Musk claims to "respect the justice system," his deliberate indifference to compliance with this Court's Final Judgment indicates otherwise.

## CONCLUSION

For all the reasons stated, the SEC respectfully requests that the Court enter an order to show cause why Defendant Elon Musk should not be held in contempt of the Court's October 16, 2018 Final Judgment.

Dated: February 25, 2019

*s/ Cheryl L. Crumpton*_____
Cheryl L. Crumpton*
E. Barrett Atwood*

*Admitted *pro hac vice*

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4459 (Crumpton)
crumptonc@sec.gov

44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2467 (Atwood)
atwoode@sec.gov

Of counsel:

Erin E. Schneider
Steven Buchholz
Walker S. Newell

**CERTIFICATE OF SERVICE**

I certify that on February 25, 2019, a copy of the foregoing was filed through the Court's CM/ECF system, which will send copies to all counsel of record.

*s/ Cheryl L Crumpton*_____
Counsel for the SEC