**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br>vs.<br><br>ELON MUSK,<br><br>        Defendant. | Case No. 1:18-cv-8865-AJN-GWG |

## RESPONSE TO ORDER TO SHOW CAUSE WHY DEFENDANT ELON MUSK SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING THE COURT'S FINAL JUDGMENT

5491445

TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 4

I.      The Settlement .............................................................................................. 4

II.     The February 19, 2019 Tweets and Prior Disclosures ................................. 5

III.    Musk's Post-Tweet Response ....................................................................... 7

IV.     SEC's Post-Tweet Response ......................................................................... 8

V.      Market's Post-Tweet Response ..................................................................... 8

LEGAL STANDARD ................................................................................................ 9

ARGUMENT ............................................................................................................. 9

I.      Musk Did Not Violate the Order, Much Less Clearly So ............................. 9

        A.      The 7:15 Tweet Was Not Material ...................................................... 10

        B.      The SEC Has Not Shown the Tweet Contained, or Reasonably
                Could Contain, Material Information ................................................... 13

II.     Musk Diligently Attempted to Comply with the Order in a Reasonable
        Manner ......................................................................................................... 16

        A.      Musk Has Significantly Altered His Communications with the
                Public as a Result of the Order ........................................................... 16

        B.      Musk's Actions on February 19 Demonstrated Diligence ................. 17

        C.      The SEC's Purported Evidence of Lack of Diligence Is
                Uncompelling ...................................................................................... 18

III.    The SEC's Interpretation of the Order Raises Significant Constitutional
        Concerns ...................................................................................................... 20

CONCLUSION ......................................................................................................... 25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*,
  340 U.S. 593 (1951) .......................................................................................... 23

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) .......................................................................................... 21

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ..................................................................................... 2, 10

*Blake v. Carbone*,
  489 F.3d 88 (2d Cir. 2007) ............................................................................. 25

*Carroll v. President & Comm'rs of Princess Anne*,
  393 U.S. 175 (1968) ........................................................................................ 21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ............................................................................ 12

*Cooke v. United States*,
  267 U.S. 517 (1925) ................................................................................ 4, 5, 19

*Crosby v. Bradstreet Co.*,
  312 F.2d 483 (2d Cir. 1963) ............................................................................ 24

*Crowell v. Benson*,
  285 U.S. 22 (1932) .......................................................................................... 25

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
  485 U.S. 568 (1988) ........................................................................................ 25

*El Badrawi v. United States*,
  787 F. Supp. 2d 204 (D. Conn. 2011) ............................................................. 25

*Empire HealthChoice Assurance, Inc. v. McVeigh*,
  396 F.3d 136 (2d Cir. 2005) ............................................................................ 25

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ...................................................................... 10, 11

*Gayety Theatres, Inc. v. City of Miami*,
  719 F.2d 1550 (11th Cir. 1983) ...................................................................... 21

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010) ....................................................... 10, 15

TABLE OF AUTHORITIES (cont.)

Page(s)

*Grenada Cnty. Supervisors v. Brown*,
  112 U.S. 261 (1884) ........................................................................................ 25

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
  Scotland Grp., PLC*,
  783 F.3d 383 (2d Cir. 2015) ........................................................................... 11

*In re Duane Reade Inc. Sec. Litig.*,
  2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ............................................... 12

*In re Halkin*,
  598 F.2d 176 (D.C. Cir. 1979) ........................................................................ 24

*In re IBM Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998) ........................................................................... 12

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006) ............................................................. 15

*In re Weiss*,
  703 F.2d 653 (2d Cir. 1983) ............................................................................. 9

*Jeri-Jo Knitwear, Inc. v. Club Italia, Inc.*,
  94 F. Supp. 2d 457 (S.D.N.Y. 2000) ............................................................... 16

*John Doe, Inc. v. Mukasey*,
  549 F.3d 861 (2d Cir. 2008) ........................................................................... 21

*King v. Allied Vision, Ltd.*,
  65 F.3d 1051 (2d Cir. 1995) ............................................................................. 9

*King v. Allied Vision, Ltd.*,
  919 F. Supp. 747 (S.D.N.Y. 1996) .................................................................. 16

*Lasker v. N.Y. State Elec. & Gas Corp.*,
  85 F.3d 55 (2d Cir. 1996) ............................................................................... 12

*Madsen v. Women's Health Ctr.*,
  512 U.S. 753 (1994) ........................................................................................ 21

*Matrix Essentials v. Quality King Distribs., Inc.*,
  346 F. Supp. 2d 384 (E.D.N.Y. 2004) ............................................................ 17

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*,
  239 F.3d 172 (2d Cir. 2001) ..................................................................... 21, 22

TABLE OF AUTHORITIES (cont.)

Page(s)

*Nadoff v. Duane Reade, Inc.*,
107 F. App'x 250 (2d Cir. 2004) ................................................................. 12

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976) .................................................................................... 20

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
369 F.3d 645 (2d Cir. 2004) ................................................................ 1, 2, 9

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) .......................................................................... 12

*Reno v. ACLU*,
521 U.S. 844 (1997) .................................................................................... 22

*Robert Half, Inc. v. Romac Int'l, Inc.*,
101 F. Supp. 2d 223 (S.D.N.Y. 2000) ........................................................ 17

*SEC v. Citigroup Glob.Markets Inc.*,
827 F. Supp. 2d 328 (S.D.N.Y. 2011) ........................................................ 24

*SEC v. Sky Way Glob., LLC*,
710 F. Supp. 2d 1274 (M.D. Fla. 2010) ..................................................... 23

*Slayton v. Amer. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010) ....................................................................... 12

*Stadnick v. Vivint Solar, Inc.*,
861 F.3d 31 (2d Cir. 2017) ......................................................................... 10

*United States v. Contorinis*,
692 F.3d 136 (2d Cir. 2012) ....................................................................... 14

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000) .................................................................................... 21

*United States v. Quattrone*,
402 F.3d 304 (2d Cir. 2005) ................................................................. 20, 21

*Wojnarowicz v. Am. Family Ass'n*,
772 F. Supp. 201 (S.D.N.Y. 1991) ....................................................... 16, 17

**Statutes**

15 U.S.C. § 77z–2(c)(1)(B)(i) ..................................................................... 12

## TABLE OF AUTHORITIES (cont.)

Page(s)

15 U.S.C. § 78u-5(c)(1)(B)(i) ................................................................................................ 12

15 U.S.C. § 78u(d)(1) ............................................................................................................ 23

5491445

## INTRODUCTION

Elon Musk ("Musk") did not violate this Court's Final Judgment (the "Order"), and there is no basis to issue contempt sanctions against him. The Securities and Exchange Commission's ("SEC's") request that Musk be held in civil contempt for a single, immaterial tweet that dutifully complied with the Order and with Tesla's "Senior Executives Communications Policy" (the "Policy") is incorrect on the facts and on the law.

*First*, a party can only be held in contempt if there is clear and convincing evidence that an unambiguous court order was violated. *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004). The Order requires that Musk comply with Tesla's Policy on the pre-approval of certain communications "that contain, or reasonably could contain, information material to [Tesla] or its shareholders." 1:18-cv-8865-AJN-GWG, Dkt. No. 14 at 14. As Tesla has confirmed, Musk has complied with the Policy, which permits Musk to exercise his reasonable discretion in the first instance to determine whether his communications contain information requiring pre-approval.[1] As relevant here, Musk correctly used his discretion to determine that his 7:15 pm tweet was not material and did not contain information that could reasonably be considered material. The definition of materiality is well-settled under the securities law. "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure . . . would have been viewed by the reasonable investor as having significantly altered

---

[1] The Policy provides that an "Authorized Executive," which includes Musk, may use written communications "to disseminate information relating to Tesla," subject to following certain procedures, and specifies that one such procedure is seeking pre-approval of posts that "contain, or reasonably could contain," material information. Dkt. No. 18-1 at 1. As explained by Tesla to the SEC, Tesla's Policy entrusts the Authorized Executive (here, Musk) with the discretion in the first instance to determine whether a communication "reasonably could contain" material information that would require pre-approval. Mar. 11, 2019 Letter from M. Martens to C. Crumpton (attached hereto as Exhibit 8). In addition to granting preliminary discretion to the Executive, the Policy also provides that Tesla will periodically review the Executive's statements that have already been communicated and provide guidance should it be necessary. Tesla and Musk have done so here.

the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted). Here, the tweet was simply Musk's shorthand gloss on and entirely consistent with prior public disclosures[2] detailing Tesla's anticipated production volume. Moreover, it is clear from the context of the tweet that it was celebratory and forward-looking—a type of statement that courts have concluded is immaterial as a matter of law. Musk was rightfully proud of the work he and his team had done to get Tesla from a point where it produced no cars to a point where it would be producing hundreds of thousands of vehicles. Under no fair reading of the materiality standard did Musk's proud and optimistic restatement of publicly disclosed information, coming after the market closed, "significantly alter" the total mix of information available to investors. The Court need not go further to discharge its Order to Show Cause.

*Second*, even if Musk were incorrect in his judgment that the tweet was not nor reasonably could be considered material—a view shared by Tesla and reflected by the market's non-reaction—he cannot be held in contempt unless there is evidence that he did not diligently attempt to comply with the Order. *Paramedics Electromedicina Comercial, Ltda.*, 369 F.3d at 655. Musk's conduct since entry of the Order, and his conduct with respect to the particular tweet at issue, demonstrates the opposite. He has diligently attempted to comply with the Order. Since entry of the Order, Musk has dramatically reduced his volume of tweets generally and regarding Tesla in particular. This self-censorship is reflective of his commitment to adhering to the Order and avoiding unnecessary disputes with the SEC. Indeed, Musk's actions on February 19, 2019, underscore his diligence. Despite his view that there was no need for a subsequent clarification

---

[2] Tesla's January 30, 2019 Fourth Quarter & Full Year 2018 Update; Tesla's January 30, 2019 Earnings Call; Tesla's February 19, 2019 Annual Report (10-K); and Tesla's January 2, 2019 Form 8-K.

5491445

tweet, Musk posted such a clarification promptly after speaking with Disclosure Counsel and without any intervention by the SEC.

*Third*, the Order as the SEC interprets it would raise serious First Amendment issues and implicate other constitutional rights.  The SEC seeks to rewrite the Order to eliminate Musk's discretion, effectively requiring Musk to seek pre-approval of any tweet that relates to Tesla, regardless of its significance, prior dissemination, or nature.  Such a broad prior restraint would violate the First Amendment.  Moreover, the SEC seeks to procure through a contempt proceeding enforcement power that is far broader and less clearly defined than the power Congress has granted it via statute.  The Court should construe the Order narrowly to avoid applying it in a way that would raise significant constitutional concerns.

This contempt action, following Musk's sincerely-held criticism of the SEC on *60 Minutes*, also reflects concerning and unprecedented overreach on the part of the SEC.  The SEC no doubt recognizes that "exercise [of contempt power] is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions," *Cooke v. United States*, 267 U.S. 517, 539 (1925), and it is rare for the agency to seek a contempt order.  Virtually every SEC contempt motion in recent years has sought to preserve assets, to recover money owed to the agency, to enforce a prohibition against issuance of securities or solicitation of investors, or to enforce compliance with an investigative subpoena.  The SEC has not cited—and counsel has not identified—any prior case in the last decade where the SEC has sought a contempt order to enforce the type of injunction at issue here.[3] This case should not be the first.

---

[3] *See, e.g.*, *SEC v. Roger S. Bliss, et al.*, No. 2:15-cv-00098, Dkt. No. 84 (D. Utah Aug. 14, 2015) (contempt order for violating asset freeze); *SEC v. James M. Louks et al.*, No. 15-cv-3456, Dkt. No. 86 (D. Minn. Sep. 30, 2016) (contempt order for violating order to halt raising money from investors); *SEC v. Sethi Petroleum, LLC and Sameer P. Sethi*, No. 4:15-cv-338, Dkt. No. 169 (E.D. Tex. Aug. 9, 2016) (contempt order for violating preliminary injunction restraining defendants from participating in securities offerings); *SEC v. Anvil Partners, Inc.*, 1:17-mc-

Musk respectfully requests that the Court's Order to Show Cause be discharged.

## FACTUAL BACKGROUND

### I.    The Settlement

On September 27, 2018, the SEC filed a complaint against Musk related to statements he had published on Twitter in August 2018 about a potential transaction to take Tesla private.  Two days later, the SEC reached settlement agreements with Musk and Tesla.

On October 16, 2018, the Court entered a Final Judgment as to Musk (the "Order").  *See* Dkt. No. 14.  The Order reflects Musk's obligations under the settlement.  As relevant here, the Order enjoins Musk from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  *Id.* at 10-11.  It also requires Musk to "comply with all mandatory procedures implemented by Tesla, Inc. . . . regarding . . . the pre-approval of any [] written communications that contain, or reasonably could contain, information material to [Tesla] or its shareholders."  *Id.* at 13-14.  The Order itself does not specify a protocol for pre-approval of Tesla-related tweets; rather, it directs Musk to comply with Tesla's policies regarding certain tweets.

Tesla, in turn, enacted a "Senior Executives Communications Policy" on December 11, 2018 (the "Policy").  *See* Dkt. No. 18-1.  The Policy mandates that any of Musk's "Written Communications" that "contain, or reasonably could contain, information material to Tesla or its stockholders" must be submitted to Tesla's General Counsel and Disclosure Counsel for pre-approval prior to publication.  *Id.* at 1.  The Policy lists various categories of information that "may, depending on its significance, be material," including, among other things, production progress or delays, sales or delivery numbers, projections, forecasts, or estimates regarding Tesla business.  *Id.*  The Policy also provides that, if Musk plans to publish a communication that

---

00318, Dkt. No. 22 (S.D.N.Y. Dec. 19, 2017) (contempt order for failing to comply with SEC subpoena).

contains, or reasonably could contain, material information more than two days after that communication was pre-approved, Musk must re-confirm the pre-approval.  *Id.* at 2.  The Policy does not contain any requirement to obtain a second pre-approval after the information in question has been publicly disseminated.

As Tesla has explained, the Policy was drafted to permit Musk to determine, in the first instance, whether a communication "contain[s], or reasonably could contain," material information requiring pre-approval.  Ex. 8 at 2-3; Declaration of Elon R. Musk (Musk Decl.) ¶ 6.

## II.   The February 19, 2019 Tweets and Prior Disclosures

Musk posted a series of tweets on February 19, 2019.  Musk. Decl. ¶¶ 8, 12.  At 7:02 p.m. ET, Musk tweeted, "4000 Tesla cars loading in SF for Europe."  *Id.* ¶ 8.  The tweet attached a photograph depicting thousands of Tesla vehicles on a loading dock in the San Francisco Bay.  *Id.* A few minutes later, at 7:15 p.m. ET, Musk tweeted, "Tesla made 0 cars in 2011, but will make around 500k in 2019" (the "7:15 tweet").  *Id.*  The 7:15 tweet was linked to the 7:02 tweet.

At the time Musk posted these tweets, Tesla had already disclosed in recent public statements information relating to its current and anticipated 2019 production volumes.   On January 2, 2019, Tesla filed a Form 8-K reporting its Fourth Quarter 2018 production numbers, stating in part:

> Production in Q4 grew to 86,555 vehicles, 8% more than our prior all-time high in Q3. This included:
> - 61,394 Model 3 vehicles, in line with our guidance and 15% more than Q3.
> - 25,161 Model S and X vehicles, ***consistent with our long-term run rate of approximately 100,000 per year***."

Form 8-K (Jan. 2, 2019), attached hereto as Exhibit 1, at 5 (emphasis added).

- 5 -

On January 30, 2019, Tesla released its financial results for the fiscal quarter and year ended December 31, 2018 by posting its Fourth Quarter & Full Year 2018 Update letter (the "Update") on its website and filing a copy of the letter with the SEC.  The letter stated, in part:

> Model 3 production volumes in Fremont should gradually continue to grow throughout 2019 and reach a sustained rate of 7,000 units per week by the end of the year.  We are planning to continue to produce Model 3 vehicles at maximum production rates throughout 2019.  Inclusive of Gigafactory Shanghai, where we are initially aiming for 3,000 Model 3 vehicles per week, our goal is to be able to produce 10,000 vehicles per week on a sustained basis. Barring unexpected challenges with Gigafactory Shanghai, we are targeting annualized Model 3 output *in excess of 500,000 units* sometime between Q4 of 2019 and Q2 of 2020.

Tesla Fourth Quarter & Full Year 2018 Update (Jan. 30, 2019), attached hereto as Exhibit 2, at 6 (emphasis added).

This information was discussed in a January 30, 2019 earnings call (the "Earnings Call"), which included the following comments by Musk and Tesla's then-CFO Deepak Ahuja:

> [MUSK]: [W]e do feel quite confident at this point, at least for the factories that are in our control, that we can achieve volume production in Shanghai by the end of the year. And that should allow us to get to the 10,000 vehicles a week rate, or very close to it, by the end of the year.
>
> . . .
>
> [ANALYST]: Can you talk a little bit about the geographic dispersion for the guidance for 2019, where you're expecting the Model 3s to sell through as well as the other models?
> ELON R. MUSK: Well, I think we did, actually. Yes, it's clear in our letter.
> DEEPAK AHUJA: Correct. We indicated in Q1, we will start delivering Model 3s in Europe and China. And we also shared a chart showing the potential market size for mid-sized premium sedans in North America, Europe and Asia, suggesting those markets can be even bigger. So I think that gives a good sense of where we'll be. And we'll launch the right-hand drive version at some point to go to the other markets.
> ELON R. MUSK: Yes, it's *maybe on the order of 350,000 to 500,000 Model 3s*, something like that this year.

- 6 -

5491445

Q4 2018 Tesla Inc. Earnings Call Transcript (Jan. 30, 2019), attached hereto as Exhibit 3, at 5, 8 (emphasis added).

Finally, on February 19, 2019—*the same day* that Musk posted his comments on Twitter—Tesla filed its Form 10-K for 2018, which reiterates information contained and discussed in the prior disclosures and the Earnings Call, including the following:

> At the Tesla Factory, we expect to continue to increase our Model 3 production rate to approximately 7,000 units per week on a sustained basis by the end of 2019. Moreover, in China, we expect to commence production of certain trims of Model 3 for the local market in China in the initial phase of our Gigafactory Shanghai by the end of 2019, and then progressively increase levels of localization through local sourcing and manufacturing. Inclusive of Gigafactory Shanghai, our goal is to be able to produce 10,000 Model 3 vehicles per week on a sustained basis, and an annualized output rate ***in excess of 500,000 Model 3 vehicles*** sometime between the fourth quarter of 2019 and the second quarter of 2020.

Form 10-K (Feb. 19, 2019), excerpts attached hereto as Exhibit 4, at 3 (emphasis added). The Form 10-K also includes lengthy disclosures regarding the risks and assumptions affecting Tesla's production projections. Ex. 4 at 3-24.

## III.    Musk's Post-Tweet Response

Tesla's Disclosure Counsel reviewed Musk's 7:15 tweet shortly after it was posted. Musk Decl. ¶ 12. This was consistent with the Policy, which provides that Tesla will periodically review tweets after they are posted and provide feedback if necessary. Ex. 8 at 3. As Tesla has confirmed to the SEC, the company does not view the tweet as material, or possibly material, and does not believe it required pre-approval under the Policy. *See* Ex. 8 at 3-4. However, out of an abundance of caution and because pundits and others tend to scrutinize statements by Musk and Tesla for criticism, Musk posted another tweet at 11:41 p.m. ET. Musk Decl. ¶ 12.

## IV.     SEC's Post-Tweet Response

On Wednesday, February 20, 2019, the SEC sent letters to counsel for Musk and for Tesla, demanding to know whether the 7:15 tweet had been pre-approved.  *See* Dkt. Nos. 18-2, 18-3.  On Friday, February 22, 2019, counsel responded on behalf of Tesla and Musk, confirming that the 7:15 tweet was not pre-approved and explaining Tesla's determination that pre-approval was not required under the Policy.  Dkt. No. 18-4.  The letter also included steps Musk and Tesla have taken, and continue to take, to comply with the Order.  *Id.* at 1-2.

On Sunday, February 24, 2019, the SEC sent a further request for information to Musk and Tesla, demanding a response on the same day (i.e., on Sunday).  *See* Feb. 24, 2019 Email from C. Crumpton to B. Bondi, attached hereto as Exhibit 5.  Musk's counsel responded that he could not provide an immediate response, as the request sought substantial information and it was a Sunday, but that counsel would likely be able to respond in full on the following day, Monday, February 25.  *See* Feb. 24, 2019 Email from B. Bondi to C. Crumpton, attached hereto as Exhibit 6.  Rather than providing Tesla or Musk a reasonable opportunity to respond, on Monday, February 25, 2019, the SEC moved for an order to show cause why Musk should not be held in contempt.  *See* SEC's Motion and Memorandum of Law in Support of an Order to Show Cause ("Mot.").  Despite having moved for a contempt order, however, the SEC continued to investigate the facts surrounding the 7:15 tweet, sending *another* letter to Tesla on February 26, 2019, that contained 11 additional Requests for Information.  *See* Feb. 26, 2019 Letter from C. Crumpton to B. Bondi, attached hereto as Exhibit 7.  Counsel for Tesla responded to that letter on March 11, 2019.  *See* Ex. 8.

## V.     Market's Post-Tweet Response

As confirmed by the declaration of Dr. Christopher Noe, the 7:15 tweet did not cause any notable move in Tesla's stock price in the after-hours market and was plainly not material to

- 8 -

shareholders.   Declaration of Christopher F. Noe, PhD ("Noe Decl.") ¶ 21 (noting a .09% movement in the stock price in after-hours trading).  By contrast, the SEC's filing a motion seeking to hold Musk in contempt caused a 3.4% decline in Tesla's stock price during after-hours trading. *Id.* ¶¶ 21, 30.

## LEGAL STANDARD

"A party may be held in civil contempt for failure to comply with a court order if (1) the order the [party] failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the [party] has not diligently attempted to comply in a reasonable manner."  *Paramedics Electromedicina Comercial, Ltda.*, 369 F.3d at 655 (internal quotation marks omitted).  "In a civil contempt proceeding . . . the government must prove its case by clear and convincing proof of violation of a court decree; a bare preponderance of the evidence will not suffice."  *In re Weiss*, 703 F.2d 653, 662 (2d Cir. 1983) (internal quotation marks omitted).  As the Second Circuit cautions, "a contempt order . . . is a potent weapon to which courts should not resort when there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (internal quotation marks and citations omitted).

## ARGUMENT

### I.   Musk Did Not Violate the Order, Much Less Clearly So.

Proof of non-compliance is not "clear and convincing" because Musk did not violate the Order.  The 7:15 tweet was not material given the total mix of information available, and Musk exercised his discretion reasonably in making that determination.  The SEC's arguments to the contrary are unpersuasive, and the SEC has therefore failed to carry its burden of proving contempt by clear and convincing evidence.

5491445

### A.    The 7:15 Tweet Was Not Material.

It is well established that a statement is material for purposes of the federal securities laws only if there is a "substantial likelihood that the disclosure . . . would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc.*, 485 U.S. at 231-32; *see also Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017) (a statement or omission is material "if a reasonable investor would view [it] as significantly altering the total mix of information made available" (internal quotation marks omitted)).  Musk's 7:15 tweet did not significantly alter the total mix of information available to investors, and he thus reasonably determined that it did not contain material information.

Prior to Musk's posting of the 7:15 tweet, the subject matter and substance of the tweet— i.e., Tesla's projected production and rates of production for 2019—had been publicly disclosed in multiple documents and discussed at length in an earnings call.  As noted above, on January 2, 2019, Tesla filed a Form 8-K reporting its Q4 2018 production of "25,161 Model S and X vehicles, consistent with our long-term run rate of approximately 100,000 per year."  Ex. 1 at 5.  Then, during the January 30 Earnings Call, Musk stated that Model 3 production in 2019 would be on the order of "350,000 to 500,000" vehicles.  Ex. 3 at 8.  Tesla similarly disclosed in its January 30 Update and February 19 Form 10-K that it was "targeting annualized Model 3 output in excess of 500,000 units sometime between Q4 of 2019 and Q2 of 2020."  Ex. 4 at 3.  Thus, whether one adds the production estimates for the three models (S, X, and 3) together or even considers projections for the Model 3 alone, Musk's statement that Tesla would make "around 500k" "cars" in 2019 was within previously disclosed ranges.  The tweet simply was not "news."  Because this constitutes "information already known on the market," it is "immaterial."  *Gissin v. Endres*, 739 F. Supp. 2d 488, 502 (S.D.N.Y. 2010); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167

- 10 -

(2d Cir. 2000) ("A defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known.").

The immateriality of the 7:15 tweet is confirmed by an analysis of the after-hours trading market. *See generally* Noe Decl. ¶¶ 14-34. After Musk posted the 7:15 tweet, there was no noticeable change in either the after-hours trading price or volume. *Id.* ¶¶ 21-22 (noting a .09% change in the stock price after the 7:15 tweet, and that after-hours trading volume after the 7:15 tweet was less than .01% of the shares of outstanding common stock). This is probative evidence that the 7:15 tweet was not material to shareholders. *Id.* ¶ 23.[4]

Moreover, the 7:15 tweet was not posted in a vacuum. Just minutes earlier, at 7:02 p.m., Musk tweeted, "4000 Tesla cars loading in SF for Europe." Musk. Decl. ¶ 8. Attached to that tweet was a photograph of thousands of Tesla vehicles on a dock on the San Francisco Bay, ready for shipping abroad. *Id.* The message was that Tesla has come a long way and is now flourishing globally. At 7:15 p.m., Musk tweeted—in a tweet linked in a chain to the 7:02 tweet—"Tesla made 0 cars in 2011, but will make around 500k in 2019." *Id.* This was a celebratory string of tweets, expressing excitement about Tesla's success since 2011 and pride for what Tesla anticipated achieving in 2019. *Id.* To any reasonable observer, this is a statement of pride and optimism, not of guidance. *See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015) ("Statements of general corporate optimism . . . do not give rise to securities violations.").

---

[4] By contrast, significant trading volume and price movement can occur in after-market or pre-market trading when material events occur during those periods. Noe Decl. ¶ 30. For example, the SEC filed its motion for an order to show cause regarding contempt on February 25, 2019, during after-market trading hours. *Id.* After the filing, there was a significant 3.4% decrease in Tesla's stock price, and a spike in trading volume to an average of 222,674 shares traded per hour—approximately 17 times higher than the hourly trading volume after the 7:15 tweet. *Id.*

The 7:15 tweet—that Tesla "*will make around*" 500,000 cars—was also aspirational and forward-looking on its face.  Courts have repeatedly held that non-specific statements concerning anticipated future performance are immaterial as a matter of law.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) ("To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome . . ."); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (holding statements not material where they reflected "expressions of optimism or projections about the future").[5]  Here, the statement with which the SEC takes issue concerns general estimates of expected future production levels.  Reasonable investors are expected to use caution in evaluating such forward-looking statements, which carry with them a strong presumption of immateriality.  *See, e.g.*, *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *5 (S.D.N.Y. Nov. 25, 2003) (citing *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58 (2d Cir. 1996) for the proposition that "future earnings, sales goals, and the Company's desire to achieve continued prosperity are just the sort of predictive statements of opinion and belief that courts have found immaterial" and thus finding "protected forward-looking opinions and inactionable puffery" when defendant stated that "we anticipate achieving sales of approximately $355 million and expect diluted earnings per share will range from $.40-$.44") (internal quotation marks and alterations omitted), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (holding that a company's statement that "regulatory changes" had created a marketplace for one

---

[5] Statements of this type are not actionable in private litigation unless a plaintiff can "prove that the forward-looking statement . . . was made with actual knowledge by that person that the statement was false or misleading."  15 U.S.C. § 77z–2(c)(1)(B)(i); 15 U.S.C. § 78u-5(c)(1)(B)(i) (same); *see Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  Not even the SEC argues that Musk deliberately made a false or misleading statement.

of its business lines with "an expected annual growth rate of 10% to 30% over the next several years" was the kind of "[s]oft" and "puffing" statement that generally lacked materiality, "because the market price of a share is not inflated by vague statements predicting growth").

The 7:15 tweet was a celebratory, aspirational, and forward-looking statement on a topic that had been the subject of multiple written disclosures by Tesla—including a Form 10-K filed the same day the tweet was posted—as well as an extensive discussion by company executives on a recent earnings call. The tweet thus would not have been perceived by a reasonable investor (and was not perceived by the market) as having "significantly altered the total mix of information" already available. Musk therefore properly utilized the discretion granted to him under the Policy when he determined that the tweet was not material and did not require pre-approval.

### B. The SEC Has Not Shown the Tweet Contained, or Reasonably Could Contain, Material Information.

Remarkably, the SEC does not even argue that the 7:15 tweet was, in fact, material. Rather, the SEC states that the tweet was "reasonably likely" to contain material information because Tesla's Policy lists "'projections, forecasts, or estimates regarding Tesla's business'" as *examples* of subjects "that may be material to Tesla and its shareholders." Mot. at 8. This clearly misreads the Policy, which states that information on these and other subjects "may, *depending on its significance*, be material to Tesla or its stockholders[.]" Dkt. No. 18-1 at 1 (emphasis added). In other words, whether or not a statement fits in one of the listed categories is not determinative of whether the statement requires pre-approval. Rather, the question under the Policy is still one of "significance"—i.e., whether the statement is or could contain *material* information. Tesla has confirmed that with respect to the 7:15 tweet, Musk's decision not to submit the statement for pre-approval complied with the Policy. Ex. 8 at 3-4.

The SEC argues that notwithstanding the Policy's plain wording and Tesla's interpretation of it, the Court should interpret the Policy, and therefore the Order, to require categorical pre-approval of *every* statement that arguably falls into any of the numerous and non-exhaustive categories listed in the Policy, irrespective the statement's significance and materiality.  Such an interpretation would go well beyond the requirements of the Order and the Court's authority.

When enforcing a consent decree, "a district court may not impose obligations on a party that are not unambiguously mandated by the decree itself," and any portions of a contempt order that are "inconsistent with or beyond the scope" of the decree are therefore invalid.  *King*, 65 F.3d at 1058.  The Order requires Musk to "comply with all mandatory procedures implemented by" Tesla.  Dkt. No. 14 at 13-14.   Tesla has confirmed that the 7:15 tweet did not require pre-approval and that Musk complied with the Policy.  Ex. 8 at 3-4.  The plain words of the policy, and Tesla's determination that the 7:15 tweet complied with it, are thus determinative of his obligation under the Order.  Dkt. No. 14 at 13-14.

The SEC also claims that the tweet is inaccurate when compared with the January 30 Update.  But, again, the SEC fails to consider the total mix of information available to investors.  The Update was a ten-page, detailed analysis of Tesla's latest financials and outlook.  The Form 10-K was similarly detailed and included a lengthy discussion of the risks and assumptions underlying Tesla's production estimates.  In the January 30 Earnings Call, which the SEC ignores, Musk and other Tesla executives had extensive discussions with analysts regarding Model 3 production and deliveries.  The 7:15 tweet was a shorthand gloss on topics that had already been covered in depth in company filings and an earnings call with analysts.  Any reasonable investor would have read the tweet with reference to the much more thorough disclosures and extensive discussions on the same topic.  *See United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012)

- 14 -

(information "comes in varying degrees of specificity and reliability, and the extent to which a newly reported item of information alters the total mix may depend on the specificity or reliability of that information"); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) ("In reviewing forward-looking statements, courts are instructed to consider the total mix of information and are supposed to bear in mind that disclosure requirements are not intended to attribute to investors a child-like simplicity.  Rather, investors are presumed to have the ability to be able to digest varying reports and data." (quotations and citations omitted)).

Finally, the SEC claims that even if the tweet was not material and even if Musk was simply restating previously disclosed information, Musk still violated the Policy's procedures because more than two days had lapsed since that information first had been approved.  Mot. at 9.  To support its position, the SEC points to a provision in the Policy that requires Musk to seek reconfirmation if he desires to release a communication he has had pre-approved more than two days after the pre-approval.  Dkt. No. 18-1 at 2.  But as Tesla has explained to the SEC, Tesla's Policy does not operate that way: "This provision addresses the time frame in which a pre-approved communication must be released in order for the pre-approval to remain effective, not whether a communication is subject to mandatory pre-approval in the first instance."  Ex. 8 at 3.  That is, the Policy *does not* operate to require Musk to seek pre-approval of any communication that once was pre-approved and then publicly disclosed.  Such a requirement would make no sense, because "information already known on the market is . . . immaterial."  *Gissin*, 739 F. Supp. 2d at 502.  Because Musk believed that his statement was re-iterating information that had already been

publicly disseminated, he reasonably believed that the 7:15 tweet contained no material information (and thus did not require pre-approval under the Policy).[6]

## II.     Musk Diligently Attempted to Comply with the Order in a Reasonable Manner.

A party will not be held in contempt unless it has been shown that the party "has not been reasonably diligent and energetic in attempting to accomplish what was ordered."  *King v. Allied Vision, Ltd.*, 919 F. Supp. 747, 752 (S.D.N.Y. 1996) (internal citation and quotation marks omitted).  In assessing a party's diligence, courts in this District generally require a showing of intent, sometimes amounting to willfulness, before a party will be held in contempt.  *Jeri-Jo Knitwear, Inc. v. Club Italia, Inc.*, 94 F. Supp. 2d 457, 459 (S.D.N.Y. 2000) ("I can not, however, conclude on the total record before me that defendants' conduct is of that flouting willfulness to have earned the denomination 'contemnor.'"); *Wojnarowicz v. Am. Family Ass'n*, 772 F. Supp. 201, 202 (S.D.N.Y. 1991) ("While the Court is troubled by the mailings and the potential damage that may come to plaintiff therefrom, it finds no 'willfulness' on the part of defendants and concludes that the mailings were mistakes from which no malevolence may be presumed.").  Musk has diligently attempted to comply with the Order, both generally, as reflected by significant changes to his tweeting behavior since the Order was entered, and specifically with respect to his actions on February 19, 2019.

### A.     Musk Has Significantly Altered His Communications with the Public as a Result of the Order.

Musk has approached his Tesla-related communications, especially Twitter communications, with a significantly heightened awareness as part of his commitment to adhering to the Order and Tesla's Policy.  Compared to the three months prior to the August tweets (May,

---

[6] Additionally, Tesla production numbers were published on February 19, 2019 in Tesla's Form 10-K.  This document is formally reviewed by Tesla for accuracy.

June, and July 2018), during the three months following the entry of the Order (November and December 2018 and January 2019), Musk has cut his average monthly Tesla-related tweets nearly in half. Ex. 8 at 6; *see also* Musk Decl. ¶ 7. By the numbers, it is evident that Musk has taken steps to dramatically reduce the volume of communications that he understands have been a source of concern in the past.

In addition to reducing volume, Musk has modified the content of his tweets, and no longer tweets information that he believes is, or could be, material. Musk Decl. ¶ 7. The Disclosure Counsel and other members of Tesla's legal department have reviewed the updated controls and procedures with Musk on multiple occasions. *Id.* Tesla's General Counsel and Disclosure Counsel have been reviewing all his tweets promptly in real time upon publication to double-check compliance with the Policy and to ensure that any errors are caught and rectified quickly. *Id.*

### B.   Musk's Actions on February 19 Demonstrated Diligence.

Musk complied with the Order by reasonably determining that the 7:15 tweet did not require pre-approval. *See supra* Section I; Musk Decl. ¶¶ 9-11. Moreover, Musk consulted with Tesla's Disclosure Counsel after posting the 7:15 tweet. *Id.* ¶ 12. Out of an abundance of caution, Musk posted another tweet at 11:41 p.m. ET. *Id.* This is precisely the kind of diligence that one would expect from someone who is endeavoring to comply with the Order, and it is certainly not the type of "willful flouting" of judicial authority that is often required to justify a contempt finding. *See Robert Half, Inc. v. Romac Int'l, Inc.*, 101 F. Supp. 2d 223, 225 (S.D.N.Y. 2000) (holding that an "inadvertent" violation "is not such a willful flouting of the court's authority so as to warrant a finding of contempt"); *Wojnarowicz*, 772 F. Supp. at 202 (refusing to find party in contempt upon a party's first time violation of a court order that could reasonably have been a mistake); *Matrix Essentials v. Quality King Distribs., Inc.*, 346 F. Supp. 2d 384, 393 (E.D.N.Y.

- 17 -

2004) (refusing to hold party in contempt without further factual development about whether the "violations were *de minimus*, inadvertent and/or promptly cured").

### C.     The SEC's Purported Evidence of Lack of Diligence Is Uncompelling.

The SEC's primary evidence that Musk has not been diligent in his efforts to comply with the Order consists of excerpts from an interview he gave to *60 Minutes*. *See* Mot. at 11-12. During the interview, and consistent with his First Amendment rights, Musk was sharply critical of the SEC. The SEC's heavy reliance on this interview in its motion for contempt smacks of retaliation and censorship.

As an initial matter, and as the SEC admits, Tesla had not yet implemented the Policy at the time of the interview. Musk thus did not make (and could not have made) any statement during the interview regarding the Policy or his efforts to comply with it. Nevertheless, the SEC points to Musk's statement during the interview that he may "make mistakes" in implementing the Order as evidence that he *intended* to violate the Policy (once promulgated) and, therefore, the Order. This is untrue. When Musk was asked in the interview whether he intended to comply with the Order, he answered unequivocally in the affirmative, "because [he] respect[s] the justice system." Musk's acknowledgment that he may "make mistakes" was an honest and accurate reflection of the fact that materiality is highly fact dependent, and that, despite his best efforts, Musk could make judgment calls with which others disagree. A "mistake" is not, however, an appropriate basis for a finding of *contempt*.

The SEC's only other argument that Musk lacked diligence in complying with the Order is that he did not seek pre-approval for *other tweets* he has posted regarding Tesla. Mot. at 12. Tellingly, the SEC does not identify a *single other tweet* from Musk since the Policy was promulgated that it believes contained or reasonably could contain material information, and for which pre-approval thus could have been required. Indeed, based on his best efforts to comply

with the Order, Musk does not believe he has posted any such tweet.  Musk Decl. ¶¶ 7, 11.  The absence of other pre-approved tweets regarding Tesla is thus not evidence that Musk has *failed* to comply with the Order, but rather evidence that he *has*—by avoiding tweeting information that requires pre-approval.  Moreover, as the SEC is aware, many other written communications containing material information have been subject to the pre-approval process under the Policy, further demonstrating Tesla's and Musk's compliance with the Order.  Dkt. 18-4 at 2 (listing examples of written statements that have gone through the mandated pre-approval process).

Musk acted with diligence and in good faith to comply with the Order.  The SEC cannot carry its heavy burden of presenting clear and convincing evidence that Musk violated a clear and unambiguous court order.  Indeed, the SEC has not even attempted to prove Musk's tweets were in fact material or had any effect on the market.  The SEC knows Musk's after-hours tweet did not affect Tesla's stock price.  The SEC knows that the information contained in Musk's forward-looking and aspirational tweets already had been the subject of extensive public disclosures.  The SEC knows that Musk promptly posted an additional tweet after discussions with Tesla's Disclosure Counsel.  And the SEC knows Musk has dramatically reduced his Tesla-related activity on Twitter since the Order was entered.  Yet the SEC jumped at the first opportunity to move for contempt against Musk, refusing to wait even one business day for responses from Musk's counsel (after requesting information on a Sunday).

The "exercise [of contempt power] is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions."  *Cooke*, 267 U.S. at 539.  To issue a contempt order on the grounds advanced by the SEC here would be an improper use of this power.

- 19 -

5491445

## III.   The SEC's Interpretation of the Order Raises Significant Constitutional Concerns.

Because Musk did not violate the Court's Order or the Tesla Policy, the Court's analysis can end and the Order to Show Cause should be discharged.  Undeterred, and perhaps embarrassed by Musk's criticism of it, the SEC urges the Court to read and apply the Order in an unconstitutional manner.  The Court should reject the SEC's invitation to trample on Musk's First Amendment rights and grant the SEC far broader powers than authorized by Congress.

At bottom, the SEC demands that Musk be punished for failing to obtain preauthorization for tweeting: (a) his proud reflection of Tesla's progress and (b) anticipation for the future that had (c) already been shared with shareholders and that he (d) reasonably and in good faith determined was not and could not be deemed material.  The SEC's desire for such a sweeping prior restraint on speech,[7] effectuated not through some formal statutory authority granted to the SEC by Congress but through a contempt proceeding, must be rejected by the Court.  *See United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (Sotomayor, J.) ("A 'prior restraint' on speech is a law, regulation or *judicial order* that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression." (emphasis added)).

Prior restraints on speech "are the most serious and the least tolerable infringement on First Amendment rights."  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  "A prior restraint . . . has an immediate and irreversible sanction."  *Id.*  "[While] a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it."  *Id.*  Moreover, "[w]hen a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected

---

[7] Notably, the SEC's interpretation is not limited to Twitter.  The SEC could apply its rule to statements made "in any written format," including press releases, blogs, website postings, and, even more expansively, any written materials, notes, Q&A, and scripts used for preparation for public statements such as earnings calls.

under the First Amendment increases." *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001); *see also Madsen v. Women's Health Ctr.*, 512 U.S. 753, 764 (1994) ("Injunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances.").

In light of these concerns, "[a]ny imposition of a prior restraint . . . bears 'a heavy presumption against its constitutional validity.'" *Quattrone*, 402 F.3d at 310 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). A content-based prior restraint, like the restraint urged by the SEC here, would be subject to review under strict scrutiny, "requiring a showing that the restriction is 'narrowly tailored to promote a compelling Government interest.'" *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 871 (2d Cir. 2008) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)); *see also Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968) (a prior restraint "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order").

As the SEC interprets and seeks to enforce it, the Order's injunction is a *de facto* gag on a broad spectrum of statements implicating Tesla. Were the Order interpreted in this fashion, it would plainly fail strict scrutiny review. The government's legitimate interest (shared by Musk) in protecting shareholders can be and has been served through less-restrictive means. These means include allowing Musk the discretion to make good-faith determinations of materiality (which is what the Order *actually* says) or by having the SEC go through normal enforcement proceedings under Rule 10b-5 targeting specific communications that the SEC contends are actionable.[8] *See*

---

[8] Even prior violations of Rule 10b-5 or other statutes or regulations cannot justify an otherwise unconstitutional prior restraint. An injunction against future expression issued because of prior acts is incompatible with the First Amendment. *Gayety Theatres, Inc. v. City of Miami*, 719 F.2d 1550, 1551-52 (11th Cir. 1983).

*Reno v. ACLU*, 521 U.S. 844, 874 (1997) (finding unconstitutional a statute that threatened to censor speech because such a burden is "unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve").

The Second Circuit's decision in *Metropolitan Opera Ass'n, Inc.* is illustrative.  There, a local union challenged an injunction entered by the district court that "prohibit[ed] the Union and its members generally from 'threatening or harassing' and 'engaging in fraudulent or defamatory representations regarding' the Met" and others.  *Metro. Opera Ass'n, Inc.*, 239 F.3d at 173.  The court explained that the injunction "plainly constitute[d] a broad prior restraint on speech."  *Id.* at 176 (also finding that the district court's "contempt sanctions on the Union" based upon statements the district court found "to be defamatory" were "improper").  The Second Circuit was clearly troubled by the fact that the "Union risks contempt sanctions for speech that may ultimately, after full appellate review, be found constitutionally protected" and even if the "Union's methods may be harassing, upsetting, or coercive . . . they are constitutionally protected."  *Id.* at 176, 178. After reaffirming that "the First Amendment strongly disfavors injunctions that impose a prior restraint on speech," the court vacated the injunction because its terms were "so vague and imprecise that the Union cannot fairly determine what future speech is permitted and what speech might place it in contempt."  *Id.* at 178-79.  The SEC's proffered interpretation of the Order, as imposing a broad, prior restraint on Musk's speech, would violate the First Amendment and be unconstitutionally vague, because it does not make clear to Musk which of his words will expose him to contempt and which are protected.  The law does not tolerate such uncertainty.

The constitutional concerns implicated by the SEC's reinterpretation of the Order are heightened because the SEC is seeking to procure through this contempt proceeding what it cannot obtain through the exercise of its congressionally-delegated authority.  Congress has carefully

- 22 -

circumscribed the SEC's power to seek injunctive relief.  The statutory provision pursuant to which the SEC originally brought this action provides, in relevant part, that "[w]henever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of [Rule 10b-5]," the Commission may "bring an action . . . to enjoin *such* acts or practices[.]"  15 U.S.C. § 78u(d)(1) (emphasis added).  The SEC's statutory power is thus limited to seeking to enjoin "a certain, identifiable, and demonstrably imminent 'act or practice,'" which "differs markedly from authorization to enjoin any act or practice and all possible acts or practices that violate the law, wherever and whenever the act or practice occurs."  *SEC v. Sky Way Glob., LLC*, 710 F. Supp. 2d 1274, 1282 (M.D. Fla. 2010).  The reinterpretation and expansive application of the Order advanced by the SEC would expand the SEC's power well beyond that afforded to it by Congress.  In addition to running afoul of the First Amendment, seizure by the SEC of power to censor speech even when that speech does not violate the laws the SEC is empowered to enforce would implicate separation-of-powers concerns.  *See id.*; *cf. 62 Cases v. United States*, 340 U.S. 593, 600 (1951) ("In our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop."); Federalist No. 47 (James Madison).

The SEC may respond by claiming that Musk "consented" to the Order.  But this is no defense to the SEC's unconstitutional power grab.  The SEC interprets the Order to require pre-approval of any Musk statement touching upon the subjects listed in the Policy.  Mot. at 8 (citing Dkt. No. 18-1 at 1).  This would effectively prevent Musk from speaking on *any* matters related to Tesla business based on the subject matter alone, as a substitute for any fact-based materiality consideration.  Musk never consented to and would not consent to such a sweeping gag order (Musk Decl. ¶ 6), and Tesla has not implemented any such policy, Ex. 8 at 2-3.

- 23 -

5491445

Moreover, because this Court has an independent duty not to enter or enforce an unconstitutional order, any argument by the SEC regarding Musk's purported "consent" would also be legally irrelevant.  *See Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir. 1963) (invalidating a consent order that prohibited a defendant from publishing matter about the plaintiff and holding that "[t]he court was without power to make such an order" or to enforce it through the contempt power, and it was thus "immaterial" whether "the parties may have agreed to it"); *SEC v. Citigroup Glob. Markets Inc.*, 827 F. Supp. 2d 328, 333 n.5 (S.D.N.Y. 2011), *vacated and remanded on other grounds*, 752 F.3d 285 (2d Cir. 2014) (noting that under Second Circuit law, a consent settlement is invalid where the resulting "injunction, enforceable through the contempt power, constitute[d] a prior restraint by the United States against the publication of facts which the community has a right to know" (quoting *Crosby*, 312 F.2d at 485)); *see also In re Halkin*, 598 F.2d 176, 189-90 (D.C. Cir. 1979) ("Even where individuals have entered into express agreements not to disclose certain information . . . by consent agreement, . . . judicial orders enforcing such agreements are prior restraints implicating First Amendment rights." (internal citations omitted)). Similarly, this District has recognized that gag orders entered into consensually in SEC enforcement actions pose significant constitutional problems.  *See Citigroup Glob. Markets Inc.*, 827 F. Supp. 2d at 333 n.5 ("On its face, the SEC's no-denial policy raises a potential First Amendment problem.").

The SEC's interpretation of the Order should be rejected in light of the significant constitutional issues illustrated above.[9]   The Supreme Court has long held that statutes be

---

[9] The SEC may argue that by raising his constitutional arguments, Musk is impermissibly seeking to collaterally attack the Order.  Not so.  As explained above, the Order, properly construed, was not violated in this instance. Thus, it is not the Order that is being challenged here but rather the SEC's attempt to modify the Order into something far broader, far more pernicious, and far more constitutionally suspect.

interpreted to avoid constitutional concerns.  *See, e.g.*, *Grenada Cnty. Supervisors v. Brown*, 112 U.S. 261, 269 (1884) ("Our duty, therefore, is to adopt that construction which, without doing violence to the fair meaning of the words used, brings the statute into harmony with the provisions of the constitution."); *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."); *Blake v. Carbone*, 489 F.3d 88, 100 (2d Cir. 2007) (rejecting statutory interpretation offered by an executive agency and nothing that "[c]ourts interpret statutes to avoid constitutional infirmities").  This Court should likewise not adopt an interpretation of the Order that "infringe[s] constitutionally protected liberties or usurp[s] power constitutionally forbidden it."  *Edward J. DeBartolo Corp.*, 485 U.S. at 575.  The Court should interpret the Order in the way Musk has explained herein and discharge the Order to Show Cause.  *Cf. Empire HealthChoice Assurance, Inc. v. McVeigh*, 396 F.3d 136, 144 (2d Cir. 2005) (applying *Edward J. DeBartolo Corp.* to construe statute whose reading "would raise serious constitutional problems" in a manner "to avoid such problems"); *El Badrawi v. United States*, 787 F. Supp. 2d 204, 223 (D. Conn. 2011) (declining to adopt government's proposed interpretation because "[c]ourts must avoid an interpretation of a statute or a regulation that would raise 'a serious doubt' as to its constitutionality").

## CONCLUSION

Musk respectfully requests that the Court discharge its order to show cause.

- 25 -

Dated:  March 11, 2019          HUESTON HENNIGAN LLP


                                By:    *s/ John C. Hueston*
                                       John C. Hueston*
                                       *jhueston@hueston.com*
                                       Marshall A. Camp
                                       *mcamp@hueston.com*
                                       Alison L. Plessman*
                                       *aplessman@hueston.com*
                                       Moez M. Kaba
                                       *mkaba@hueston.com*

                                       *Admitted pro hac vice

                                       HUESTON HENNIGAN LLP
                                       523 West 6th Street, Suite 400
                                       Los Angeles, CA 90014
                                       Telephone:  (213) 788-4340
                                       Facsimile:  (888) 775-0898

                                       *Attorneys for Defendant Elon Musk*

5491445

**CERTIFICATE OF SERVICE**

I certify that on March 11, 2019, a copy of the foregoing was filed through the Court's

CM/ECF system, which will send copies to all counsel of record.

*s/ John C. Hueston*
Counsel for Elon Musk