# EXHIBIT 8

WILMERHALE

March 11, 2019

Matthew T. Martens

+1 202 663 6921 (t)
+1 202 663 6363 (f)
matthew.martens@wilmerhale.com

Cheryl L. Crumpton
Supervising Trial Attorney
Division of Enforcement
U.S. Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549-5985
CrumptonC@sec.gov

Re: *SEC v. Tesla, Inc.*, 1:18-cv-8947-AJN

Dear Ms. Crumpton:

    I write on behalf of Tesla, Inc. ("Tesla" or the "Company") in response to your letter dated February 26, 2019. In your letter, you made eleven specific Requests for Information from Tesla. Tesla has addressed each request in Appendix A to this letter. I would also like to take this opportunity to respond to your concerns regarding Tesla's oversight of Mr. Musk's Twitter communications pursuant to the Final Judgment entered as to Tesla in the above-referenced matter on October 16, 2018 ("Final Judgment").

    Tesla takes seriously its obligations under the Final Judgment. This commitment is evidenced by the significant enhancements to governance that the Company has made since the entry of the Final Judgment. With regard to Mr. Musk's communications, Tesla is obligated by the Final Judgment to implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company made in any format, and to implement procedures and controls to pre-approve certain of his written communications. In accordance with these requirements, Tesla issued its Senior Executives Communications Policy ("Communications Policy"), dated December 11, 2018. Tesla sought and addressed comments from the Staff of the Securities and Exchange Commission on the Communications Policy before it was issued, and Tesla provided a copy of the final policy to the Staff on December 13, 2018.

    Under the Communications Policy, and consistent with the Final Judgment, Mr. Musk is not required to obtain pre-approval of all written communications. Indeed, Mr. Musk need not even obtain pre-approval of all written communications *about Tesla*. Rather, only those written communications "that contain, or reasonably could contain, information material to the Company or its shareholders" are subject to mandatory pre-approval. The Communications Policy provides examples of topics that "may" be material to Tesla or its stockholders depending on the significance of the information in question, and the policy vests discretion in its Authorized Executives, including Mr. Musk, to make a judgment in the first instance about whether the information contained in a written communication meets that applicable standard. If it does meet

WILMERHALE

Cheryl L. Crumpton
March 11, 2019
Page 2

that standard, Mr. Musk is to submit the statement to Tesla's designated Disclosure Counsel and General Counsel, who will review it, including for accuracy and timing.

The Communications Policy does not rely entirely on the exercise of discretion of the Authorized Executives, of course. The Policy states that, among other things, the Company will "periodically review" past communications of Authorized Executives and "provide guidance," contemplating that the Company will provide constructive feedback where needed. With respect to Mr. Musk's statements posted on Twitter, Tesla did much more than a "periodic review." Senior Tesla officers monitored Mr. Musk's Twitter feed in real-time. This allowed Tesla to assure that Mr. Musk was exercising his discretion appropriately in submitting for pre-clearance those communications that "contain, or reasonably could contain, information material to the Company or its shareholders," in accordance with the Communications Policy, and to provide additional guidance to him where appropriate.

The Communications Policy also contains a provision stating that if an Authorized Executive receives pre-approval for a written communication but wishes to release it more than two days later, the Authorized Executive must re-confirm the pre-approval. This provision addresses the time frame in which a pre-approved communication must be released in order for the pre-approval to remain effective, not whether a communication is subject to mandatory pre-approval in the first instance. Under the Communications Policy, whether a communication is subject to mandatory pre-approval turns on whether it "contains, or reasonably could contain, information material to Tesla or its stockholders." And that determination depends on, among other things, the total mix of information in the public domain at the time of the communication.

We understand that the Staff has concerns about Mr. Musk's February 19 tweet, made after NASDAQ trading hours, in which he stated: "Tesla made 0 cars in 2011, but will make around 500k in 2019." Tesla believes that Mr. Musk's decision not to submit that statement for pre-approval under the Communications Policy was reasonable and appropriate. The statement was a comparative one, plainly meant to do nothing more than celebrate how far the Company has come in such a short period of time. The post was added to a tweet thread featuring a photo of Tesla cars "loading … for Europe," reinforcing the cheerleading aspect of the message. As for the shorthand phrase, "around 500k in 2019," it was non-specific, not even referencing any particular Tesla model or models. What is more, that expected rate of production was previously disseminated, with additional context, in Tesla's recent "Fourth Quarter & Full Year 2018 Update" and management's perspectives on that guidance provided during the Company's related earnings call, both on January 30, 2019. Even if a reader of the tweet understood Mr. Musk to be referring to total vehicle production in 2019, the estimated range of "around 500k" for 2019 was consistent with information previously disclosed by Tesla. Merely reiterating recently disseminated information in a shorthand way as part of a statement reasonably understood to convey nothing more than that Tesla has accomplished much in a relatively short time period is not remotely material. No reasonable investor would understand that comparative

WILMERHALE

Cheryl L. Crumpton
March 11, 2019
Page 3

statement of corporate pride in what Tesla has accomplished to significantly alter the total mix of information already in the public domain.

    Nonetheless, as with all of Mr. Musk's tweets, this tweet was monitored by Tesla in real-time. Even though the tweet was not material, Mr. Musk, after consulting with Tesla's Disclosure Counsel, issued a clarifying tweet just a few hours later out of an abundance of caution in order to avoid even the possibility of confusion about what the "around 500k" figure referred to. The subsequent tweet indicated that "around 500k" referenced "annualized production rate at the end of 2019, ie 10k cars/week." This was consistent with the recent January 30 guidance and Mr. Musk's gloss on that guidance during the January 30 earnings call, in which he expressed confidence that Tesla would "get to the 10,000 vehicles a week rate or very close to it by the end of the year."

    From Tesla's perspective, Mr. Musk's February 19 tweet, made outside NASDAQ trading hours, followed by a prompt clarification designed to eliminate even the possibility for confusion about what was being communicated, demonstrates Tesla's and Mr. Musk's good faith and their commitment to compliance generally and to fulfilling their obligations under the Final Judgment specifically. Mr. Musk cited information previously disseminated by Tesla in making a general statement of corporate pride and optimism. As part of the discretion vested in him to make an initial judgment regarding the materiality of a communication, Mr. Musk reasonably determined that the tweet did not require pre-approval. Tesla monitored his tweets and, with Mr. Musk, took a conservative approach when this communication was made: Mr. Musk promptly issued a clarifying tweet intended to address even the possibility of any confusion about the figure he had referenced. Both tweets were posted outside of NASDAQ trading hours and neither caused any harm to investors. Thus, even if the Staff disagrees in hindsight with Mr. Musk's and Tesla's good faith determinations regarding materiality, any possible issue regarding those judgments was remedied and addressed promptly with the subsequent communication by Mr. Musk. As a matter of sound public policy, the Commission should not take an approach here that could suggest that good faith efforts by public companies to clarify information will be punished.

    We trust that this letter, as well as Tesla's responses in the attached to your inquiries, will allay your concerns. Tesla values its dialogue with the Staff and would welcome further discussion on any of these topics. If after reviewing these responses, you continue to have concerns or questions, please do not hesitate to contact me.

WILMERHALE

Cheryl L. Crumpton
March 11, 2019
Page 4

Sincerely,

Matthew T. Martens

Enclosure

## APPENDIX A

### Tesla, Inc. Responses to February 26, 2019 Requests for Information

#### Information Requests 1 – 4

Under the Final Judgment entered on October 16, 2018, in *SEC v. Tesla, Inc.*, 1:18-cv-8947-AJN, Tesla is obligated to implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company made in any format, and to implement mandatory procedures and controls to pre-approve certain written communications. In accordance with these requirements, Tesla issued its Senior Executives Communications Policy ("Communications Policy"), dated December 11, 2018.

Tesla's Communications Policy has several important components, including: (a) mandatory pre-approval of written communications that contain, or reasonably could contain, information material to Tesla or its stockholders; (b) monitoring of senior executives' communications and guidance; (c) auditing by Tesla's Internal Audit function of compliance with the Communications Policy; and (d) oversight of the Communications Policy by the Disclosure Controls Committee of Tesla's Board of Directors, including through reports to the Committee by the Company's designated Disclosure Counsel and Internal Audit.

Tesla has applied each of these components of the Communications Policy to Mr. Musk's Tesla-related written communications, especially his Twitter communications, since the adoption of the Policy. As most relevant to these information requests, each of the then-current General Counsels and the designated Disclosure Counsel have monitored Mr. Musk's Tesla-related tweets on a real-time basis. Since the entry of the Final Judgments, Mr. Musk has approached his Tesla-related communications—especially Twitter communications—with heightened awareness. An examination of Mr. Musk's Twitter feed during the months of May, June, and July 2018, compared to Mr. Musk's Twitter feed during the three months following the entry of the Final Judgements (November and December 2018 and January 2019) shows that Mr. Musk's average monthly Tesla-related tweets were cut nearly in half. This dramatic decrease in Mr. Musk's Tesla-related Twitter activity reflects Tesla's and Mr. Musk's commitments to adhering to the Communications Policy.

From December 11, 2018, when the Communications Policy became effective, until the Commission's extraordinary Court filing following Mr. Musk's February 19, 2019 tweet, Mr. Musk did not seek pre-approval for any of his Twitter communications.[1] The Company believes that Mr. Musk has exercised reasonable and appropriate judgment under the Communications Policy in deciding that the tweets neither contained, nor reasonably could contain, information that is material to Tesla or its stockholders. Mr. Musk's Tesla-related Twitter communications since December 11 have (i) reiterated information previously disclosed by the Company; (ii) consisted of immaterial customer relations; and/or (iii) dealt with clearly immaterial matters. Tesla does not believe that there was a substantial likelihood that the information contained in Mr. Musk's tweets could reasonably be viewed by a reasonable investor as having "significantly

---

[1] Following the Commission's contempt proceeding against Mr. Musk on February 25, 2019, and although not required by the Communications Policy, Mr. Musk has sought pre-approval for a wide range of Tesla-related proposed tweets, even those that are clearly immaterial.

1

altered the total mix of information" available to the public concerning the Company. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). As such, under the terms of the Communications Policy, Mr. Musk was not required to seek pre-approval for any of his post-December 11 tweets to date before they were posted. To the extent the Staff disagrees with the Company's judgments in this regard or has specific concerns about any of Mr. Musk's written communications during this timeframe, Tesla would appreciate the opportunity to discuss the issue further and explain the Company's perspective concerning the immateriality of Mr. Musk's post-December 11 tweets.

Although the Company does not believe that any of Mr. Musk's post-December 11 tweets required pre-approval pursuant to the Communications Policy, Mr. Musk's Twitter communications have been subject to significant and robust monitoring and attention by Tesla during this period, reflecting Tesla's and Mr. Musk's commitment to fulfilling their obligations under the Final Judgments. Indeed, through this real-time monitoring, on February 19, 2019, Tesla's designated Disclosure Counsel identified the tweet that the Staff has inquired about and followed-up on it. Even though the tweet was not material, after consulting with Disclosure Counsel, Mr. Musk promptly issued a clarifying tweet in order to avoid even the possibility of confusion. Both the original tweet and the clarifying tweet were posted outside NASDAQ trading hours and caused no investor harm.

Tesla has devoted and continues to devote considerable time and attention to the effective operation and implementation of the Communications Policy. At all times, Tesla has been committed to assuring its proper functioning and to fulfilling its obligations under the Final Judgments.

**Information Request 5**

The materials that were pre-approved by Tesla in accordance with the Communications Policy and that were used in connection with Tesla's Q4 2018 Financial Results and Q&A call and webcast held on January 30, 2019 are the January 30, 2019 shareholder and the January 30 Script, consisting of a set of talking points. Tesla will provide both documents to the Staff under separate cover.

The January 30 shareholder letter was prepared with the active participation of Tesla's Management Disclosure Committee, which includes the General Counsel and designated Disclosure Counsel. In that process, on January 30, the Management Disclosure Committee, of which the General Counsel and Disclosure Counsel were members, approved the final document for dissemination. The January 30 Script was prepared under a similar process. Also on January 30, the Management Disclosure Committee approved the content of the January 30 Script for use in connection with the January 30 Q&A call and webcast.

**Information Requests 6 & 7**

As of the date of your letter, February 26, Tesla had not revised its public guidance, as originally stated in Tesla's Fourth Quarter & Full Year 2018 Update letter ("Q4 Letter"), that it is "expecting to deliver 360,000 to 400,000 vehicles in 2019." Nor had Tesla, as of that date, revised its public guidance, as originally stated in the Q4 letter, that Tesla is "targeting

2

annualized Model 3 output in excess of 500,000 units sometime between Q4 of 2019 and Q2 of 2020."

Mr. Musk's initial tweet on February 19 – stating "Tesla made 0 cars in 2011, but will make around 500k in 2019" – was intended only to recapitulate the Company's recently-issued guidance and Mr. Musk's gloss on that guidance during the earnings call, and did not amount to a change in guidance. His tweet was comparative, employed the word "around," and did not even reference any specific Tesla model. It was intended only to convey and celebrate how far the Company has come in a short period of time. Mr. Musk's subsequent clarifying tweet, issued only a few hours later, made clear that the initial tweet was not a change in guidance. Mr. Musk wrote: "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10 cars/week. Deliveries for year still estimated to be about 400k." This tweet reinforced that Tesla's recent January 30 guidance remained in effect and had not been revised. Nor did this tweet, referencing "about" 400k deliveries, alter Tesla's guidance regarding expected vehicle delivery in 2019.

**Information Requests 8-10**

Tesla has made substantial changes to its governance since the entry of Final Judgments on October 16, 2018. Tesla appointed a new independent Chair of the Board of Directors on November 7, 2018, and appointed two new independent directors to the Board of Directors on December 28, 2018. Tesla created a permanent, independent Disclosure Controls Committee of the Board of Directors, as of December 11, 2018, to oversee the matters set forth in the Final Judgments. Also on December 11, 2018, the Board approved the Company's Communications Policy, which states that the Committee will provide oversight over the Policy and specifies that the Policy may be amended only by action of the Committee. And on December 18, 2018, Tesla designated a Disclosure Counsel whose qualifications are not unacceptable to the Staff of the Securities Exchange Commission; indeed, the Staff met with the candidate by telephone before he was appointed.

In the short period of time between the formation of the Disclosure Controls Committee and Mr. Musk's February 19 tweet that prompted the present inquiries, the Disclosure Controls Committee has taken appropriate steps to oversee the matters set forth in the Final Judgments, including the procedures concerning mandatory pre-approval of certain written communications. The Committee's directors have heard multiple reports on the operation of the Communications Policy. The directors of the Committee, who each also serve on the Audit Committee, heard a report from the designated Disclosure Counsel to the Audit Committee on January 29, 2019. In addition, the Disclosure Controls Committee convened on February 14, 2019. During that meeting, the directors received a second report from the Disclosure Counsel. Also in that meeting, the Committee received a report from Internal Audit on the operation of the Policy, and Internal Audit did not report any exceptions. The Disclosure Controls Committee has not made any recommendations to the Board to address any non-compliance with the Communications Policy because no instances of non-compliance have been identified.

Following the Staff's inquiries to Tesla, the full Board has met and discussed these matters, including in executive session. The Disclosure Controls Committee also has been actively monitoring these matters. The directors have received regular reports from the

Disclosure Counsel, and the Committee convened on March 8 and 11. The Board and the Disclosure Controls Committee will continue to monitor these matters closely going forward.

In further response to this question, Tesla declines to waive its attorney-client privilege to disclose the content of any advice provided by Tesla's General Counsel or designated Disclosure Counsel.

### Information Request 11

Tesla and Mr. Musk remain committed to ensuring full compliance with their obligations under the Final Judgments, including their obligations related to pre-approval of certain of Mr. Musk's written communications. The Disclosure Controls Committee will be evaluating the effectiveness of the Communications Policy and its operation and will make any enhancements or changes to the Policy that it deems warranted. Tesla also welcomes any input the Staff may have on these matters.