## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

      Plaintiff,

v.

ELON MUSK

      Defendant.

No. 1:18-cv-8865-AJN-GWG

## DECLARATION OF CHRISTOPHER F. NOE, PH.D.

## March 11, 2019

# Table of Contents

I.    Qualifications ............................................................................................................. 1

II.   Case Background and Summary of Allegations ........................................................... 2

III.  Assignment and Compensation ................................................................................... 4

IV.   Summary of Opinions .................................................................................................. 4

V.    The 7:15 PM Tweet Did Not Contain Material Information for Tesla's shareholders .................... 5

  A.   Materiality ................................................................................................................. 5

  B.   Opening Price and Trading Volume of Tesla's Common Stock on February 20, 2019 ................... 5

  C.   After-Market Trading of Tesla's Common Stock on February 19, 2019 ............................... 7

  D.   Pre-Market Trading of Tesla's Common Stock on February 20, 2019 ................................. 9

  E.   Market Reaction to SEC's Contempt Motion Was Greater Than to February 19 Tweets ............. 11

VI.   Market Commentary ...................................................................................................... 11

VII.  Conclusion ..................................................................................................................... 13

## I. QUALIFICATIONS

1.  I am a Senior Lecturer in Accounting at the Massachusetts Institute of Technology's Sloan School of Management. I have taught at MIT Sloan since 2005 and have been a full-time member of the faculty since 2011. My teaching focuses on accounting principles, financial statement analysis, disclosure, forecasting, and valuation. Between 1995 and 2000, I served on the faculty of the Harvard Business School where I taught similar subjects. During the course of my academic career, I have published articles in peer-reviewed journals as well as authored teaching case studies. My peer-reviewed academic articles include the use of event studies to examine how various corporate disclosures affect stock prices.

2.  I received a B.A. in Economics from Emory University in 1990, an M.S. in Applied Economics from the University of Rochester in 1993, and a Ph.D. in Business Administration from the University of Rochester in 1996.

3.  In addition to my academic experience, I worked at Charles River Associates, an economics, finance, and business consulting firm, between 2000 and 2011. My consulting assignments at Charles River dealt primarily with the fields of financial accounting and corporate finance, primarily in the context of securities litigation. While at Charles River, I came to lead the firm's securities litigation marketing efforts, which included overseeing the development of a software product for analyzing daily stock price movements in the context of securities lawsuits.

4. A copy of my curriculum vitae, which includes my publications and a list of all matters in which I have provided expert testimony, is attached as **Appendix A**.

## II. CASE BACKGROUND AND SUMMARY OF ALLEGATIONS

5. Elon Musk ("Defendant") is the Chief Executive Officer of Tesla, Inc. ("Tesla"), a publicly traded company since June 29, 2010.[1] Tesla's stock is currently listed on the NASDAQ Stock Market ("NASDAQ").

6. In 2018, Tesla produced 254,530 vehicles and delivered 245,506 vehicles.[2]

7. On January 2, 2019, Tesla filed a Form 8-K, reporting its Fourth Quarter 2018 production numbers. Tesla stated that production in Q4 grew to 86,555 vehicles, including 61,394 Model 3 vehicles and 25,161 Model S and X vehicles.[3]

8. In an update letter that the company released on January 30, 2019, Tesla announced that it expected to deliver 360,000 to 400,000 vehicles in 2019.[4] In that same letter, Tesla also disclosed that it aimed to raise the annualized output for the Model 3, one of three vehicles that the company currently offers, to over 500,000 units between Q4 of 2019 and Q2 of 2020, "[b]arring unexpected challenges with Gigafactory Shanghai."[5]

9. On February 19, 2019, Tesla filed its Form 10-K for fiscal year 2018. Tesla stated that its goal is to produce 10,000 Model 3 vehicles per week on a sustained

---

[1] Tesla, Form 10-K for the fiscal year ended December 31, 2018, pp. 27, 39.

[2] Tesla, Form 10-K for the fiscal year ended December 31, 2018, p. 42.

[3] Tesla, Form 8-K filed January 2, 2019.

[4] Tesla, "Tesla Fourth Quarter & Full Year 2018 Update," January 30, 2019.

[5] Tesla, "Tesla Fourth Quarter & Full Year 2018 Update," January 30, 2019; Tesla, Form 10-K for the fiscal year ended December 31, 2018, p. 1.

basis, with an annualized output rate in excess of 500,000 Model 3 vehicles sometime between the fourth quarter of 2019 and second quarter of 2020.[6]

10. After the close of NASDAQ's regular market trading on February 19, 2019,[7] Defendant posted a message on Twitter at 7:15 PM ET ("7:15 PM Tweet") regarding Tesla's production capacity:[8]

> Tesla made 0 cars in 2011, but will make around 500k in 2019.

11. Later at 11:41 PM ET on the same day, Defendant posted another message on Twitter ("11:41 PM Tweet"):[9]

> Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week.  Deliveries for year still estimated to be about 400k.

12. After the close of NASDAQ's regular market trading on February 25, 2019, several news sources reported that the Securities and Exchange Commission ("SEC" or "Plaintiff") filed a motion ("Contempt Motion"), requesting that the United States District Court for the Southern District of New York hold Defendant in contempt over the 7:15 PM Tweet.[10]  The SEC alleges that the 7:15 PM Tweet was "inaccurate" and that Defendant violated the terms of his October 2018 settlement with the SEC, under which Defendant is required to seek pre-

---

[6] Tesla, Form 10-K for the fiscal year ended December 31, 2018, p. 16.

[7] "NASDAQ Trading Schedule," available at <https://www.nasdaq.com/about/trading-schedule.aspx>, accessed March 7, 2019.

[8] Twitter, available at <https://twitter.com/elonmusk/status/1098013283372589056>, accessed March 10, 2019.

[9] Twitter, available at <https://twitter.com/elonmusk/status/1098080063801585664>, accessed March 10, 2019.

[10] This news was first reported by Bloomberg at 6:10 PM ET.  *See* "SEC Asks Judge To Hold Elon Musk In Contempt For Violating Deal," *Bloomberg*, February 25, 2019; *see also* "SEC Asks Manhattan Federal Court to Hold Elon Musk in Contempt," *The Wall Street Journal*, February 25, 2019; *United States Securities And Exchange Commission v. Elon Musk*, United States Securities and Exchange Commission's Motion and Memorandum of Law in Support of an Order to Show Cause, February 25, 2019, p. 1.

approval from Tesla officials for any written statements that "contain[] or reasonably could contain information material to Tesla or its shareholders."[11]

## III.    ASSIGNMENT AND COMPENSATION

13. I have been retained by counsel for Defendant to evaluate whether the 7:15 PM Tweet contained material information for Tesla's shareholders.  A list of documents that I have relied upon in this declaration is provided in **Appendix B**.  Staff from Analysis Group, operating under my direction, have provided me with research assistance in preparing this declaration.  My billing rate in this matter is $700 per hour.  My compensation is not contingent upon my findings or the outcome of this proceeding.

## IV.    SUMMARY OF OPINIONS

14. Based on my review of stock price and trading volume data, news articles, and analyst reports, I have reached the following conclusions:

(i)  The 7:15 PM Tweet did not contain material information for Tesla's shareholders;

(ii)  More specifically, the lack of meaningful price reaction and relatively low trading volume following the 7:15 PM Tweet (and the lack of meaningful price reaction and relatively low trading volume following the 11:41 PM Tweet, which the SEC alleges "correct[ed]" the 7:15 PM Tweet[12]) indicate

---

[11] Contempt Motion, p. 1; *see also* "SEC Asks Manhattan Federal Court to Hold Elon Musk in Contempt," *The Wall Street Journal*, February 25, 2019.

[12] Contempt Motion, pp. 5, 6.

that the 7:15 PM Tweet had no material impact on the price of Tesla's common stock;

(iii) My review of market commentary following the 7:15 PM Tweet indicates that analysts did not view information contained in this disclosure as material, consistent with the lack of meaningful price reaction and relatively low trading volume;

(iv) On the other hand, the market did react, based on price reaction, trading volume, and market commentary, in response to the filing of the SEC's Contempt Motion.

## V. THE 7:15 PM TWEET DID NOT CONTAIN MATERIAL INFORMATION FOR TESLA'S SHAREHOLDERS

### A. Materiality

15. From an economic perspective, the materiality of a statement to the value of an actively traded security (such as Tesla stock) can be assessed through the market reaction to that statement. Information that is considered material to investors in their decision as to whether to buy or sell a security tends to generate responsive movements in trading volume and stock price as investors react to that information. These trends are observable through an analysis of trading data.

### B. Opening Price and Trading Volume of Tesla's Common Stock on February 20, 2019

16. As discussed above, Tesla's common stock is traded on NASDAQ, for which regular trading hours begin at 9:30 AM ET and end at 4:00 PM ET on each

trading day.[13]  The 7:15 PM Tweet and 11:41 PM Tweet (collectively, the "February 19 Tweets") were both published after regular trading hours, i.e., after 4:00 PM ET.  If the February 19 Tweets contained material information to Tesla's shareholders, one would expect this information to be reflected in its stock price at the open of regular trading on the next trading day.[14]

17. I find that Tesla's stock price declined by only 0.4 percent from $305.64 per share at the close of regular trading on February 19, 2019 to $304.41 per share at the open of regular trading on February 20, 2019.[15]  To put this price reaction in context, **Exhibit 1** shows Tesla's daily stock price movements for September 2018 through February 2019.  As this exhibit shows, a 0.4 percent change is small in comparison to the general volatility of Tesla's stock price over this six-month period.  In addition, the average absolute value of Tesla's close-to-open stock returns between September 2018 and February 2019 is 1.53 percent, nearly four times greater than 0.4 percent.  In contrast, following the filing of the SEC's Contempt Motion, Tesla's stock price declined by 2.2 percent from the close of regular trading hours on February 25, 2019 ($298.77 per share) to the open of regular trading hours on February 26, 2019 ($292.22 per share).[16]

18. Tesla's small stock price change from the close of regular trading on February 19, 2019 to the open of regular trading on February 20, 2019 was roughly in line with

---

[13] "NASDAQ Trading Schedule," available at <https://www.nasdaq.com/about/trading-schedule.aspx>, accessed March 7, 2019.

[14] I also reviewed stock price and trading volume data outside of regular trading hours, which I discuss later in this declaration.

[15] Bloomberg.

[16] Bloomberg.

a small contemporaneous change in the NASDAQ Composite Index.[17]

Furthermore, Tesla's stock price remained stable within the first hour after the open of regular trading on February 20, 2019, fluctuating between $303.00 per share and $305.84 per share. Thus, I conclude that the February 19 Tweets had no material impact on Tesla's stock price.

19. The trading volume of Tesla's stock on February 20, 2019 is lower than the average daily volume over the six-month period from September 2018 through February 2019.[18] The lack of meaningful price reaction up to an hour after the open of regular trading on February 20, 2019 coupled with relatively low trading volume throughout the day indicates that the February 19 Tweets did not contain material information for Tesla's shareholders.[19]

## C. After-Market Trading of Tesla's Common Stock on February 19, 2019

20. Investors have the option to trade stocks outside of regular trading hours. For stocks listed on NASDAQ, investors can trade after the close of regular trading

[17] The NASDAQ Composite Index is a capitalization-weighted index of stocks in all three NASDAQ tiers: Global Select, Global Market and Capital Market. *See* "CCMP Quote - NASDAQ Composite Index", available at <https://www.bloomberg.com/quote/CCMP:IND>, accessed March 10, 2019. According to data from Bloomberg, the NASDAQ Composite Index increased by 0.05 percent from 7486.77 at the close of regular trading on February 19, 2019 to 7490.31 at the opening of regular trading on February 20, 2019.

[18] The trading volume of Tesla's stock on February 20, 2019 is 7,142,117, and the average daily trading volume over the six-month period from September 2018 through February 2019 is 8,738,667. The daily trading volume reported by Bloomberg includes only trading activities during regular trading hours.

[19] I note that other news related to Tesla was disclosed after the close of regular trading on February 19, 2019 and before the open of regular trading on February 20, 2019. First, *Electrek* reported at 7:15 PM ET on February 19, 2019 that Tesla was preparing to offer leasing options for its Model 3 vehicles. Second, *The Wall Street Journal* reported at 8:00 AM ET on February 20, 2019 that Tesla's general counsel had left the company. To the extent that information from either of these news events were material to Tesla shareholders, the trading activities attributable to the February 19 Tweets would be even lower in magnitude. *See* "Tesla is preparing to offer Model 3 leasing to boost demand," *Electrek*, February 19, 2019; *see also* "Tesla Replaces Top Lawyer After Two Months in Latest Major Departure," *The Wall Street Journal*, February 20, 2019.

between the hours of 4:00 PM ET and 8:00 PM ET ("After-Market Hours") or prior to the open of regular trading between the hours of 4:00 AM ET and 9:30 AM ET ("Pre-Market Hours").[20]  These expanded trading windows provide investors with the potential to respond quickly to news and events that occur outside of regular trading hours.[21]  Thus, I reviewed Tesla's stock price and trading volume during After-Market Hours on February 19, 2019 and Pre-Market Hours on February 20, 2019 to assess the materiality of the 7:15 PM Tweet.[22]

21. On February 19, 2019, investors had the opportunity to trade following the 7:15 PM Tweet during After-Market Hours between 7:15 PM and 8:00 PM.  As shown in **Exhibit 2**, Tesla's stock price declined by only 0.09 percent during this 45-minute interval, from $307.10 per share at 7:13 PM ET[23] to $306.82 per share at 7:59 PM ET.  In contrast, as shown in **Exhibit 3**, Tesla's stock price fell by 3.4 percent following news of the filing of the SEC's Contempt Motion at 6:10 PM ET on February 25, 2019,[24] from $298.02 per share at 6:09 PM ET to $287.87 per share at 7:59 PM ET.

22. The trading volume during the 45-minute time window between the 7:15 PM Tweet and the end of After Market Hours trading totaled 9,973 shares, which represents less than 0.01 percent of the total shares outstanding of Tesla's

---

[20] "NASDAQ Trading Schedule," available at <https://www.nasdaq.com/about/trading-schedule.aspx>, accessed March 7, 2019.

[21] "Extended Hours Trading," available at <https://www.nasdaq.com/extended-trading/>, accessed March 7, 2019.

[22] While trading activities outside regular trading hours tend to be limited, an assessment of the market reaction during this time may be informative.

[23] There were no trading activities at 7:14 PM ET on February 19, 2019.

[24] "SEC Asks Judge To Hold Elon Musk In Contempt For Violating Deal," *Bloomberg*, February 25, 2019, 6:10 PM ET.

common stock.[25]  Average trading volume per hour during After-Market Hours prior to the 7:15 PM Tweet (21,087 shares per hour) is higher than afterwards (13,297 shares per hour).  By comparison, average trading volume during After-Market Hours following news of the filing of the SEC's Contempt Motion is 222,674 shares per hour, which is nearly seventeen times higher than the hourly trading volume after the 7:15 PM Tweet.

23. The lack of meaningful price reaction and relatively low trading volume during After-Market Hours on February 19, 2019 following the 7:15 PM Tweet (and before the 11:41 PM Tweet was posted) is evidence that the 7:15 PM Tweet did not contain material information for Tesla's shareholders.

**D.  Pre-Market Trading of Tesla's Common Stock on February 20, 2019**

24. The 11:41 PM Tweet occurred after the conclusion of After-Market Hours trading on February 19, 2019.  Investors had the opportunity to trade following the 11:41 PM Tweet during Pre-Market Hours on February 20, 2019.  The SEC describes the 11:41 PM Tweet as "correcting" the 7:15 PM Tweet.[26]  Were that so, I would expect to see a noticeable change in stock price or trading volume during the Pre-Market Hours on February 20, 2019.

25. That did not occur.  As shown in **Exhibit 2**, Tesla's stock price declined during Pre-Market Hours by only 0.8 percent, from $306.82 per share at 7:59 PM ET on

---

[25] According to Tesla's Form 10-K for the fiscal year ended December 31, 2018, there were 172,721,487 shares of Tesla's common stock outstanding as of February 12, 2019.

[26] Contempt Motion, p. 5.

February 19, 2019 to $304.41 per share at the open of regular trading on February 20, 2019.

26. The even more relevant window for observing any reaction to the supposedly corrective 11:41 PM Tweet is from 7:59 PM ET on February 19, 2019 to 7:59 AM ET on February 20, 2019 because the departure of Tesla's General Counsel was announced at 8:00 AM ET that morning, which caused its own stock price reaction.[27]  As shown in **Exhibit 2**, Tesla's stock price increased by only 0.7 percent from $306.82 per share at 7:59 PM ET on February 19, 2019 to $308.81 per share at 7:59 AM ET on February 20, 2019.

27. The trading volume during the four-hour time window during Pre-Market Hours prior to 8:00 AM ET totaled 23,993 shares, which represents approximately 0.01 percent of the total shares outstanding of Tesla's common stock.[28]  By comparison, average trading volume per hour during Pre-Market Hours on February 20, 2019 prior to 8:00 AM ET (5,998 shares per hour) is far lower than the average trading volume per hour during Pre-Market Hours on February 26, 2019 (52,876 shares per hour).

28. The lack of meaningful price reaction to the 11:41 PM Tweet and the relatively low trading volume during Pre-Market Hours prior to 8:00 AM ET on February 20, 2019 provides further evidence that the 7:15 PM Tweet did not contain material information for Tesla's shareholders.

---

[27] "Tesla Replaces Top Lawyer After Two Months in Latest Major Departure," *The Wall Street Journal*, February 20, 2019.

[28] As previously noted, there were 172,721,487 shares of Tesla's common stock outstanding as of February 12, 2019.

### E. Market Reaction to SEC's Contempt Motion Was Greater Than to February 19 Tweets

29. As discussed above and shown in **Exhibit 2**, there was a minimal price or volume reaction in After-Market Hours trading of Tesla stock on February 19, 2019 following the 7:15 PM Tweet. The next morning, during Pre-Market Hours trading, there was similarly minimal price or volume reaction to the 11:41 PM Tweet.

30. In contrast, as discussed above and shown in **Exhibit 3**, when the news of the SEC's Contempt Motion became public, there was an immediate negative reaction as Tesla's stock price fell 3.4 percent between the news release (at 6:10 PM ET) and the end of After-Market Hours trading. On an hourly basis, 13,297 shares traded per hour after the 7:15 PM Tweet on February 19, 2019 while 222,674 shares traded per hour after the 6:10 PM ET news on February 25, 2019, nearly a seventeen fold difference. This response demonstrates that a material event can be perceived in the trading activities during After-Market or Pre-Market Hours if one occurs.

## VI. MARKET COMMENTARY

31. I reviewed market commentary regarding the February 19 Tweets and find that it is consistent with my conclusions discussed above. If the information contained in the February 19 Tweets was material to investors, one would expect equity analysts following Tesla to publish reports commenting on the information. I found a total of three analyst reports published between February 20 and February 24, 2019 available through Thomson One. None of the three reports mentioned

the February 19 Tweets, indicating that the analysts did not consider these as new material information.  Two of the analyst reports, one by Jefferies and one by New Constructs, commented on the Form 10-K that Tesla had filed before the open of regular trading on February 19, 2019.[29]  The other report by CFRA mentioned the departure of Tesla's general counsel and that Tesla had planned to start leasing its Model 3 vehicles.[30]

32. In contrast, I found a total of 13 analyst reports published between February 26 and February 27, 2019 available through Thomson One.  Analysts' commentary indicate that they viewed the SEC's action as negative news.  For example, analysts from J.P. Morgan commented that they "see a negative reaction in TSLA shares to these developments."[31]  Similarly, analysts from Cowen expected Tesla's stock to "trade down."[32]  Moreover, some analysts expressed concerns over the potential consequences.  For example, analysts from Wedbush commented that "now this latest tweet (which most investors shrugged off at the time) represents a wild card that could potentially bring this tornado of uncertainty back into the Tesla story until resolved."[33]  Analysts from J.P. Morgan noted that "[i]f the SEC were to seek Mr. Musk's removal (perhaps subject to yet

---

[29] Jefferies, "Estimates and Views Confirmed Post 10-K," February 20, 2019; New Constructs, "Stock Option Liabilities Add Risk in Today's Filing Season Find," February 21, 2019.

[30] CFRA, "Tesla, Inc.," February 20, 2019.

[31] J.P. Morgan, "See Negative Reaction to Further SEC Allegations Against Tesla CEO Elon Musk — Reiterate UW," February 26, 2019.

[32] Cowen, "SEC Asks Judge To Hold Elon Musk In Contempt For Violating Settlement," February 26, 2019.

[33] Wedbush, "SEC Asks Court to Hold Musk in Contempt; Uncertainty Will Weigh on Shares," February 26, 2019.

another settlement), we believe the shares may approach the mid-$200 levels seen in the aftermath of the earlier SEC suit."[34]

33. The lack of commentary on the February 19 Tweets indicates that equity analysts did not view information contained in these disclosures as material, consistent with the lack of meaningful price reaction and low trading volume.

## VII.   CONCLUSION

34. Based on my review of stock price and trading volume data, news articles, and analyst reports, it is my opinion that the 7:15 PM Tweet did not contain material information for Tesla's shareholders.  There was no meaningful price reaction and relatively low trading volume in Tesla's shares following the 7:15 PM Tweet. Nor was there any meaningful price reaction or noticeable change in trading volume after what the SEC refers to as the "corrective" 11:41 PM Tweet. Moreover, no equity analysts commented on the February 19 Tweets.


Executed on this _11th_ day of March, 2019, at ___4:49 pm___ .

_____
                    Christopher F. Noe

---

[34] J.P. Morgan, "See Negative Reaction to Further SEC Allegations Against Tesla CEO Elon Musk — Reiterate UW," February 26, 2019.



**CHRISTOPHER F. NOE**
Senior Lecturer
Sloan School of Management
Massachusetts Institute of Technology
77 Massachusetts Ave., E62-681
Cambridge, MA 02139
e-mail: chrisnoe@mit.edu
phone: (617) 253-4903

## EMPLOYMENT

2005-        *Senior Lecturer*, Sloan School of Management, Massachusetts Institute of Technology

2008-11      *Vice President*, Charles River Associates

2005-08      *Principal*, Charles River Associates

2003-05      *Associate Principal*, Charles River Associates

2000-03      *Senior Associate*, Charles River Associates

1995-2000    *Assistant Professor*, Harvard Business School, Harvard University

## EDUCATION

Ph.D. Accounting, William E. Simon Graduate School of Business Administration, University of Rochester, 1996

M.S. Applied Economics, William E. Simon Graduate School of Business Administration, University of Rochester, 1993

B.A. Economics, Emory University, 1990

## RESEARCH

Duarte-Silva, T., H. Fu, C. Noe, and K. Ramesh, 2013, How Do Investors Interpret Announcements of Earnings Delays?, *Journal of Applied Corporate Finance* 25, 66-73.

Fisher, F., C. Noe, and E. Schouten, 2005, The Sale of the Washington Redskins: Discounted Cash Flow Valuation of S-Corporations, Treatment of Personal Taxes, and Implications for Litigation, *Stanford Journal of Law, Business & Finance* 10, 18-30.

Gilson, S., P. Healy, C. Noe, and K. Palepu, 2001, Analyst Specialization and Conglomerate Stock Breakups, *Journal of Accounting Research* 39, 565-82.

Bushee, B. and C. Noe, 2000, Disclosure Quality, Institutional Investors, and Stock Return Volatility, *Journal of Accounting Research* 38, 171-202.

Noe, C., 1999, Voluntary Disclosures and Insider Transactions, *Journal of Accounting and Economics* 27, 305-26.

## CASE STUDIES

Noe, C. and J. Weber, 2018, Amazon.com, Inc., MIT Sloan Case #17-183.

Noe, C. and J. Weber, 2018, Amazon.com, Inc., MIT Sloan Teaching Note #19-192.

Noe, C. and J. Weber, 2018, Spartan Race Inc., MIT Sloan Case #17-184.

Noe, C. and J. Weber, 2018, Spartan Race Inc., MIT Sloan Teaching Note #18-187.

Noe, C., L. Pully, and C. Reavis, 2018, Hertz Global Holdings Inc., MIT Sloan Case #15-164.

Noe, C., 2018, Hertz Global Holdings, Inc., 2018, MIT Sloan Teaching Note #18-186.

Yu, G., C. Noe, J. Weber, and T. Samuelson, 2015, Microsoft's aQuantive Acquisition, Harvard Business School Case #9-115-039.

Yu, G., C. Noe, J. Weber, and T. Samuelson, 2015, Microsoft's aQuantive Acquisition, Harvard Business School Teaching Note #5-115-039.

Yu, G., C. Noe, J. Weber, and J. McClellan, 2013, For Profit Higher Education: University of Phoenix, Harvard Business School Case #9-114-024.

Yu, G., C. Noe, J. Weber, and J. McClellan, 2014, For Profit Higher Education: University of Phoenix, Harvard Business School Teaching Note #5-114-032.

Miller, G. and C. Noe, 2006, Sears, Roebuck and Co. vs. Wal-Mart Stores, Inc., Harvard Business School Case #9-101-011.

Miller, G. and C. Noe, 2001, Bausch & Lomb, Inc. (A), Harvard Business School Case #9-101-010.

Miller, G. and C. Noe, 2001, Bausch & Lomb, Inc. (B), Harvard Business School Case #9-101-008.

Miller, G. and C. Noe, 2000, Bausch & Lomb, Inc. (C), Harvard Business School Case #9-101-009.

Miller, G. and C. Noe, 2002, Bausch & Lomb, Inc. (A), (B) and (C), Harvard Business School Teaching Note #5-101-009.

Noe, C., Kmart Corp., 1999, Harvard Business School Case #9-199-017.


## EXPERT TESTIMONY

Report, rebuttal report, deposition testimony, and trial testimony on behalf of respondent in William Richard Kruse Individually and as a Trustee for The Vivian Calvert Living Trust and The William Richard Kruse Living Trust vs. Synapse Wireless, Inc., Court of Chancery of the State of Delaware, C.A. No. 12392-VCMR, 2017-19.

Report, rebuttal report, and trial testimony on behalf of plaintiffs in Morgan Stanley and MS Solar Solutions Canada ULC v. Stikeman Elliott LLP, Ontario Superior Court of Justice, CV-12-457683, 2017-18.

Report, rebuttal reports, and deposition testimony on behalf of defendants in City of Ann Arbor Employees' Retirement System, et al. v. Sonoco Products Co., et al., United States District Court, District of South Carolina, 4:08-cv-02348-TLW-SVH, 2010-11.

Deposition and arbitration testimony on behalf of defendant in Federal Insurance Company v. Interdigital Communications Corporation and Interdigital Technology Corporation, Ref. #1450000228, 2007.

Rebuttal report on behalf of plaintiff in Matthew Bender & Company Inc. v. Gould Publications Inc., et al., AAA No. 13 489 Y 02155 05, 2006.

Affidavit on behalf of individuals from KPMG LLP in CVS Corp. before the United States Securities and Exchange Commission, B-02164, 2006.

Report and hearing testimony on behalf of Loudoun Hospital Center in Combined Review of Competing Certificate of Public Need Applications: VA-6859, VA-6860, VA-6861, Commonwealth of Virginia, Department of Health, 2003.

**AWARDS & HONORS**

MIT Sloan Teacher of the Year 2015-16

**MISCELLANEOUS**

Friends of Brookline Rowing, Treasurer 2018-

Temple Israel of Boston, Treasurer 2009-13, Vice President 2013-15, President 2015-17

*The Two Dollar Bill Documentary* film credit http://www.imdb.com/title/tt4083126/?ref_=ttfc_fc_tt, 2015

**Appendix B**

**Documents Relied Upon**

### Legal Filing

*United States Securities And Exchange Commission v. Elon Musk*, United States Securities and Exchange Commission's Motion and Memorandum of Law in Support of an Order to Show Cause, February 25, 2019.

### News Articles

"SEC Asks Judge To Hold Elon Musk In Contempt For Violating Deal," *Bloomberg*, February 25, 2019.

"SEC Asks Manhattan Federal Court to Hold Elon Musk in Contempt," *The Wall Street Journal*, February 25, 2019.

"Tesla is preparing to offer Model 3 leasing to boost demand," *Electrek*, February 19, 2019.

"Tesla Replaces Top Lawyer After Two Months in Latest Major Departure," *The Wall Street Journal*, February 20, 2019.

### Analyst Reports

CFRA, "Tesla, Inc.," February 20, 2019.

Cowen, "SEC Asks Judge To Hold Elon Musk In Contempt For Violating Settlement," February 26, 2019.

Jefferies, "Estimates and Views Confirmed Post 10-K," February 20, 2019.

J.P. Morgan, "See Negative Reaction to Further SEC Allegations Against Tesla CEO Elon Musk — Reiterate UW," February 26, 2019.

New Constructs, "Stock Option Liabilities Add Risk in Today's Filing Season Find," February 21, 2019.

Wedbush, "SEC Asks Court to Hold Musk in Contempt; Uncertainty Will Weigh on Shares," February 26, 2019.

### Websites and Other Sources

Bloomberg.

"CCMP Quote - NASDAQ Composite Index", available at <https://www.bloomberg.com/quote/CCMP:IND>, accessed March 10, 2019

"Extended Hours Trading," available at <https://www.nasdaq.com/extended-trading/>, accessed March 7, 2019.

Factiva.

"NASDAQ Trading Schedule," available at <https://www.nasdaq.com/about/trading-schedule.aspx>, accessed March 7, 2019.

Tesla, Form 8-K filed January 2, 2019.

Tesla, Form 10-K for the fiscal year ended December 31, 2018.

Tesla, "Tesla Fourth Quarter & Full Year 2018 Update," January 30, 2019.

Thomson One.

Twitter, available at <https://twitter.com/elonmusk/status/1098013283372589056>, accessed March 10, 2019.

Twitter, available at <https://twitter.com/elonmusk/status/1098080063801585664>, accessed March 10, 2019.



**Exhibit 1: Tesla Daily Closing Prices and Volumes**
*(Sep 1, 2018 ~ Feb 28, 2019)*

Feb 25-26, 2019:
SEC Motion

Feb 19-20, 2019:
Musk Tweets

Tesla Daily Volume — Tesla Closing Price

**Source:** Bloomberg



**Exhibit 2: Tesla Price and Volume by Minute**
*(Feb 19, 2019 ~ Feb 20, 2019)*

Mr. Musk tweeted about Tesla's vehicle production on Feb 19 at 7:15 PM.

Feb 19 7:13 PM: $307.10

Feb 20 7:59 AM: $308.81

The Wall Street Journal reported the departure of Tesla's General Counsel on Feb 20 at 8:00 AM

Feb 19 7:59 PM: $306.82

Mr. Musk tweeted to clarify about Tesla's vehicle production numbers on Feb 19 at 11:41 PM.

Opening Price on Feb 20 ($304.41) is 0.40% lower than Closing Price on Feb 19 ($305.64).

Pre-Market Hours    After-Market Hours    Volume    Share Price

**Notes:**
[A] NASDAQ regular trading hours are from 9:30 am - 4:00 pm. Pre-Market Hours cover 4:00 am - 9:30am. After-Market Hours cover 4:00 pm - 8:00 pm.
[B] Share Price is calculated as the simple average price of all trades recorded with positive volume within each minute. Volume is the aggregated trade size within each minute.
[C] All times are in ET.

**Source**: Bloomberg



**Exhibit 3: Tesla Price and Volume by Minute**
*(Feb 25, 2019 ~ Feb 26, 2019)*

Bloomberg reported at Feb 25 6:10 PM that SEC filed a motion and requested the court to hold Mr. Musk in contempt.

Feb 25 6:09 PM: $298.02

Feb 25 7:59 PM: $287.87

Pre-Market Hours    After-Market Hours    Volume    Share Price

**Notes:**
[A] NASDAQ regular trading hours are from 9:30 am - 4:00 pm. Pre-Market Hours cover 4:00 am - 9:30am. After-Market Hours cover 4:00 pm - 8:00 pm.
[B] Share Price is calculated as the simple average price of all trades recorded with positive volume within each minute. Volume is the aggregated trade size within each minute.
[C] All times are in ET.

**Source**: Bloomberg