UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : : : : |
| Plaintiff, | : : |
| v. | : No. 1:18-cv-8865-AJN-GWG : |
| ELON MUSK | : : |
| Defendant. | : : : |

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S
REPLY MEMORANDUM TO DEFENDANT ELON MUSK'S RESPONSE TO ORDER
TO SHOW CAUSE**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..........................................................................................................ii

TABLE OF AUTHORITIES ..................................................................................................iii

I.  Musk Violated this Court's Order by Failing to Seek Pre-Approval of a Tweet
    Containing Information Material to Tesla and its Shareholders. ...........................................3

    A.  The Order Contains a Broad Pre-Approval Standard......................................4

    B.  Tesla's Production Forecasts Are Material to Tesla
        and its Shareholders..........................................................................................6

    C.  Musk's 7:15 Tweet Was Materially Different from Prior
        Public Disclosures. ...........................................................................................7

II. Musk Has Not Diligently Attempted to Comply with the Court's Order..............................9

III. The Court Has Authority to Enforce its Order and Compel Musk's Compliance................11

    A.  Musk Waived His Challenge to the Constitutionality of the Order by
        Consenting to its Entry. ..................................................................................11

    B.  The Pre-Approval Requirement Does Not Implicate the
        First Amendment.............................................................................................12

    C.  Authority to Enforce its Order Is Vested with the Court,
        Not the SEC.....................................................................................................13

CONCLUSION........................................................................................................................14

# TABLE OF AUTHORITIES

**CASES**

*Cent. Hardware Co. v. N.L.R.B.*,
  407 U.S. 539 (1972) ................................................................................................................. 12

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ....................................................................................................... 5

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
  673 F.3d 192 (3d Cir. 2012) ..................................................................................................... 11

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v.
  Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015) ............................................... 5

*In re IBM Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998) ....................................................................................................... 5

*In re Refco Inc.*,
  505 F.3d 109 (2d Cir. 2007) ..................................................................................................... 12

*Loce v. Time Warner Ent. Advance/Newhouse P'ship*,
  191 F.3d 256 (2d Cir. 1999) ..................................................................................................... 12

*New York State Nat'l Org. for Women v. Terry*,
  886 F.2d 1339 (2d Cir. 1989) ................................................................................................... 13

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004) ..................................................................................................... 13

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*,
  679 F. App'x 33 (2d Cir. 2017) ................................................................................................ 12

*Shillitani v. United States*,
  384 U.S. 364 (1966) ................................................................................................................. 13

On September 27, 2018, the Commission charged Defendant Elon Musk with fraud for recklessly making a series of false and misleading statements about Tesla that resulted in significant market confusion and disruption. Two days later, Musk agreed to settle the case. This Court ordered him to comply with a series of conditions, including that Musk submit certain of his written communications about Tesla for pre-approval before publishing them. Dkt. No. 14, at 13-14.[1]

The Court-ordered pre-approval requirement for Musk's written communications lies at the heart of the settlement. Musk's unchecked and misleading tweets about Tesla are what precipitated the SEC's charges, and the pre-approval requirement was designed to protect against reckless conduct by Musk going forward. It is therefore stunning to learn that, at the time of filing of the instant motion, Musk had not sought pre-approval for *a single one* of the numerous tweets about Tesla he published in the months since the Court-ordered pre-approval policy went into effect. Many of these tweets were about the topics specifically identified by Tesla in its own policies as potentially material to shareholders. Musk reads this Court's order as not requiring pre-approval unless *Musk himself* unilaterally decides his planned tweets are material. His interpretation is inconsistent with the plain terms of this Court's order and renders its pre-approval requirement meaningless.

Musk's tweet at 7:15 PM ET on February 19, 2019 (the "7:15 tweet") was a blatant violation of this Court's order. The statement that Tesla "will make around 500k" cars in 2019 plainly "contain[ed], or reasonably could [have] contain[ed], information material to the Company or its shareholders." *See* Dkt. No. 14, at 13-14. This is apparent from the immediate response of Tesla's Designated Securities Counsel, *the person who was supposed to have*

---

[1] Page numbers in citations to docketed court filings are to the page numbers assigned by the Court's ECF system.

1

*reviewed this tweet before Musk published it*.  After seeing the published 7:15 tweet, the Designated Securities Counsel "immediately arranged to meet with Musk" to draft a corrective tweet (the "11:41 tweet").  Ex. 4, at 3.  Had Musk simply complied with the Court's order and Tesla's Court-ordered Senior Executives Communications Policy ("the Tesla Policy"), the Designated Securities Counsel presumably would have caught his misstatement on the front end, and Musk would not have again disseminated inaccurate information about Tesla to 25 million people.

Musk's explanation for his failure to seek pre-approval of the 7:15 tweet has changed even in the short time since he published it.  Initially, Musk explained that, while his 7:15 tweet had not been "individually pre-approved," he "believed that the substance had already been appropriately vetted, pre-approved, and publicly disseminated."  Ex. 4, at 3.  Neither Musk nor Tesla claimed at that time that Musk was not required to seek pre-approval because his tweet could not have reasonably contained material information.  *See id*.  After the SEC filed its motion, however, Musk pivoted to a different explanation.  He now claims he did not seek pre-approval because *he* determined prior to publication that his tweet could not have reasonably contained material information.  Dkt. No. 27, at 9-16.  Musk's contention—that the potential size of a car company's production for the year could not reasonably be material—borders on the ridiculous.  Musk's shifting justifications suggest that there was never any good faith effort to comply with the Court's order and the Tesla Policy.  Rather, Musk has simply elected to ignore them.

As Musk observes, requests by the SEC to hold a party in contempt are relatively rare. Here, the SEC acted only after—following discussions with counsel—Musk admitted that he had not sought pre-approval of the 7:15 tweet, which contained demonstrably material and inaccurate

information about Tesla's 2019 vehicle production, and then offered a purported justification that ignored the plain language of the Court's order and the Tesla Policy.  Such brazen disregard of this Court's order is unacceptable and unworkable going forward.  For the reasons set forth below and in the SEC's initial motion, the SEC requests that this Court hold Musk in contempt and impose an appropriate remedy to ensure future compliance.

I.    **Musk Violated this Court's Order by Failing to Seek Pre-Approval of a Tweet Containing Information Material to Tesla and its Shareholders.**

The language of the Court's order is clear:  Musk must comply with Tesla's mandatory procedures requiring pre-approval before publishing tweets that contain or *reasonably could contain* information material to Tesla and its shareholders.  As of the filing of the SEC's motion, for a period of more than two months, Musk tweeted repeatedly about Tesla's business but never once sought pre-approval prior to publication.[2]  Musk's disregard of the pre-approval process culminated in the publication of the inaccurate 7:15 tweet to more than 25 million Twitter users.

Confronted with these facts, Musk urges the Court to re-write the terms of its order and evaluate whether his communications must be pre-approved based on a hindsight analysis of whether they moved the market.  This proposed standard is inconsistent with the Court's order and plainly unworkable because Musk will never know if the market is going to move until it actually reacts to his statements.  Musk's proposed approach also incorrectly applies the

---

[2]   The SEC requested additional information after filing the instant motion because it was also concerned about Tesla's compliance with its final judgment, which ordered Tesla to "implement mandatory procedures and controls to oversee all of Elon Musk's communications regarding the Company . . . and to pre-approve any such written communications that contain, or reasonably could contain, information material to the Company or its shareholders."  *SEC v. Tesla, Inc.*, 1:18-cv-8865-AJN-GWG, Dkt. No. 14, at 15.  To that end, on February 24, 2019, the SEC asked Musk and Tesla the straightforward question of whether Musk had sought or received pre-approval for any tweets since the Policy was adopted.  *See* Dkt. No. 27-6, at 2.  The answer, as it turns out, was simply "no," but it took more than two weeks for Musk and Tesla to concede as much.  *See* Dkt. No. 27-8, at 6.

3

materiality standard applicable in private securities fraud actions in lieu of the much broader pre-approval standard contained in the Court's order. *See* Dkt. No. 27, at 12.

Had Musk sought to comply with the Court's order, he would have sought pre-approval of the 7:15 tweet, which contained new information about a key metric that has long been important to Tesla's business. Indeed, Musk offers no explanation of how he arrived at the counterintuitive conclusion that pre-approval was not required. Conspicuously absent from Musk's submission is any citation to a prior public disclosure that Tesla would make around 500,000 cars in 2019. This is because no such disclosure had ever been made prior to the 7:15 tweet. This fact is alone sufficient to show that the 7:15 tweet reasonably could have contained material information and required pre-approval before Musk published it. At bottom, Musk's tortured, *post hoc* explanation of why he should not be held in contempt is inconsistent with the terms of this Court's order and the Tesla Policy.

### A.  The Order Contains a Broad Pre-Approval Standard.

The SEC asked this Court to approve its settlement with Musk because it included terms, including the pre-approval requirement, that were tailored to prevent future violations of the type alleged by the SEC against Musk in its original complaint, *i.e.*, publicly disseminating misleading or inaccurate information. *See* Dkt. No. 13, at 5-7. In keeping with this prophylactic purpose, the plain language of this Court's order and the Tesla Policy state that Musk is required to seek pre-approval of any written communications that "contain or **reasonably could contain**" information material to Tesla or its shareholders. *See* Dkt. No. 14, at 13-14; Ex. 1, at 1 (emphasis added).

The standard for pre-approval of Musk's communications is not the same as the materiality standard that applies in SEC civil fraud actions, let alone the stringent requirements applicable in private securities actions, as Musk's argument implies. The SEC insisted on the

pre-approval requirement that applies to all statements that contain *or reasonably could contain* information material to Tesla or its shareholders so that Tesla would implement meaningful controls on Musk's communications to prevent any potentially fraudulent or erroneous statements from being published in the first place.

Musk's citations to fraud actions brought by private securities plaintiffs are inapposite. Unlike the statements at issue in those cases, Musk's 7:15 tweet, "Tesla made 0 cars in 2011, but will make around 500k in 2019," was neither non-specific nor aspirational on its face. It stated, without any qualifying language, that Tesla would produce a specific number of cars ("around 500k") in a specific timeframe (the current year, 2019).[3] Moreover, Musk's claim that statements about future performance are immaterial as a matter of law, and therefore need not be pre-approved (Dkt. No. 27, at 12), is inconsistent with the plain language of the Tesla Policy, which unambiguously includes "projections, forecasts, or estimates regarding Tesla's business" on its non-exhaustive list of subjects that may be material to Tesla or its shareholders. *See* Ex. 1, at 1.

Contrary to Musk's suggestion, there is no carve-out from materiality for "celebratory" statements that contain key numerical forecasts about a company's business. Dkt. No. 27, at 11. When Musk publishes a tweet with new information about an important Tesla metric, it must

---

[3]   By contrast, the statements found to be immaterial in the cases cited by Musk were clearly aspirational in nature. *See*, *e.g.*, *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015) (statement that integration of another bank acquired by RBS was "off to a promising start" and that RBS's "positive view . . . has been confirmed" were immaterial statements of "general corporate optimism"); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (general statements about UBS's "compliance, reputation, and integrity" that included qualifiers such as "aims to," "wants to," and "should" were immaterial); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (statement that IBM was not "concerned" about covering its dividend payment to investors was too indefinite to be material for purposes of private fraud action).

first be submitted for pre-approval under the terms of the Court's order and the Tesla Policy, regardless of whether it was subjectively intended as a statement of "pride and optimism."  *Id.* at 12.

### B. Tesla's Production Forecasts Are Material to Tesla and its Shareholders.

In addition to being specifically identified in the Tesla Policy as a potentially material topic (Ex. 1, at 1), Tesla's production forecasts have long been significant to market participants who follow the company.  *See*, *e.g.*, Ex. 6, "1Q18 a Bit Better, but Model 3 Ramp Remains the Story" (Deutsche Bank, May 3, 2018), at 1 (observing that "[i]nvestors' main questions related to the trajectory of Model 3 production," along with two other focus areas).  The forecasts are important because research analysts incorporate their expectations of future production and deliveries into revenue and profit forecasts and corresponding valuation models and price targets for Tesla's stock.  *See*, *e.g.*, Ex. 7, "Rollercoaster Ride with Model 3 Production Turning the Corner; Initiating at OP" (Wedbush Securities, Dec. 13, 2018), at 1 ("Tesla Model 3 production analysis we have built is the linchpin to our broader bull thesis and valuation on the company" and emphasizing that "More Model 3 Production = Key to Cash Flow and Profitability Ramp").

Musk's recognition of the significance of Tesla's vehicle production forecasts to investors is evidenced by the frequency with which he and Tesla highlight such forecasts in their public statements.  For years and continuing through the company's most recent earnings release, Tesla and Musk have prominently featured vehicle production forecasts in their public communications, including Tesla's investor letters, Musk's tweets, and the company's filings with the SEC.  While some companies emphasize forward-looking guidance on financial metrics such as revenue and earnings per share, Tesla often highlights guidance regarding expected production rates and deliveries.  *See*, *e.g.*, Ex. 5, at 5 (lead paragraph of "Outlook" section highlights production forecasts).  Given this focus on Tesla's production capabilities, Musk

cannot credibly argue that his statement, as Tesla's CEO, that the company "will make around 500k" cars in 2019 could not have reasonably contained information material to Tesla and its investors.

### C. Musk's 7:15 Tweet Was Materially Different from Prior Public Disclosures.

Disputing the logical conclusion that new information about a critical company metric reasonably could be material to Tesla's shareholders, Musk claims that the 7:15 tweet "simply was not 'news.'" It is frankly difficult to follow Musk's tortured analysis, which attempts to cobble together information from various public statements by Tesla in January 2019 to arrive at the *post hoc* conclusion that his 7:15 tweet was "within previously disclosed ranges." Dkt. No. 27, at 10. Regardless, Musk's arguments do not change the fact that, before the 7:15 tweet, Tesla had never disclosed that it planned to make around 500,000 cars in 2019. Therefore, Musk was required to obtain pre-approval before he published this statement.

Prior to the 7:15 tweet, Tesla had not publicly disclosed *any* forecast of the total number of vehicles it expected to produce in 2019. This should end the Court's inquiry as to whether Musk's failure to seek pre-approval constituted a violation of the Court's order. In the absence of an affirmative forecast on this important topic, Musk's tweet contained new information that could reasonably have been material to Tesla and its shareholders.

Tesla had, however, previously provided a clear forecast of total vehicle *deliveries* in 2019. Specifically, Tesla's January 30, 2019 Fourth Quarter & Full Year Update ("Update Letter") stated, "In total, **we are expecting to deliver 360,000 to 400,000 vehicles in 2019** . . . ." Ex. 5, at 5 (emphasis added). Tesla included the same delivery forecast in the pre-approved talking points for its January 30 earnings call. *See* Ex. 8 (internal Tesla email dated Jan. 30, 2019, produced in response to SEC's request for pre-approved talking points); *see also* Dkt. No.

7

27-8, at 7 (Tesla representing that these talking points were pre-approved in accordance with the Tesla Policy). Evidently at a loss as to how to explain the material difference between the company's repeated deliveries guidance and his 7:15 tweet,[4] Musk's brief does not even mention the deliveries guidance.

Instead, Musk argues that his tweet could not reasonably have been material because Tesla previously stated that it was "targeting" an annualized production rate in excess of 500,000 Model 3 vehicles sometime between Q4 of 2019 and Q2 of 2020. Ex. 5, at 5. This guidance was also given in Tesla's 2018 Form 10-K and during Tesla's January 30 earnings call. Dkt. No 27-3, at 5; Dkt. No. 27-4, at 3. But this was a *qualified* forecast ("targeting") of Tesla's expected achievement of a *production run rate* (not of aggregate production) for a particular vehicle line[5] at some future point in time (somewhere between late 2019 and the middle of 2020). On its face, the 7:15 tweet—which stated that Tesla will make around 500,000 cars in 2019—was materially different from Tesla's production rate forecasts for Model 3.[6]

---

[4]  While deliveries and production could differ somewhat, in recent periods, Tesla's annual deliveries have closely tracked annual production. In 2018, for example, according to the company's public statements, Tesla produced 254,530 vehicles and delivered 245,506 vehicles. *See* Ex. 9 (excerpts of Tesla, Inc. Form 10-K filed with the SEC on Feb. 23, 2018, and Feb. 19, 2019), at 42. Similarly, in 2017, Tesla produced 101,027 vehicles and delivered approximately 103,184 vehicles. *See id.* at 39; Ex. 10 (compilation of Tesla's quarterly vehicle and production deliveries reports for 2017).

[5]  Musk also obliquely references a public statement about Tesla's Q4 2018 production achievement and "long term run rate" for its Model S and Model X vehicles as somehow supportive of his claim that the 7:15 tweet was immaterial. *See* Dkt. No. 27, at 10. The purported significance of this backward-looking statement is difficult to discern from Musk's brief. Regardless, it does not change the fact that Tesla had not issued any guidance for total 2019 production as of the 7:15 tweet.

[6]  Musk also claims he made a statement during the January 30 earnings call projecting 2019 Model 3 production "on the order of '350,000 to 500,000' vehicles." Dkt. No. 27, at 10. In reality, Musk made no such production forecast during the earnings call. Instead, in remarks that were not a part of Tesla's pre-approved earnings call script, he made a cryptic reference to

8

The divergence between Musk's 7:15 tweet and Tesla's previous public statements is evidenced by the swift reaction of Tesla's Designated Securities Counsel to correct Musk's 7:15 tweet. According to Musk and Tesla's original version of the events of February 19:

> [u]pon seeing the 7:15 PM EST tweet, the Designated Securities Counsel immediately arranged to meet with Musk at the Fremont factory. Musk and the Designated Securities Counsel together drafted a clarifying tweet.

*See* Ex. 4, at 3. The subsequent 11:41 tweet indicated that the 7:15 had been inaccurate ("*meant to say*") and reiterated that both the deliveries forecast and Model 3 production rate forecasts remained in effect. Decl. of Elon R. Musk (Dkt. No. 27-9), at ¶ 12 ("Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week. Deliveries for year still estimated to be about 400k.")

None of the prior statements Musk points to contains a forecast of 2019 vehicle production at all, much less a forecast of around 500,000 cars. As a result, Musk's 7:15 tweet—which stated that Tesla "will make 500k" cars in 2019—was reasonably likely to add to the total mix of information available to investors at the time about a metric important to Tesla investors, and Musk's failure to submit the tweet for pre-approval before publishing it violated the Court's order.

**II.     Musk Has Not Diligently Attempted to Comply with the Court's Order.**

Musk made no diligent or good faith effort to comply with the pre-approval provision of the Court's order. Musk failed to seek pre-approval of *any* of his Tesla-related tweets, from the

---

"350,000 to 500,000 Model 3s" after Tesla's CFO made a comment about potential market size for North America, Europe and Asia, following a question from an analyst relating to geographic dispersion of Model 3 sales. *See* Dkt. No. 27-3, at 8. In the wake of the earnings call, multiple research analysts observed that Musk's murky remark was inconsistent with Tesla's official guidance. *See, e.g.*, Ex. 11, "Leaving Intensive Care . . . Waiting for Revenues to Ramp" (Evercore ISI, Jan. 31, 2019), at 2 (observing that Musk had made an "off-the-cuff" statement about "'350-500k Model 3s, something like that this year' when the official total delivery guidance is only 360-400k").

9

time Tesla implemented its Court-ordered Policy until the SEC filed this motion.  Since Tesla adopted the Policy on December 11, 2018, Musk has regularly published substantive information about Tesla and its business in tweets and replies to other Twitter users' tweets.  In addition to his February 19 tweet about 2019 production, Musk has tweeted about the following:

- Tesla vehicle tax credits and pricing,
- Tesla vehicle maintenance costs,
- Tesla's plans for expansion of charging stations internationally,
- the EPA rating of Tesla vehicles,
- Tesla's construction and production plans for a new Shanghai factory,
- Tesla's refund policies,
- Whether Tesla plans to phase out its Model S and Model X vehicles in the future,
- The status of regulatory approvals for Tesla's assisted driving features,
- The results of government safety testing of Tesla vehicles, and
- A response refuting a published report that Tesla had reached agreement with a Chinese company to supply batteries.

*See* Ex. 12 (screenshots of examples of Musk's tweets).

Musk has chosen to disregard the pre-approval requirement altogether by claiming that the Court's order and the Tesla Policy vested in him the exclusive authority to determine whether a tweet could have reasonably contained information material to Tesla or its shareholders.  *See* Dkt. No. 27-9, at ¶ 6.  Musk, however, does not identify any language in the order or the Tesla Policy that grants him such discretion.  Nor does he articulate any particular methodology or process that he employs to determine that a tweet does not require pre-approval before

publishing it. This is particularly troublesome given that it was Musk's lack of judgment with respect to public statements about Tesla that led to entry of the Court's order in the first place.

Instead of submitting his tweets for pre-approval, Musk stated that he relies on Tesla counsel's review of his tweets "upon publication" to ensure that he is compliant with the order and the Policy. *Id.* at ¶ 7. It strains credulity that Musk could believe in good faith that he is allowed to substitute *post hoc* review for the pre-approval requirement clearly set forth in the Court's order. While Musk professes to take seriously his obligations to comply with the Court's order and the Tesla Policy, his actions speak much more loudly: he has not diligently sought to comply with either.

**III.     The Court Has Authority to Enforce its Order and Compel Musk's Compliance.**

Musk argues that unless he is granted complete discretion to determine whether his written communications about Tesla require pre-approval, the Court's order is unconstitutional and exceeds the scope of the SEC's authority. Dkt. No. 27, at 20-25. This frivolous argument rests on a misapprehension of governing case law and on the false premise that the Court-ordered pre-approval requirement prohibits his speech.

> **A.     Musk Waived His Challenge to the Constitutionality of the Order by Consenting to its Entry.**

Musk admits that he consented to the order (*id.* at 23) in which he waived any First Amendment rights that may be implicated by the pre-approval provision. *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 205 (3d Cir. 2012) (even if court enforcement of a consent judgment constitutes state action, "constitutional rights . . . may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver"). Further, "it is well-established that a party to a consent judgment is thereby

11

deemed to waive any objections it has to matters within the scope of the judgment." *In re Refco Inc.*, 505 F.3d 109, 120 (2d Cir. 2007) (internal quotation omitted).

Musk's argument that he consented to the terms of the Court's order only because he believed he had sole discretion to determine when the pre-approval requirement applied (Dkt. No. 27-9, at ¶ 6) is inconsistent with the plain language of the Court's order.  The Court's order clearly mandates that Musk obtain pre-approval of written communications that contain or reasonably could contain material information and states nowhere that this requirement is subject to his discretion.  Musk voluntarily waived the constitutional arguments he now advances.  Dkt. No. 6-1, at 4 ("Defendant enters into this Consent voluntarily").

### B. The Pre-Approval Requirement Does Not Implicate the First Amendment.

Musk's First Amendment argument also fails because it rests on the false premise that the pre-approval requirement imposes a prior restraint on his speech.  Dkt. No. 27, at 20-22.  Submitting his written statements for pre-approval does not, as Musk baldly asserts, mean that he is prohibited from speaking.  Dkt. No. 27, at 23.  As long as a statement submitted for pre-approval is not false or misleading, Tesla would presumably approve its publication without any restraint on Musk.  And if the proposed statement is false or misleading, then any restraint on Musk's speech would be constitutional even if it involved state action.  *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 679 F. App'x 33, 36-37 (2d Cir. 2017) (prohibition of speech that is false, deceptive, or misleading does not violate First Amendment) (citing *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014); *Democratic Nat'l Comm.*, 673 F.3d at 204-05).

Moreover, the First Amendment limits only state action, not private action.  *Cent. Hardware Co. v. N.L.R.B.*, 407 U.S. 539, 547 (1972); *Loce v. Time Warner Ent.*

*Advance/Newhouse P'ship*, 191 F.3d 256, 266 (2d Cir. 1999). No First Amendment concern exists given that Musk's speech is to be reviewed by Tesla, a private actor, and not the government. Finally, Musk's argument that any restraint on his speech is already served by less-restrictive means—*i.e.*, Musk's discretion and potential future SEC enforcement actions (Dkt. No. 27, at 21)—is belied by Musk's demonstrated inability to discern potential materiality and is inconsistent with the prophylactic purpose of the parties' negotiated relief. Thus, the supposedly less-restrictive means put forth by Musk are demonstrably ineffective and would be inconsistent with the parties' negotiated resolution embodied in the terms of the Court's order.

        **C.     Authority to Enforce Its Order Is Vested with the Court, Not the SEC.**

Musk's argument that enforcement of the terms of the Court's order exceeds the SEC's authority is equally flawed. Enforcement of the provisions of the Court's order does not depend on the SEC's statutory authority to bring injunctive action or on any authority of the SEC at all. Rather, *this Court* has broad equitable powers to enforce the terms of its order against Musk through civil contempt. *See*, *e.g.*, *Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."); *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004) ("To the extent that a contempt sanction is coercive, the court has 'broad discretion to design a remedy that will bring about compliance.'") (quoting *Perfect Fit Indus. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982)); *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (affirming civil contempt sanctions issued "to coerce the contemnor into future compliance with the Court's order" despite First Amendment implications); *see also* Dkt. No. 14, at 14 ("this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment").

## CONCLUSION

For all the reasons stated, the SEC respectfully requests that the Court find Defendant Elon Musk in contempt of the Court's October 16, 2018 Final Judgment and order all necessary and appropriate relief to enforce its terms.

In response to the Court's March 12, 2019 order (Dkt. No. 29), the SEC respectfully submits that, because there appear to be no disputed issues of material fact, an evidentiary hearing is unnecessary.

Dated: March 18, 2019

*s/ Cheryl L. Crumpton*
Cheryl L. Crumpton\*
E. Barrett Atwood\*

\*Admitted *pro hac vice*

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4459 (Crumpton)
crumptonc@sec.gov

44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2467 (Atwood)
atwoode@sec.gov

Of counsel:

Erin E. Schneider
Steven Buchholz
Walker S. Newell

**CERTIFICATE OF SERVICE**

  I certify that on March 18, 2019, a copy of the foregoing was filed through the Court's CM/ECF system, which will send copies to all counsel of record.

                <u>*s/ Cheryl L. Crumpton*</u>
                Counsel for the SEC