J443SECC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

U.S. SECURITIES and EXCHANGE
COMMISSION,

                    Plaintiff,

            v.                          18 CV 8865 (AJN)

ELON MUSK,

                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        April 4, 2019
                                        2:00 p.m.

Before:

                    HON. ALISON J. NATHAN,

                                        District Judge

                        APPEARANCES

U.S. SECURITIES AND EXCHANGE COMMISSION
BY:  CHERYL L. CRUMPTON
       STEVEN D. BUCHHOLZ
       E. BARRETT ATWOOD

HUESTON HENNIGAN, LLP
       Attorneys for Defendant
BY:  JOHN C. HUESTON
       MOEZ M. KABA
       ALISON L. PLESSMAN

J443SECC

1          THE DEPUTY CLERK:  This is in the matter of the United

2    States Securities and Exchange Commission v. Elon Musk.

3    Starting with the government, counsel, please state your name

4    for the record.

5          MS. CRUMPTON:  On behalf of the Securities and

6    Exchange Commission, I'm Cheryl Crumpton.  With me is Barrett

7    Atwood and Steven Buchholz.

8          THE COURT:  For the defendant?

9          MR. HUESTON:  Good afternoon, your Honor.  John

10   Hueston, Moez Kaba, and Alison Plessman appearing on behalf of

11   Elon Musk, who is also with us at counsel table.

12         THE COURT:  Good afternoon, counsel.  Good afternoon,

13   Mr. Musk.

14         We are here on the SEC's order to show cause why

15   contempt should not be ordered.  I have received the parties'

16   briefing, including sur-reply briefing.  I thank counsel for

17   that.

18         We'll organize ourselves today as follows:  You'll

19   have 45 minutes per side, if we need it.  And it is the SEC's

20   motion, so you'll go first, and you may reserve time if you'd

21   like, Ms. Crumpton.

22         MS. CRUMPTON:  Thank you, your Honor.  If your Honor

23   doesn't mind, I'm going to use the lecturn because I have a

24   couple of documents that I'm going to want to show.

25         THE COURT:  I prefer actually both counsel to use the

J443SECC

1    podium.  And I often say the room is beautiful on the eye, but

2    not on the ear, so please do speak into the microphone.

3              MS. CRUMPTON:  Absolutely.  Thank you, your Honor.  I

4    doubt it's going to take us 45 minutes, but I would like to

5    reserve a few minutes for rebuttal.

6              May it please the Court --

7              THE COURT:  Five minutes then?

8              MS. CRUMPTON:  Five minutes should be plenty.  Thank

9    you.

10             May it please the Court.  We are here today because

11   Elon Musk has disregarded the preapproval requirement of this

12   Court's order, and has offered a series of shifting

13   justifications to ignore the plain language of what he agreed

14   to and what this Court required him to do.

15             I'd like to start with a bit of background, and then

16   walk through each of the elements of the standard for civil

17   contempt.

18             The Court will recall that the SEC brought this case,

19   and the Court entered the order that's at issue based on Elon

20   Musk recklessly tweeting out material information that had no

21   basis in fact to tens of millions of people.  It was his lack

22   of judgment and his recklessness that led to serious market

23   disruption and confusion.

24             Based on Mr. Musk's conduct, the SEC charged him with

25   10b securities fraud, and two days later, both Mr. Musk and

J443SECC

1    Tesla agreed to settlements with the SEC.  But before this

2    Court would enter those settlements, it required the parties to

3    come before it and explain why they were fair, why they were

4    reasonable, and why they were in the public interest.  And your

5    Honor will recall that what the SEC told the Court about why

6    these settlements were fair, reasonable, and in the public

7    interest, is because they included specific corporate

8    governance undertakings, like the preapproval requirement.

9         This preapproval requirement was the heart of the

10   relief that the Court ordered in this case, because it was

11   designed to address the very harm that was the basis of the

12   fraud charge against Mr. Musk.  This preapproval requirement

13   was designed to keep him from publishing inaccurate statements

14   again in the future.  But the only way this preapproval

15   requirement serves its necessary purpose --

16        THE COURT:  Just to pause for a moment.  Because that

17   briefing in response to my order wasn't in the parties' papers,

18   I don't think.  But I looked at it today, and noted that in sub

19   (e) of that document on page two, which is under the broad

20   heading "proposed settlement terms," it takes what is arguably

21   the sort of broadest view that's been briefed to me on the

22   meaning of the provision.  It says, "Comply with mandatory

23   procedures to be adopted by Tesla concerning the oversight and

24   approval of his Tesla-related public statements."  Right?

25        MS. CRUMPTON:  That's correct.  That is correct.  And

J443SECC

1    that preapproval requirement only serves its necessary purpose

2    if Mr. Musk complies with it in good faith.

3              It's become pretty clear over the course of the last

4    few weeks that he is not doing that.  For example, we learned

5    for the first time during the course of this proceeding that

6    Mr. Musk has failed to submit a single tweet for preapproval

7    during the over two-month period from the time that Tesla

8    implemented the preapproval policy to the time that the SEC

9    brought this motion in February.

10             THE COURT:  Just let me pause you for a moment because

11   I tend to think in certain boxes.  You're laying out the test

12   for good faith.

13             MS. CRUMPTON:  That's correct.

14             THE COURT:  What you just said was what's become clear

15   is he's failed to comply with the procedures in good faith.

16   Then you're citing a number of post the tweet in issue pieces

17   of evidence.

18             MS. CRUMPTON:  Right.

19             THE COURT:  Where does that fit in?  Is it in the

20   language of the consent judgment.  Maybe it fits in under

21   diligent effort to comply, etc.  Where are you putting that

22   since you're starting me with the question of good faith?

23             MS. CRUMPTON:  Well, we would argue it fits within

24   diligent efforts to comply.  And I mean, as Mr. Musk has

25   correctly pointed out, there is some degree of discretion in

J443SECC

1    the language here.  It doesn't say this is a binary process

2    where every single tweet about Tesla has to be preapproved.

3              THE COURT:  I don't think that, do you?

4              MS. CRUMPTON:  No.

5              THE COURT:  What would be a Tesla-related tweet or

6    communication that wouldn't require preapproval?

7              MS. CRUMPTON:  For example, if Mr. Musk wanted to

8    communicate with individual Tesla owners about their personal

9    vehicles on Twitter, something he actually does quite

10   regularly.  That's clearly an immaterial tweet that wouldn't

11   require preapproval.  But that is not the communication that we

12   are talking about here.  The communication that we are talking

13   about here is very, very different.  And --

14             THE COURT:  Can I ask you, in your reply brief you

15   listed, similar to what you said a moment ago, I think 10 or so

16   additional communications of Mr. Musk that you said needed

17   preapproval on any of these, and that's something you say about

18   diligent efforts.

19             Is it the SEC's position that any of those

20   communications required preapproval?

21             MS. CRUMPTON:  Your Honor, we have not moved for a

22   contempt sanction based on any of those tweets.  We don't offer

23   them to say that they are all necessarily violations.

24             THE COURT:  My question is are any of them?

25             MS. CRUMPTON:  They may well be.  They may well be.

J443SECC

1    We haven't undertaken that analysis.  We are looking at the

2    tweet that is the most clear violation, which is the 7:15

3    tweet.  We would offer that there very well may be tweets

4    within those 10 that we submitted.  There is at least one

5    tweet, I believe about the opening of the Tesla Gigafactory,

6    that actually moved the market.  So it may very well be that

7    some of those tweets required preapproval.

8            But we offered them to show that he is regularly

9    tweeting about topics that are specifically laid out in Tesla's

10   policy as communications that could be material and just

11   blowing past that preapproval requirement.  He has stated that

12   he's substituted his own procedures for the preapproval

13   requirement.

14           If you look at paragraph seven of Mr. Musk's

15   declaration to this Court, he says, and I quote:  "With my

16   knowledge and approval, Tesla's general counsel and disclosure

17   counsel have been reviewing all tweets promptly in real time

18   upon publication to ensure that any errors are caught and

19   rectified quickly."

20           That is not what the SEC negotiated in its settlement,

21   and that is not, most importantly, what this Court ordered.

22           THE COURT:  You've taken that out of context, right.

23   He says earlier, the topic sentence here is he's taking his

24   obligations seriously.  He's cut his tweeting down

25   substantially.  And I think he's pointing here to sort of

J443SECC

diligence efforts, just as you point to post tweeting conduct

to show lack of diligence, he is in a sense pointing to post

tweeting conduct to show diligence, right.  He's not saying

that's what the policy requires of him as a sort of after

communication step.

MS. CRUMPTON:  But what he's not saying in that

declaration, and what he doesn't say anywhere in any of the

pages and pages of briefing that he submitted to this Court, is

the actual analysis that he underwent before he published this

7:15 tweet without preapproval.  He's offered you a lot of

justifications, but he has never said here is the analysis I

went through to decide this reasonably could not contain

material information.  And instead, he says look at these other

things that I did.

And I would submit that there's no need for the

general counsel and disclosure counsel to review his tweets in

real time upon publication to catch and rectify errors if the

preapproval policy is being followed in the way that this

Court's order requires it to be.

THE COURT:  What if he thought he was just repeating

information that had already been publicly disclosed.  So let's

focus on that.  From the SEC's perspective, if he's doing that,

if he's simply repeating information that has already been

disclosed, there is no question, there is no delta between what

he says and what's previously been put out there.  Does he

J443SECC

require preapproval?

MS. CRUMPTON:  I think it would depend on whether that particular communication fell within the Court's language of communication that reasonably could contain material information.  Sometimes merely repeating prior guidance later in time shows that the company is still on track for that guidance, it could potentially be material.  So I wouldn't say that there's never a situation --

THE COURT:  There is an approved communication that gets put out that says we're going to produce 500,000 cars in 2019, and Mr. Musk -- let's start with a hypo of he retweets that or forwards that as a tweet.  Danger of judges not using social media.  So he retweets that with some celebratory language.  This is great news, see below.

Does that communication need prior approval?

MS. CRUMPTON:  I mean, understanding that it is a hypothetical, and I'm giving it the thought as I'm standing here, I --

THE COURT:  That's the game.

MS. CRUMPTON:  Right.  Exactly.  I would say that's highly unlikely to be material.  If it's just merely repeating something that Tesla has already published.

But that is not the factual situation that we have here.

THE COURT:  Of course.  And then let's say he makes

J443SECC

1    some changes, puts a gloss, are the words in the briefing, and

2    it is essentially the same information.  Maybe he converts

3    500,000 cars a year in 2019 to 10,000 cars a week.

4              Does that need preapproval?

5              MS. CRUMPTON:  Tesla's policy already addresses that

6    scenario.  It says if it is not a verbatim unwritten

7    communication that's already been approved, it requires a

8    subsequent preapproval.

9              THE COURT:  The edit provision.

10             MS. CRUMPTON:  Right.  This is the provision that says

11   if you've sought preapproval of a communication, and you want

12   to rerelease that communication with any edits, you have to

13   submit it again for preapproval.  So Tesla --

14             THE COURT:  I think it is an interesting point which

15   you raise in your opening brief.  It wasn't really addressed in

16   the response brief, and then you didn't come back to it in

17   reply.  I didn't know why.  Just focusing on that language for

18   a second.

19             I think when I first read that argument in your

20   briefing, I thought, well, that's a good point.  I wonder what

21   Mr. Musk is going to say in reply, and then I didn't find

22   anything.  So, obviously, Mr. Hueston, you'll have your chance.

23             But if you look at that language, right, which is on

24   page two of the policy, the second bolded bullet point.

25   There's two subsections to this provision, right, (i) and (ii).

J443SECC

1   You noted both in your briefing.  Mr. Musk's briefing responded
2   to the (ii), but not (i).  And the (i) seems the more important
3   point.  Reading that and editing out the (ii), it says if an
4   authorized executive further edits a preapproved written
5   communication, after receipt of written preapproval, such
6   authorized executive will reconfirm the preapproval in writing
7   in accordance with this policy, prior to release.

8       So, also, in Tesla's letter which was attached that
9   focused on (ii) here, and said he is in compliance, SEC, you
10  misunderstood what this means.  They, too didn't focus on (i).
11  So why didn't you come back to that in your reply?

12      MS. CRUMPTON:  Your Honor has focused, as we did, with
13  the fact there are shifting justifications here.

14      The first thing we raised in the first instance in our
15  initial brief, because we were responding to the first
16  justification that Mr. Musk and Tesla offered for why this was
17  okay.  If you look at the exhibit that we attached to our first
18  filing, there was a letter from Tesla's counsel on behalf of
19  both Tesla and Mr. Musk.  They offered the explanation that
20  this tweet did not -- was not preapproved because it had -- the
21  substance had already been preapproved.  And we pointed out
22  that is still a violation of the policy.

23      THE COURT:  Can I ask you, you read this provision as
24  not containing a materiality analysis with respect to the edit?
25  In other words, this provision says if you have a preapproved

J443SECC

1    statement, so it was originally material.  If it gets approved

2    and you make any edits, you have to get it approved again, no

3    matter the nature of the edits?

4              MS. CRUMPTON:  Well, that's what the policy says.

5              THE COURT:  That's the facial meaning of the policy.

6    Do we know from Tesla if it has a different interpretation?  We

7    don't.

8              MS. CRUMPTON:  Tesla has not offered a different

9    interpretation that I am aware of, of that provision.

10             But, I'm glad the Court brings up Tesla, because

11   Tesla's conduct is also troubling to the SEC.  This Court

12   ordered Tesla to implement a mandatory preapproval process, but

13   they are apparently fine with Mr. Musk making up his own

14   procedure instead, and deciding whether something needs

15   preapproval based on whether he thinks the sum and substance is

16   already in the public record.

17             And we would submit that the Court should, for that

18   reason, give no weight to Tesla's opinion with respect to

19   Mr. Musk's conduct in this matter.  In fact, the Court should

20   be concerned that, despite the corporate governance

21   undertakings that the Court ordered, Tesla still appears to be

22   unwilling to exercise any meaningful control over the conduct

23   of its CEO.  I'd like to focus --

24             THE COURT:  Well, they did get within a few hours a

25   corrective tweet; did they not?

J443SECC

1          MS. CRUMPTON:  They did get a corrective tweet,

2     because the preapproval procedure was not correctly followed.

3     That corrective tweet highlighted that the preapproval

4     procedure was not correctly followed.

5          While we do not fault Tesla or Mr. Musk for correcting

6     that statement promptly, that's not what this Court ordered

7     Mr. Musk and Tesla to do.  We don't want to be in a situation

8     where this designated securities counsel for Tesla is reacting

9     at the same time that the entire world is reading the

10    information that Mr. Musk is tweeting out.  The whole point is

11    to stop that before it happens in the first instance.

12         THE COURT:  Right.  And the question is, when is he

13    required to do that.  You were going to start with the -- I

14    turned you away from the "reasonably could contain" language.

15         MS. CRUMPTON:  Sure.  So why don't we start with that.

16    Why don't we start with the fact that that language is clear

17    and unambiguous.

18         THE COURT:  What does it mean?

19         MS. CRUMPTON:  It mean, we know it's broader than the

20    standard for securities fraud, because it contains the language

21    that not just a communication that contains material

22    information, but that reasonably could contain information

23    material to Tesla or its shareholders.  So we know just --

24         THE COURT:  Sometimes when I read it I think it's

25    missing something.  Like, reasonably could be seen to contain

J443SECC

1    or reasonably could be -- its meaning seems more like arguably

2    could contain.

3              Is that phrasing one that you've used before,

4    "reasonably could contain"?

5              MS. CRUMPTON:  Your Honor will be not be surprised to

6    learn that this is a somewhat unusual factual situation, so I

7    don't believe that we have used that formulation.

8              THE COURT:  It's not an SEC term of art.

9              MS. CRUMPTON:  It is not an SEC term of art.  But just

10   because something is not capable of mathematical determination,

11   that is what we do in the law.  We interpret the words, and we

12   figure out whether the facts before us fit within those words.

13   And I would submit to the Court that this is not even a close

14   call.  And the way you know that --

15             THE COURT:  The question is it clear and unambiguous.

16             MS. CRUMPTON:  It is clear and unambiguous.

17             THE COURT:  What does it mean?

18             MS. CRUMPTON:  It means it is broader than the

19   standard that the law puts forth for materiality, and we would

20   argue it essentially means unless something is obviously

21   immaterial, it needs to get preapproval.

22             THE COURT:  Interesting.  And you get that as a

23   textual matter?  There's case law that sort of suggests that

24   gloss?  That what reasonably could contain material information

25   means that, unless it obviously -- unless something is

J443SECC

 1    obviously immaterial, I'm not sure on a spectrum of

 2    materiality, if that's right.  Where do you get that from?

 3            MS. CRUMPTON:  Your Honor, I think we can look at

 4    Tesla's own policy to inform what reasonably could contain --

 5            THE COURT:  Do I need to do that to interpret the

 6    consent judgment?

 7            MS. CRUMPTON:  I don't think you do, because I think

 8    that this tweet clearly needed preapproval under either the

 9    reasonably could contain language or even the contained

10    language.

11            THE COURT:  In other words, I could conclude it's

12    material, and you win, and not have to touch that language.

13            MS. CRUMPTON:  Right.  Right.

14            THE COURT:  But if I think it's on the gray area of

15    materiality, if I were to come to that conclusion, I will have

16    to know what that means, and the first step in the contempt

17    analysis is, is that clear and unambiguous.  Right?

18            MS. CRUMPTON:  I would note that Mr. Musk did not even

19    raise any ambiguity in the Court's order until his sur-reply.

20    And that there has been no argument up until that point --

21            THE COURT:  Right, but you differ on the meaning.  As

22    you pointed out in your briefing, he is just saying

23    materiality.  So --

24            MS. CRUMPTON:  Right.

25            THE COURT:  He's read it out.

J443SECC

1          MS. CRUMPTON:  The fact that the parties -- that one

2     party offers a different interpretation can't be the test for

3     ambiguity.  All anyone would have to say is, well, I disagree

4     with the SEC's interpretation, and voila, it's now ambiguous.

5          There is no ambiguity here.  If you look at his

6     interpretation of what the language means, it flies in the face

7     of the plain language of the order.

8          First of all, Mr. Musk argues that preapproval is

9     required only if a communication is material using the

10     narrowest possible definition of materiality.  Just absolutely

11     reading out, as you say, the reasonably could contain language

12     that's in the Court's order.

13          Secondly, Mr. Musk has repeatedly urged the Court to

14     decide whether his communication required preapproval based on

15     whether it moved the market.  That can't possibly be the

16     standard.  No one is going to know before they publish a

17     communication whether it's going to move the market or not.  So

18     that just disregards the concept of preapproval.

19          There can't be a serious argument here that this 7:15

20     tweet was not required to be preapproved, either under the

21     materiality prong or the reasonably could contain material

22     information prong.  It is material under either definition, and

23     the way we know that is by the course of conduct on

24     February 19.  Up until February 19, even though Mr. Musk had

25     been tweeting about Tesla regularly, the SEC assumed that he

J443SECC

1    had been seeking and receiving preapproval.  It wasn't until we

2    saw the February 19 tweets that we were confronted with the

3    obvious evidence of non-compliance.

4           And for this point, I want to use the document camera

5    just to put up before the Court the two communications that are

6    at issue.

7           THE COURT:  I have them here, but go ahead.

8           MS. CRUMPTON:  At 7:15 Eastern Time, on February 19,

9    Mr. Musk tweeted:  Tesla made zero cars in 2011 but will make

10   around 500K in 2019.

11          And then, according to what happened next, according

12   to what Tesla and Musk said what happened next, is that the

13   securities counsel for Tesla immediately arranged to meet with

14   Mr. Musk at the Fremont factory, and together they drafted a

15   clarifying tweet.  And that clarifying tweet, as they call it,

16   is this tweet that was published a little over four hours later

17   at 11:41 p.m. Eastern Time, where Mr. Musk says what he meant

18   to say, and what he meant to say, was Tesla's previous guidance

19   on vehicle deliveries and Model 3 production rates.

20          And so just those events show you that this was

21   something that had to be corrected.  And the Court doesn't need

22   to wade into the materiality analysis that Mr. Musk's attorneys

23   have suggested.  And I would submit to the Court that the mere

24   fact that you have to take his 7:15 tweet and compare it to

25   various pieces of other information that was arguably in the

J443SECC

1   public domain in order to determine that it may or may not have

2   been material, shows it is not a communication that so clearly

3   could not have contained material information that he properly

4   blew past the preapproval requirement.

5            THE COURT:  It goes back to the line I started you on

6   and you pointed to the editing language.  But I am still

7   curious, setting aside the argument about editing, if he is

8   repeating without any new information, any significant new

9   information into the mix, in his communication, does that

10  require preapproval?

11           MS. CRUMPTON:  That would be a violation of Tesla's

12  policy, if he hasn't sought preapproval.

13           THE COURT:  Let's say Mr. Hueston's got a great answer

14  on the editing provision, and I don't know what it is.  It's

15  not a question of editing.  So just in the first instance, is

16  this a communication that needs to be preapproved.  And my hypo

17  is it contains no new information.

18           MS. CRUMPTON:  I suspect what Mr. Hueston will

19  argue --

20           THE COURT:  Before you guess that, answer my question.

21           MS. CRUMPTON:  What I was going to say is, if it -- I

22  would suspect that the -- sorry.  It's going to be that

23  materiality is the umbrella over which all of this has to be

24  considered.  So if it's just simply a repeating of other

25  information verbatim, then how could that be material.

J443SECC

| | |
|---|---|
| 1 | But the Court doesn't have to wade into that difficult |
| 2 | question here.  Because -- |
| 3 | THE COURT:  I might if I think that reasonably could |
| 4 | contain is not clear or unambiguous.  Then I might, right, or I |
| 5 | may not even need to get to that question I think it's |
| 6 | material. |
| 7 | MS. CRUMPTON:  What I'll point your Honor to is the |
| 8 | fact that Tesla had never, up until the 7:15 tweet, ever said |
| 9 | how many cars it was going to produce in 2019. |
| 10 | THE COURT:  That's the analysis, that's the analysis |
| 11 | that they just started saying don't worry about that, judge. |
| 12 | That's the hypo which you still haven't quite answered.  If |
| 13 | he's just repeating indisputably already public information, if |
| 14 | it adds nothing new to the mix, does he need to get |
| 15 | preapproval? |
| 16 | MS. CRUMPTON:  As I said before, reaffirming guidance |
| 17 | could be material.  It depends on the amount of time that has |
| 18 | passed between -- |
| 19 | THE COURT:  Maybe yes, maybe no. |
| 20 | MS. CRUMPTON:  Maybe yes, maybe no.  It is a |
| 21 | fact-specific inquiry under whether or not this is a |
| 22 | communication that reasonably could contain material |
| 23 | information. |
| 24 | THE COURT:  So the reasonably could contain doesn't |
| 25 | answer that question.  You are not saying, look, if it's -- |

J443SECC

yes, always.  It's things like production numbers, if it is the
kind of information.

            MS. CRUMPTON:  No.

            THE COURT:  So always yes, so if -- I'm just trying to
focus.  If he's repeating exactly verbatim information what's
already out there, even if it is not verbatim.  If he's
repeating information that's already out there, it came out
yesterday, he's repeating it today.  Does he need preapproval?

            MS. CRUMPTON:  We are not saying always yes or always
no to that.  It depends, is the answer.  But, again, I don't
think --

            THE COURT:  Why?  The question is why?  Because if we
have this incredibly broad notion of reasonably could contain,
it's really anything that's in that ballpark, he's got to the
get preapproval because we've got to make sure it exactly lines
up.  That could be an answer.

            MS. CRUMPTON:  But that's not the answer.  The answer
is, if it reasonably could contain information that's material
to Tesla or its shareholders, then it has to be --

            THE COURT:  So a tweet about production numbers,
forecasted, timeframe, all that.  Not necessarily reasonably
could contain?  That's -- I thought you were proposing a
broader meaning to that language.

            MS. CRUMPTON:  It is going to always be a
fact-specific inquiry in terms of what does reasonably could

J443SECC

1    contain material information.

2              THE COURT:  What does that inquiry look like?

3              MS. CRUMPTON:  The inquiry looks like is this

4    information that on its face is not material.  That it does not

5    need the second opinion of a securities lawyer at Tesla before

6    I publish this information to the world.  And if you look at --

7              THE COURT:  Sorry.  So Mr. Musk can make the

8    assessment, I'm going to put out numbers that are already out.

9    And wow, in the abstract, yes, those might be the kinds of

10   stuff that would be material and I'm constrained on.  But I

11   know that it's just exactly like what's been put out already.

12   So I don't need preapproval to make sure I'm right about that.

13             That is the SEC's position?

14             MS. CRUMPTON:  No, that is not the SEC's position.

15   The problem is that judgment.  That, oh, I know that I'm right

16   about this, and I don't need to show it to anybody else because

17   I know that if you combine in various combinations that my

18   lawyer will argue makes this not material, then I don't have to

19   get preapproval.  That's what we've seen in this case.

20             THE COURT:  Why doesn't it follow from that, that

21   anything sort in that subject area, that's not his assessment

22   to make under the policy and judgment?  I don't understand -- I

23   would have thought the SEC's position is yes, exactly, he can't

24   make that assessment.  That's what we've agreed to.  He's got

25   to check it with other folks to make sure.

J443SECC

1          But you won't give me -- I'm surprised.  I accept it

2     that it's not the SEC's position that categorically, anything

3     that involves something as clear -- something otherwise

4     seemingly material as projection numbers, production numbers,

5     timeframe, he doesn't need to go to preapproval, because that

6     may be just exactly the information that's already out there.

7          MS. CRUMPTON:  We would still point to Tesla's policy

8     and say that could be a violation of Tesla's policy, if he is

9     putting out information without getting preapproval, and it

10    doesn't fall within (i) and (ii) that the Court identified in

11    the policy.

12         If you're talking strictly about does this fall under

13    the materiality standard or not, it is impossible to say

14    categorically that anything falls in or out of -- there are

15    certain things, like I said before.  Tweeting with individual

16    customers about their individual Tesla.  That's pretty close to

17    categorically immaterial.  But we're nowhere close to that.

18         We are talking about a car company's production

19    numbers for the year that have never been tweeted out before.

20    I don't think the Court has to reach the thornier issue of if

21    he had just been verbatim repeating something that had already

22    been said.

23         THE COURT:  That's what he effectively says he did.

24         MS. CRUMPTON:  That's what he says, but that's not

25    correct.  It is just not correct.

J443SECC

1          THE COURT:  It is not correct that he was right about
2     that?

3          MS. CRUMPTON:  No, it's not correct that he was just
4     tweeting out information.

5          THE COURT:  He was wrong about that?

6          MS. CRUMPTON:  He was wrong about that.  And there's
7     no evidence that he actually did this analysis before he
8     decided that he didn't have to get preapproval.  You've seen
9     pages and pages of argument, but they're all lawyer-created
10    arguments about why, if you look at the certain case law that
11    arguably this is not a communication that reasonably could
12    contain material information.  But we don't see any subjective
13    analysis prepublication by Mr. Musk.

14         THE COURT:  Is that relevant to the question of
15    whether he has violated the order?

16         MS. CRUMPTON:  It's not relevant to the question of
17    whether he's violated the order.  It might be relevant to the
18    question of whether he's diligently tried to comply.

19         THE COURT:  Even if he went through that process,
20    would you still argue that he violated the order?

21         MS. CRUMPTON:  He violated the order because he was
22    wrong.  It doesn't require a willful violation in order to be
23    found in civil contempt.

24         THE COURT:  He was wrong that it was the same as
25    information that was already out there.

J443SECC

1          MS. CRUMPTON:  That is correct.

2          THE COURT:  But you don't take the position that he

3    always needs preapproval to make that assessment.

4          MS. CRUMPTON:  Again, it depends on the facts and

5    circumstances of what the information is.  We can't say

6    categorically that any particular piece of information is or

7    isn't always material.

8          THE COURT:  Tell me what authority you have for the

9    imposition of contempt when you've got that sort of what you

10   just described.  You can't say, can't know for sure whether it

11   crosses the line or not.

12         What's your best authority that says even with that

13   kind of soft standard -- I want to say "ambiguous" but you'll

14   just say no, we're not -- but that sort of standard, that sort

15   of I can't answer you categorically what, as I stand here,

16   what's in and what's out, you've got to look at all of these

17   factors.

18         What's your best authority for imposing contempt,

19   given the first requirement of contempt is that the order is

20   clear and unambiguous?

21         MS. CRUMPTON:  Again, you don't need a mathematical

22   categorical certainty in order --

23         THE COURT:  Where is that language coming that you

24   don't need -- that clear and unambiguous doesn't mean

25   mathematical certainty?

J443SECC

          MS. CRUMPTON:  If you look at all of the contempt

cases that Mr. Musk cites --

          THE COURT:  I am asking you.  What cases do you cite

for that proposition.

          MS. CRUMPTON:  Well, for example, if you look at the

case, I believe it's called <u>Paramedics Electromedicina</u>

<u>Comercial, Ltda. v. GE Medical Systems Information</u>

<u>Technologies, Inc</u>.  In that case, the court ordered a Brazilian

company to dismiss a suit that it brought in Brazilian court.

And what the company said was, well, we understood that to mean

that we just needed to suspend the suit, and that's what we

did.  And the court said, no, it's not.  You don't get to come

up with a standard that is close enough to what I ordered; you

have to do what I actually ordered.

          And that's the situation we have here, where Mr. Musk

has decided to come up with a standard that is, well, if I can

make an argument after the fact that this didn't require

preapproval, then I didn't have to get preapproval.  But that

is not what the Court's order says.  The Court says if a

communication contains or reasonably could contain material

information, it requires preapproval.  And that language is the

same materiality language that the Court --

          THE COURT:  I started our conversation by saying have

you ever used "reasonably could contain" before.  Is there a

case law that comes from, is that SEC term of art.  And I think

J443SECC

1    the answer was no.  This case is unusual.

2              MS. CRUMPTON:  That's right.  This case is unusual.

3    But if you look at -- let's take it back just to the

4    materiality standard then.  Like, just putting aside reasonably

5    could contain for a moment.

6              If you look at the seminal Supreme Court case on

7    materiality, <u>Basic v. Levinson</u>.  The Supreme Court says, look,

8    this is not a categorical test for materiality.  It doesn't

9    mean that we can't figure out what materiality is, because

10   there's not a categorical test.

11             THE COURT:  I think I'm with you on that.  But then I

12   think, well, then I am asking was this material.  Then the

13   analysis is what's the difference between what he said and what

14   was already out there, right?

15             MS. CRUMPTON:  Well, I would submit that it's not,

16   because it still contains the language reasonably could

17   contain.  And while you can't say --

18             THE COURT:  When I push down on material, you go to

19   reasonably could contain.  When I push down on reasonably could

20   contain, you go to material.  I need you to stand still for a

21   moment.

22             Do we know what reasonably could contain, do you have

23   any authority for imposition of contempt standards with that

24   sort of fluid multi-factored test?  I think the answer to that

25   is no, but you'll let me know if you've got some authority for

J443SECC

1    that.

2              And when I focus on materiality, if I say, well,

3    maybe -- so I'm intimating no view.  If I think that reliance

4    on the reasonably could contain would make it difficult to

5    conclude that the order is clear and unambiguous, then I might

6    say, well, that doesn't answer the question because I just can

7    start with whether or not it was material information.  Right?

8    I don't need to worry about that.  It's clear materiality, I

9    think we'll assume, is clear and unambiguous.

10             Then I think the analysis is, what's the difference

11   between what Mr. Musk put in the tweet and what was already out

12   there.

13             I want to know if you approach materiality different

14   than that.

15             MS. CRUMPTON:  That is one way the Court could

16   approach this.  I would submit that even under just the

17   materiality standard, this was a tweet that required

18   preapproval.  But what I would -- but --

19             THE COURT:  That's because the information contained

20   was different.

21             MS. CRUMPTON:  It was different, and it was nothing

22   like the types of immaterial statements that Mr. Musk has

23   pointed to in the cases that he cites in his brief, and I'm

24   happy to take the Court through that.

25             THE COURT:  I agree with you.

J443SECC

1          MS. CRUMPTON:  They're nothing like that.  This is a

2     statement that Tesla will make around 500,000 cars in 2019.

3          THE COURT:  If we could focus on, what do you think,

4     because I think there a couple of differences, right.  So, I

5     think you are about to walk me through.  Let's try to describe

6     this best we can what the difference is between the information

7     out there and what the tweet contained.

8          MS. CRUMPTON:  Sure.  With the Court's indulgence,

9     just before we go into that analysis, I would just say that the

10    reason why I shift back to the reasonably could contain

11    language is because, even though I submit that we would win

12    under just if it just said materiality, we know it's broader

13    than that.  Because we know reasonably could contain is broader

14    than the legal standard.

15         THE COURT:  I absolutely agree.  But I don't think

16    that answers whether it's clear and unambiguous.  It's clearly

17    and unambiguously broader than materiality, but where it draws

18    the line I'm not sure.

19         MS. CRUMPTON:  It draws the line I would submit well

20    beyond where we are.  Which is a tweet that was material under

21    the materiality standard, and it clearly reasonably could have

22    contained material information.

23         And I'll point the Court, I want to show the Court the

24    communications that Mr. Musk has pointed to, to show this was

25    information that had already been out in the public domain.

J443SECC

1          First I want to focus on the investor letter.  This is

2     an exhibit that we attached earlier.  And this is basically

3     what, after Mr. Musk was forced to correct his tweet, by

4     Tesla's designated securities counsel, it is what he went back.

5     What it says is, Tesla is targeting annualized Model 3 output

6     in excess of 500,000 units, some time between the last quarter

7     of 2019 and the second quarter of 2020.

8          He says, oh, well, that's consistent with about

9     500,000 cars.  But it's not at all consistent.  I mean,

10    reaching an annualized run rate, either at the end of this year

11    or sometime in the middle of next year, is not at all the same

12    as we're going to make 500,000 cars this year.

13          THE COURT:  So one thing it does is it shifts the

14    timeframe.

15          MS. CRUMPTON:  That's right.

16          THE COURT:  From this, which says annualized rate in

17    excess of 500,000 units between Q4 2019 and Q -- so end of

18    2019, middle of 2020, it moves that to 2019.  Right?

19          MS. CRUMPTON:  Right.  It moves -- they would already

20    have to be running at that production rate right now in order

21    for his statement to be correct that we will make around

22    500,000 cars in 2019.

23          THE COURT:  That would be material or what definition?

24          MS. CRUMPTON:  Under any definition.

25          THE COURT:  Right.

J443SECC

1          MS. CRUMPTON:  Under any definition.  So, the other

2     statement that we would point the Court to in this investor

3     letter is this statement:  In total, we are expecting to

4     deliver 360,000 to 400,000 vehicles in 2019.

5          This is also what the corrective tweet went back to

6     after Mr. Musk was forced to correct the 7:15 tweet.  All he

7     says about this in -- he completely ignores it in his response

8     brief.  And then the only thing he says about it in his

9     sur-reply brief is that it's neither here nor there.

10         THE COURT:  Because it's delivery.

11         MS. CRUMPTON:  Because it's deliveries versus

12     production.  This is a huge gap between Tesla's deliveries

13     guidance and Musk's statement that Tesla will produce 500,000

14     cars in 2019.  That's extremely relevant.

15         THE COURT:  This is overly simplifying, but it's kind

16     of moving 2019 production -- what his tweet does -- from

17     400,000 to 500,000.

18         MS. CRUMPTON:  That's exactly right.  They say, oh,

19     no, it's not the same.  But historically, the deliveries and

20     production have been very close on an annual basis.  And if it

21     is their position now that Tesla was going to make 500,000 cars

22     in 2019, but was planning on delivering only 360 to 400,000 of

23     them?  That means that Tesla was planning on producing at least

24     100,000 more cars than it was planning on delivering and

25     recognizing revenue on in 2019.  That would have been billions

J443SECC

1    of dollars in undelivered inventory, and it would have been a

2    departure from Tesla's historical practice.  That would have

3    been highly material information.

4            If that is in fact what they're saying now, I would

5    suggest that is a post hoc justification, because that is not

6    what he said in his corrective tweet.  He went back to the

7    official guidance.

8            Then I would finally, Mr. Musk puts a lot of weight

9    on, as we call it, a cryptic statement during the earnings

10   call.

11           THE COURT:  Does that count, that communication?  Is

12   that another violation?  I wasn't sure if they clearly rely on

13   it, but do you think it's appropriate to take that into account

14   as to the information that's out there in the market?

15           MS. CRUMPTON:  So that's a good question.  Because it

16   is, first of all, an oral statement, so it wouldn't fall under

17   the preapproval requirement.  However, the talking points that

18   were prepared for that earnings call did not include the

19   statement that he made on the earnings call.

20           THE COURT:  Talking points are a written

21   communication.

22           MS. CRUMPTON:  Yes, they are written communication and

23   they did not include it.  And I would -- in Mr. Musk's brief,

24   he makes it seem like he said, yes, we are going to make 350 to

25   500,000 Model 3s this year in 2019.

J443SECC

1          Let's look at the transcript.  That is not at all what

2     was said during this earnings call.  Even if it was what he

3     said, the fact that you are going to make the high end of the

4     range versus some other point in the range we would submit is

5     material.

6          But look at what was actually said.  So you have an

7     analyst who asks a question about the geographic dispersion of

8     where they're expecting to sell the Model 3s in 2019.  And then

9     Tesla's former CEO answers the question, we will start

10    delivering Model 3s in Europe and China, we share a chart

11    showing the potential market size for midsize premium sedans in

12    North America, Europe, and Asia, so that gives a good sense of

13    where we'll be.  And then Mr. Musk says, yes, it's maybe on the

14    order of 350,000 to 500,000 Model 3s, something like that this

15    year.  With no reference to what "it's" is.  Is he talking

16    about sales?  Is he talking about deliveries?  Who knows what

17    he's talking about.  It's not in the talking points, it is

18    never repeated again in any Tesla official guidance.

19          In fact, just yesterday, Tesla put out again its

20    delivery guidance, and said it expects to deliver 360 to

21    400,000 cars.  And so, this is the closest thing to anything

22    that was already out in the market, and there's no way that

23    investors would understand from context that he was saying

24    Tesla is going to make 500,000 cars in 2019.

25          This is a material statement no matter how you cut it,

J443SECC

1   regardless of the standard the Court uses, and it was a

2   violation to not get it preapproved.

3        THE COURT:  Let me just tell you, you're out of your

4   time minus your five minutes reserved.  I wanted to ask

5   briefly, there's no mention of sanctions in the SEC's briefing.

6   Are you not seeking sanctions if I hold Mr. Musk in contempt?

7        MS. CRUMPTON:  I'm happy to talk about that now.  We

8   have thought about sanctions, and we're happy to address it now

9   or we're happy to wait, if it is appropriate after the Court

10  makes a finding on whether or not to hold Mr. Musk in contempt.

11       THE COURT:  Would you be seeking sanctions?

12       MS. CRUMPTON:  Yes.  We -- well, we would be seeking,

13  we would be seeking additional remedies to prevent future

14  violations.

15       THE COURT:  Such as?

16       MS. CRUMPTON:  So, first of all, we think the most

17  important thing to the SEC is that the Court reject Mr. Musk's

18  interpretation of this policy.  That if you can come up with a

19  justification after the fact that it's arguably not material,

20  then you don't have to get preapproval.  We want the Court to

21  tell him this has to be observed in the way that it's written.

22       But, we would also suggest that it's appropriate for

23  the Court to impose some additional things to compel compliance

24  with the order.  First of all, we think the Court should

25  require Musk to report periodically regarding his compliance.

J443SECC

1    We think that could be accomplished by providing the Court with

2    a list of his written communications about Tesla, and

3    indicating for each one whether and when he sought preapproval,

4    and if not, why not.  And initially we would request those

5    reports be filed monthly.

6         Second, in the event there are future violations of

7    the Court's order, we believe that a series of escalating fines

8    would be appropriate.  And the Court certainly has discretion

9    and broad power to determine the amount of those fines, but

10   they would obviously need to take Mr. Musk's wealth into

11   account as well as statements that he's made in the past about

12   the deterrent effect of the penalty in the underlying

13   securities fraud case.

14        Just one data point for the Court to consider, Musk

15   has publicly stated that the $20 million penalty he paid as a

16   result of the false tweets about taking Tesla private was,

17   quote, worth it.  So we would ask the Court for any future

18   violations to impose a meaningful fine to make it not worth it

19   to have future violations of this Court's order.

20        THE COURT:  So your basic position would be you want

21   some additional compliance compelling mechanism, and what you

22   propose is a monthly reporting mechanism.  And clarity that any

23   future violations would lead to a series of escalating but

24   substantial fines.  That's the basic outline?

25        MS. CRUMPTON:  That is the basic outline, your Honor.

J443SECC

1          THE COURT:  Thank you.

2          MS. CRUMPTON:  Thank you very much.

3          THE COURT:  Mr. Hueston.

4          MR. HUESTON:  Good afternoon, your Honor.

5          THE COURT:  Good afternoon.

6          MR. HUESTON:  Your Honor, the SEC has the burden to

7    show by clear and convincing evidence that the order was clear

8    and unambiguous as written, and also that the proof of

9    non-compliance is clear and convincing, and finally, that the

10   party is not diligently attempting to comply.  And their proof

11   has failed on each.

12          I do want to start with the first showing they must

13   make, and your Honor asked counsel a number of questions about

14   the policy.  That, to me, illustrated that it's not clear, and

15   it is ambiguous, because counsel kept hopping from one

16   quasi-definition to another.  I'm going to run through them, a

17   series of standards, I heard today what I'm going to describe

18   as yet the fifth standard that Mr. Musk is supposedly going to

19   submit himself to that's not defined in a policy.  And if we

20   are looking at, as your Honor has written in your own opinions,

21   the very powerful tool of contempt, there should be a clear and

22   unambiguous policy, and they have not defined it here.  In

23   fact, they've defined ambiguity.

24          THE COURT:  Let me ask analytically, and then I'd love

25   for you to do that.  If I think this is material information

J443SECC

1    that was contained in the tweet because it significantly added

2    to the mix of information than what was previously out there,

3    does the uncertainty as to that standard matter?

4            MR. HUESTON:  Yes.  Because the SEC has basically

5    stated that the definition of materiality is uncertain.  We

6    asserted in our brief, your Honor, the traditional definition

7    of materiality, and they said that doesn't apply.

8            THE COURT:  Let's say I think it meets that.  It meets

9    what you've proposed as the definition of materiality.  Then it

10   doesn't matter, does it, for purposes of this contempt motion

11   that I might agree with you that the broadening language is

12   unclear?

13           MR. HUESTON:  I think, your Honor, it does.  First of

14   all, they have to meet yet the other showings.  No diligence,

15   and proof of non-compliance being clear and convincing.

16           THE COURT:  We'll get to that.

17           MR. HUESTON:  Right.  But within this, your Honor, the

18   non-definition of materiality, it's not defined, they've

19   contested what it is.  In the murk of everything else they

20   describe as a sliding standard, gives an entire context and

21   documents that is simply too ambiguous.

22           We can't take one word and say it must have been clear

23   to Mr. Musk because now the Court will import and now define

24   definitively what the SEC refused to do, importing definition

25   that's recognized in the courts for what, quote unquote,

J443SECC

1    materiality is.

2              THE COURT:  What could he be held in contempt for?  It

3    sounds like you're saying this order can't be violated by

4    Mr. Musk in a way that leads to a contempt conclusion.

5              MR. HUESTON:  Well, there are two different questions

6    here, your Honor.  There is, can he make a mistake, can there

7    be an issue?  Yes.  Is that separate from should he be held in

8    contempt?  That's separate.  There you have the very high

9    standards before you bring that very powerful tool.

10             THE COURT:  Just start with prong one.

11             MR. HUESTON:  Let's go to prong one.  Here's our

12   position, your Honor.  I'm going to get into the policy.

13             First of all, we think it's very clear that Mr. Musk

14   retained discretion in the policy in the first instance.  And

15   the policy makes clear that the tweet is subject to a

16   fact-based determination in that first instance by Mr. Musk.

17             THE COURT:  So I think I'll ask for a direct answer on

18   this.  Is there any set of circumstances of what Mr. Musk could

19   do that could lead me to conclude that prong one is met?

20             MR. HUESTON:  That the SEC meets prong one?

21             THE COURT:  Yes.  Is there any factual hypothetical

22   you could give me that you can say, yes, under that set of

23   circumstances, the SEC could show that he has failed to comply

24   with --

25             MR. HUESTON:  Yes.

J443SECC

1              THE COURT:  What would that be?

2              MR. HUESTON:  Here's the answer.  If they had a

3     clearly defined standard --

4              THE COURT:  No.  In the world, this world.

5              MR. HUESTON:  No.

6              THE COURT:  So he can't violate?

7              MR. HUESTON:  Not for contempt.  Given the murk that

8     is -- the policy in place.

9              THE COURT:  If I agree with you on that, aren't I

10    obligated -- the Court has to give clear and unambiguous

11    orders.

12             MR. HUESTON:  Yes.

13             THE COURT:  I don't give wishy-washy orders.  Doesn't

14    that require either a modification or vacating of this

15    settlement agreement and consent judgment?

16             MR. HUESTON:  Yes, I've given a lot of thought to

17    that, your Honor.  Your Honor entered an order, signed, that

18    was subject to very extensive negotiation back and forth.  The

19    order doesn't self-execute.  It refers to the Tesla policy.

20             THE COURT:  Sure.

21             MR. HUESTON:  And that's where the rubber hits the

22    road, and why we included the drafting history.  Because the

23    SEC pretends here today that they're shocked that Mr. Musk had

24    the ability to make his decisions from the get-go, but that's

25    exactly what Tesla negotiated for, and got in the negotiation

J443SECC

1    with the SEC.

2           So if we're talking ambiguity, and I think we are, you

3    have to look at the fact that the SEC wanted in the

4    implementing policy the language of, quote, oversight and

5    approval of all his public statements.  And they conceded in

6    taking out "and approval of all," which meant simply oversight

7    processes, which Tesla then implemented.  They don't like them,

8    but that's what they implemented pursuant to the order that

9    they have.

10          To answer your question, well, what should the SEC do

11   now, this is what the SEC --

12          THE COURT:  I am asking what should the Court do if I

13   adopted the position that there can be no determination of

14   violation of the Court's order because of lack of clarity.

15          MR. HUESTON:  You should instruct the SEC to clarify

16   with further negotiation with Tesla the terms of the policy.

17   Which I would offer --

18          THE COURT:  I should vacate the consent judgment,

19   modify the consent judgment, and say work it out or litigate?

20          MR. HUESTON:  First of all, let me -- I don't think

21   vacate would necessarily be right, because we've already paid

22   money.  That would mean money goes back, we might be back to

23   square one.

24          What we anticipated, your Honor, if there was an

25   issue, is what parties normally do instead of running to court.

J443SECC

1   They knock on the door and say, hey, we've seen something here,

2   is there an issue?  Let's try to work it out.  There was no

3   attempt here to do so.  Had that happened --

4           THE COURT:  I'll admit surprise.  This screams of

5   working it out.

6           MR. HUESTON:  Exactly.  Had that effort been made, I

7   assure you, Tesla was ready to join and make sure there was no

8   misunderstanding.

9           That effort wasn't, and that's why we're here today.

10  And the last thing that should happen in the context of

11  admitted ambiguity is now throw the bomb of contempt on

12  Mr. Musk.  That's not fair.

13          THE COURT:  Well, in the face of ambiguity, no

14  contempt can be brought.  But the question then is, if you

15  prevail, and again, I intimate no view.  If you were to prevail

16  in that regard, something has to change.  Either a modification

17  of the consent judgment or a vacating of the consent judgment

18  because --

19          MR. HUESTON:  I don't think -- your Honor, I don't

20  think your Honor needs to go in and sit at the table.  Your

21  Honor can encourage the parties --

22          THE COURT:  That's good.  I'm busy.

23          MR. HUESTON:  I know you are, and I'm trying to

24  respect that.  The parties should be meeting, conferring, and

25  providing some clarity, so this sort of issue doesn't happen

J443SECC

1    again.

2          We certainly want that, your Honor.  Mr. Musk doesn't

3    want to come to court and worry about a contempt sanction which

4    he believes will freeze his ability to operate as an effective

5    entrepreneur to get messages out well beyond Tesla to speak

6    even as a shareholder, as he owns 20 percent of stock.  Your

7    Honor --

8          THE COURT:  Let me ask you about, I did put out an

9    order, the Second Circuit says I don't have much role, but I

10   did put out an order asking for justification -- I don't like

11   being a rubber stamp -- justification for approving this

12   settlement and entering the consent judgment.  I talked about

13   it with your opposing colleague.  It says that Mr. Musk, under

14   the proposed settlement terms, Mr. Musk will comply with

15   mandatory procedures to be adopted by Tesla concerning the

16   oversight and approval of his Tesla-related public statements.

17         And I mean, now in your brief, you would think if you

18   saw that, you would say, oh, no, no, no way, First Amendment,

19   we're not signing on to anything like that, given that it's

20   suggesting that the terms of the settlement include oversight

21   and approval of his Tesla-related public statements.  But you

22   didn't.

23         MR. HUESTON:  Your Honor, that was a gateway

24   instruction for the negotiation that did happen afterwards

25   about the policy that would actually govern the day to day.

J443SECC

1    And in that, after that gateway, which your Honor provided,

2    they engaged knowledgeably, knowingly, crossed stuff out,

3    inserted language like they're trying -- we're going to get to

4    this -- to say it's going to be per se if it hits one of these

5    topics.  They conveniently ignore "may, depending on the

6    significance."  That is a discretionary allocation that goes to

7    the authorized executive, who is Mr. Musk, and they agreed to

8    take out language that said everything has to be approved.

9    There has to be an oversight process, and Tesla has an

10   oversight process.  They're not happy about that today, but we

11   implemented the oversight process.

12           You provided the clear gateway, and the parties

13   negotiated, and here we are.

14           THE COURT:  So then I think if I think that the policy

15   doesn't require preapproval of --

16           MR. HUESTON:  And it doesn't.

17           THE COURT:  -- statements that are material or

18   reasonably could contain material information -- and you said

19   "and it doesn't"?

20           MR. HUESTON:  Well, sorry, I spoke --

21           THE COURT:  Then Tesla is in violation of my order,

22   no?

23           MR. HUESTON:  No.  Because what Tesla did is it

24   followed in good faith your instruction.  Negotiate with the

25   SEC, under the umbrella of oversight and approval, and that's

J443SECC

1    exactly what we did.

2              THE COURT:  I don't think -- no, that's not what I

3    said.

4              MR. HUESTON:  I apologize.

5              THE COURT:  Well, I mean, I might have proposed,

6    right, you might have proposed that I say you'll negotiate in

7    good faith.

8              MR. HUESTON:  When you say according to the policy

9    that was then of course negotiated between the two parties,

10   it's difficult, I think, for us to understand what else could

11   have happened.

12             And again, your Honor, in the context of a contempt

13   hearing, the very fact that we're having some of this back and

14   forth, illustrates that there's simply not a clear enough

15   standard to use the harsh penalty of contempt.

16             THE COURT:  That might be true.  But then I am still

17   curious.  Your answer is what happens after that, is you go

18   back to the drawing board.

19             MR. HUESTON:  What happens after that is what the

20   parties should have done, what the SEC should have done, is

21   approached in good faith to try to work things out.  If hands

22   were thrown up, then it may have been time for the parties to

23   come back to the Court to seek further clarification and

24   finalization.  But that first step should happen, your Honor,

25   and your Honor should invite that first step.

J443SECC

1          THE COURT:  My intent is not only to invite it, but to
2    order it.  But we'll we get to that.
3          Turning to the policy, I understand your position on
4    that.  I don't know your position, it is nowhere in your
5    briefing, and correct me if I'm wrong, but I don't see it.
6    Nowhere in your briefing, nowhere in Tesla's letters is there
7    any explanation of your understanding of the meaning of the (i)
8    language in, for lack of a better term, the editing clause.
9          MR. HUESTON:  Yes.  I'll give you the citation in a
10   moment, your Honor.  We did answer it.
11         THE COURT:  I think what you answered is (ii) and not
12   (i).
13         MR. HUESTON:  You're right, we did.
14         THE COURT:  As did Tesla.  Tesla did the same thing.
15         MR. HUESTON:  Because that was what was teed up.
16         THE COURT:  No, they teed up both.
17         MR. HUESTON:  Okay.  Here's my answer to this.  First,
18   this is not a situation where Mr. Musk is editing anything.
19   He's not editing one of his earlier approved written
20   communications.
21         Your Honor, what that policy says, if it says
22   approved, your Honor, it presumes it must have been material
23   and not escaped the preapproval process by being immaterial.
24         Our position here is, what Mr. Musk tweeted was
25   immaterial, and not close to the ambiguous standards which the

J443SECC

1    SEC has struggled to answer.

2             THE COURT:  But I understood your argument to be

3    that's so because it is, essentially, and certainly true with

4    the corrective tweet, repetitive of information already out

5    there.  In other words, this is quoting from your brief:  The

6    tweet was simply Musk's shorthand gloss, and entirely

7    consistent with prior public disclosures.

8             And I presume those prior public disclosures were

9    preapproved written communications.

10            MR. HUESTON:  No, not necessarily, your Honor.  The

11   standard is not what you just stated.  It's the standard of

12   materiality, and this again goes back to not sure what we're

13   dealing with in terms of clear standards, but if we look at

14   court-adopted notions of materiality, did what Mr. Musk put out

15   there significantly alter the total mix of information.  The

16   answer is clearly no.  And if he made a statement, they don't

17   like it because it guts their position that there are going to

18   be 350 to 500,000 Model 3 alone cars produced, which when you

19   add it to the 100,000 that's already coming out for S and X,

20   all of which is fairly characterized by "cars," he's clearly

21   within the total mix of information.  It does not matter

22   whether some element of that had been preapproved or not.

23   That's not part of the guidance.  That's not part of

24   materiality standards.

25            THE COURT:  Just to run it through.  If he wanted to,

J443SECC

say, send out a tweet that said we're going to hit 500,000 cars
in 2019, and he got preapproval -- let me change that.  We're
going to hit 400,000 cars in 2019.  He got preapproval for that
because it would be clearly material.  And then before it went
out, he wanted to change it to 500,000.  You would need to get
new approval, right?

          MR. HUESTON:  Well, with all the premises of your
hypothetical.

          THE COURT:  Of course.

          MR. HUESTON:  Yes.  Because you said it would need
approval at first.  It had some examination.  And then for him
to edit it, you would go under the policy and have to abide by
the policy, yes.

          THE COURT:  If the same set of factual circumstances,
but he edits it after he sends out the original tweet.

          MR. HUESTON:  He edits --

          THE COURT:  He sends out a tweet.  He gets preapproval
for a tweet.  400,000 cars in 2019.  He gets preapproval.  He
sends it out.  And then he edits to say 400,005 cars in 2019.

          MR. HUESTON:  No.  And the answer is there is --

          THE COURT:  No, he doesn't need preapproval?

          MR. HUESTON:  He does not, your Honor.  Because if in
fact you are making an immaterial statement, as that would be,
some minor variance would not be viewed by anyone as material.
You don't even begin getting into the mechanisms of the policy

J443SECC

1      that presumes that something is material to begin with.

2              THE COURT:  Just so I understand, forgive the

3      tediousness of the hypo.  If he wants to send out a tweet that

4      says 400,000 cars in 2019.  He gets preapproval, and before he

5      sends it out, he wants to change it to 400,005 cars.

6              Does he need approval for that edit before it goes

7      out?

8              MR. HUESTON:  Well, it's not an edit.  A tweet is just

9      itself an independent document.

10             THE COURT:  He doesn't send the tweet out.  He wants

11     to edit the tweet.

12             MR. HUESTON:  Okay.

13             THE COURT:  Can you do that?

14             MR. MUSK:  No.

15             MR. HUESTON:  No.  Not only that, if we're having to

16     debate what this language really means, we are in ambiguity

17     land.

18             THE COURT:  Just because you can propose an argument

19     doesn't mean we are in ambiguity land.  My job here is to start

20     with the language you've agreed to and what the policy says.

21     That's what I am trying to do with the hypo, so don't move away

22     from them.

23             MR. HUESTON:  I won't.

24             THE COURT:  If he gets approval for a tweet that says

25     400,000 cars in 2019.  Before he sends it out, he says 400,005

J443SECC

1    cars in 2019.

2              Does he need approval for that tweet?

3              MR. HUESTON:  My argument would be he would not,

4    because 405 is immaterial.

5              THE COURT:  How is that consistent with the language

6    "If an authorized executive further edits a preapproved written

7    communication, after receipt of written preapproval, such

8    authorized executive will reconfirm the preapproval in writing

9    in accordance with this policy prior to release."

10             You are ignoring that language.

11             MR. HUESTON:  Your Honor, I'm not.  I think partly

12   I've struggled with two things.  That the second -- first of

13   all, that's not an edit.  Let's just say for the hypothetical,

14   so you don't believe I'm running away from the hypothetical --

15             THE COURT:  That's a change from 400,000.

16             MR. HUESTON:  So the premise --

17             THE COURT:  If I write on this paper "400,000 in

18   2019."

19             MR. HUESTON:  If the premise --

20             THE COURT:  Then I cross out it so it says "400,005 in

21   2019."  Your argument is that it's not an edit?

22             MR. HUESTON:  If in fact -- I'm going to agree with

23   you under the following.  If in fact the first draft was

24   something that was material or could be material, subjecting

25   itself to approval -- and we're outside of that here, because

J443SECC

1   obviously we are talking about Model 3 and Model S and X.

2              THE COURT:  All assumed in my hypothetical.

3              MR. HUESTON:  If in fact, then with Mr. Musk's good

4   faith efforts, there is, okay, I'm going to submit this for

5   approval, because it's material, and then two days later he

6   scratches it out and makes an alteration, yes, under the

7   literal term of the policy, he would bring that back again

8   because he is already in the area of materiality.

9              Here, we're not.

10             THE COURT:  Right.  So that's a question.  But, I

11  understand your position, you don't think the editing language

12  includes an additional examination of whether the difference

13  between in the edit is material.  Under the policy, there is an

14  edit, it needs new approval.

15             MR. HUESTON:  Under the policy, if there is an edit to

16  something that was already deemed to be material, then you

17  can't just rely on that.  If you change it, you are going to

18  have to bring something that was already deemed material back

19  to the attention and approval.  Yes.

20             Which is not, of course, the circumstance here.

21             THE COURT:  Except it parallels your argument that

22  what Mr. Musk did was simply put a gloss on already existing

23  material, which is another way of saying "edit."

24             MR. HUESTON:  No, your Honor.  What is --

25             THE COURT:  Do we know what Tesla's view is as to

J443SECC

1    that?

2             MR. HUESTON:  Tesla's view as to what?

3             THE COURT:  As to whether --

4             MR. HUESTON:  Yes.

5             THE COURT:  How do we know that?

6             MR. HUESTON:  Tesla submitted a letter stating that it

7    did not view -- that it did not view Mr. Musk's tweet as

8    material, and viewed him as in compliance with the policy.

9             THE COURT:  To be clear, do we have any idea of

10   Tesla's view as to the meaning of that (i) sentence, the

11   editing sentence?

12            MR. HUESTON:  Your Honor, the editing sentence is not

13   part of what has been submitted, because there wasn't an edit

14   that was really done here and brought to issue.  So, there

15   isn't anything submitted on that by Tesla.

16            I think Tesla very much, by saying he is in

17   compliance -- and by the way, this is something that is a Tesla

18   policy.  Tesla has said that he has the discretion to make the

19   call, they viewed what he did as appropriate and not material.

20   In and of itself, your Honor, shows compliance.  There has to

21   be deference to the company's interpretation of its own policy.

22   So, they, obviously, coming to that conclusion, that was

23   submitted by Wilmer Hale on behalf of the company.  They didn't

24   believe that (ii) somehow rendered what was otherwise

25   appropriate inappropriate.

J443SECC

1          THE COURT:  And I appreciate that, and that's helpful.

2     I don't have their view on the argument that the SEC made with

3     respect to (i).

4          MR. HUESTON:  Remember that letter was submitted, and

5     there has been no amendment to it, despite the argument.  Their

6     view is he is in compliance.  That (ii) does not render

7     anything in non-compliance.

8          Your Honor, I do want to very briefly state in terms

9     of clear and unambiguous, the SEC has very much struggled with

10    the definition themselves.  They put out two standards that are

11    not even in the written documents, which in and of itself takes

12    you out of the area of contempt.

13         One, they say, quote, it should contain -- there

14    should be submitting of tweets, if it, quote, contains

15    substantive information about Tesla and its business.

16         If that were true, there would be no need for the

17    illustrative subcategories that were present.  They simply read

18    that out.

19         THE COURT:  They're not exhaustive.

20         MR. HUESTON:  Why put it in there if it was just as

21    clear if there is any substantive information about Tesla.

22    There is even something broader.  They put in, quote --

23         THE COURT:  Sometimes examples focus the mind.

24         MR. HUESTON:  Examples could, your Honor, but what

25    should happen here, if the SEC thinks that's the appropriate

J443SECC

1    definition, it ought to be in the document.  You can't simply

2    articulate something that wasn't there, and say now under our

3    articulated standard, they violated.

4              THE COURT:  How do you define the "reasonably could

5    contain" language?  I don't see it in your papers.

6              MR. HUESTON:  Well, first of all, it's difficult, it's

7    difficult to assess, but what we believe is that if in fact

8    something is immaterial, that is certainly a proxy for it can't

9    reasonably be material.  That is a logical and appropriate

10   inference based in these policies.  That is how Mr. Musk has in

11   fact --

12             THE COURT:  You just said it can't reasonably be

13   material.

14             MR. HUESTON:  Not, if it is immaterial.

15             THE COURT:  Sorry.  Right.  Is that the same as saying

16   reasonably could contain material information?

17             MR. HUESTON:  I'm having trouble understanding what

18   that means.

19             THE COURT:  Well, but, what you just said -- I'll read

20   it from the LiveNote.

21             MR. HUESTON:  Okay.

22             THE COURT:  You said if it's immaterial, then it can't

23   reasonably be -- that's a proxy that it can't reasonably be

24   material.

25             MR. HUESTON:  It can't reasonably contain --

J443SECC

1          THE COURT:  Is your change of language, did that

2     matter?

3          MR. HUESTON:  No, I don't think so.  At least in

4     the -- there is nothing definitionally that undermines my

5     position.  Again, I think that's a problem of the SEC's burden

6     and not our own.  I think, your Honor --

7          THE COURT:  So just work with me on this.  I'll read

8     two sentences.  You'll tell me if they have similar meaning.

9          "The communication could reasonably be material to

10    Tesla or its stockholders." That's number one.  Number two,

11    "The communication reasonably could contain material

12    information to Tesla or its stockholders."

13         Isn't the second sentence broader?  maybe it's

14    ambiguous.  Isn't it broader than the first?

15         MR. HUESTON:  I'm not sure it is, your Honor.  I agree

16    that those are different words, and you can argue for greater

17    breadth.

18         THE COURT:  It's two changes.  It's changing "contain"

19    to "be," and it's changing what "could" modifies.  From "could"

20    so "reasonably could contain."

21         MR. HUESTON:  Right.

22         THE COURT:  To "could reasonably be material."

23         MR. HUESTON:  It can't -- your Honor, even under --

24    let's just assume for the argument that there is a broader

25    connotation to "reasonably could contain."  I think, again,

J443SECC

1    Mr. Musk has the right, as the authorized executive looking at

2    these standards, to make the first judgment.

3             THE COURT:  He has to apply that standard.

4             MR. HUESTON:  Okay.  First of all, it is an ambiguous

5    standard because the SEC has struggled.

6             I want to make sure I put in my argument, those 15

7    tweets?  So happy they put them in.  I'm going to go through

8    several examples, I'd like a five-minute warning on my

9    argument, because they show, by suggesting that he wasn't

10   diligent, that apparently contempt can fall on him for things

11   that he is just merely clearly repeating that's out there from

12   websites and others.

13            So they want to argue an incredibly broad compass to

14   that, that can't possibly exist.

15            THE COURT:  I'll give you time to do that.  But just

16   to follow up on that question.  Whatever you would say, even I

17   think your broad argument is Mr. Musk has to in good faith

18   apply the standard contained in the policy, right?

19            MR. HUESTON:  As best he can, with what is there in

20   the policy.

21            THE COURT:  He can't decide on a narrower version of

22   that, just because it's arguably ambiguous.

23            MR. HUESTON:  No.  And that's not what we're arguing.

24            THE COURT:  In paragraph seven of his declaration, he

25   did exactly what you did with the words.  Last sentence:

J443SECC

"Additionally since the entity of the order and enactment of
the policy, I have not tweeted information that I believe is or
could reasonably be material."

So he changed, just as you did, and I think narrowed
it, he changed "reasonably could contain" to "could reasonably
be."

Why is that?

MR. HUESTON:  Your Honor, you're asking why a
layperson felt that that was his reasonable interpretation of a
murky policy.  I think it's very difficult.  I stumbled and did
the same thing, and didn't quite quote the same language.
Frankly, it's not just our issue, it's the SEC's because they
came up with two new formulations, including a fifth one today,
unless something is obviously immaterial.  If it's that clear,
that standard five, that language ought to be in there.  I
don't think we'd have the issues that we're fighting about
today.

THE COURT:  You don't think the language adds
anything.  They might as well say "material."

MR. HUESTON:  No.  I guess, no, it's difficult for me.

THE COURT:  It adds something.  It broadens it.

MR. HUESTON:  There is a connotation of potentially
greater depth.  It is wholly undefined.  Therefore, you cannot
have a basis on that for contempt.  That's the problem the SEC
faces here.

J443SECC

1      THE COURT:  And then just to circle back, I don't need

2  to worry about material.

3      MR. HUESTON:  No.  Because, first of all, what

4  definition of material are we talking about?  They've argued

5  that the one under law doesn't apply.

6      Let's talk about whether proof of non-compliance is

7  clear and convincing.  Point number one, it's Tesla's -- under

8  the order, Mr. Musk has to comply with Tesla's policy.  Tesla

9  explains that topics may be material, depending on

10  significance, and that judgment, they say, rests first and

11  foremost with the authorized executive who is Mr. Musk.  That

12  is a good faith determination, he's made that in good faith.

13  Tesla found him to make the correct determination.  They should

14  be in the position to best interpret their own policy.

15      THE COURT:  It's interesting, because that was your

16  argument in the papers, and I thought that adds nothing to the

17  analysis.  But now I understand, because you think it's not the

18  Court's judgment -- you don't think the Court has a role in the

19  evaluation of whether Mr. Musk violated the policy and

20  therefore the contempt judgment.

21      MR. HUESTON:  Well, when you say a role, I mean, you

22  are the signatory to the order.  But the implementation is the

23  policy.  And then we go to what the policy is clearly saying

24  and not saying.

25      THE COURT:  You don't think I have any involvement in

J443SECC

1    the analysis of whether Mr. Musk complied with the policy.

2          MR. HUESTON:  Oh.

3          THE COURT:  And therefore complied with the consent

4    judgment.

5          MR. HUESTON:  I'm not saying you don't have.  You

6    certainly have a role, and that's why we're here today.

7          THE COURT:  Yes, but if you prevail today, your

8    argument is I have no future role.

9          MR. HUESTON:  Well, not necessarily.  Your Honor, the

10   way this -- there was an order that was a gateway to a

11   negotiation with the policy between the two parties.  Tesla,

12   one side of the party, has made a submission to the Court

13   saying here's how this policy works.  It gives him discretion

14   in the first instance, he has reasonably exercised the

15   discretion.  We find that there was nothing material and did

16   not reach the standards.

17         THE COURT:  I shouldn't evaluate whether Tesla's off

18   its rocker or not, right?

19         MR. HUESTON:  No, I think you have to give deference

20   to the fact that Tesla, because this is an interpretation of a

21   policy interpreted between and negotiated between two parties,

22   I think Tesla gets a lot of deference.

23         THE COURT:  So I do apply it myself, but I defer to

24   Tesla.

25         MR. HUESTON:  Because it's their policy, and they're

J443SECC

implementing it, and they are overseeing it, and they've opined

on what Mr. Musk did.  And of course, because there's

discretion provided to Mr. Musk, they are also talking about --

there is the discretion and he exercised it reasonably.  That

to me is probative.  It is not necessarily conclusive, but is

highly probative evidence of compliance in and of itself in a

contempt proceeding.  Let me --

THE COURT:  I'm still confused about when it might be

somehow different.  I can't recall if you did answer this or

not.  But I think the answer is no, there is no set of

circumstances you can imagine by which the Court could conclude

that he has failed to comply.  That there is some communication

he could put out there, without preapproval, and that it's my

job to decide whether he's in compliance with the policy or

not.

MR. HUESTON:  I'll give you a hypothetical that will

make it an easier situation.

He puts out a wholly new concrete piece of information

that's not forward looking, it's not in the context of cars.

It is very specific.  Tesla's admits he didn't follow the

policy, and it's clearly material.

I suppose -- even here I have trouble, because

materiality the SEC says is not the standard that your Honor is

speaking with me today.

That may be a situation where, okay, there's no --

J443SECC

1    even with the discretion provided by Tesla, he didn't abide by

2    that allowance, he didn't exercise his judgment in good faith.

3    We haven't even talked about diligently attempting to comply,

4    your Honor.  The fact that there was an effort to correct it

5    later.

6            THE COURT:  I'll still waiting for an answer.

7    Honestly, I don't know.  Just say if it is --

8            MR. HUESTON:  I'm having trouble.

9            THE COURT:  Whatever Mr. Musk does, whatever

10   communication he puts out there without preapproval, it is for

11   his determination whether to seek that preapproval, and Tesla's

12   determination as to whether he did that appropriately.

13           MR. HUESTON:  That's right.

14           THE COURT:  Go home, Judge Nathan.

15           MR. HUESTON:  No, your Honor.  Well, no.  With a

16   caveat that --

17           THE COURT:  I just want an example of where that

18   wouldn't be.

19           MR. HUESTON:  Sure.  If we had materiality clearly

20   defined.

21           THE COURT:  Under this consent judgment.

22           MR. HUESTON:  Right.

23           THE COURT:  Give me an example of where I have some

24   role in the evaluation as to whether or not he's in violation

25   of the policy and the order.

J443SECC

1          MR. HUESTON:  You do not on the ambiguous standard set

2     forth here.  If it was clear, you would.  It is not.  I can't

3     even describe a hypothetical materiality issue, because that's

4     been in dispute and not defined.

5          THE COURT:  Right.  You're not very imaginative.  I

6     can think of things but --

7          MR. HUESTON:  Okay.

8          THE COURT:  I steered you away from the things you

9     wanted to do with the tweets, so I invite that.

10          MR. HUESTON:  Okay.  Let me talk first, though, about

11     diligent attempt to comply, your Honor.  That is an independent

12     basis for finding that contempt should not apply.

13          Mr. Musk has diligently attempted to comply.  The

14     first thing the SEC put forth as their proof is statements on

15     60 Minutes.

16          THE COURT:  Before the policy.  I am not sure what I

17     do with that, if anything.

18          MR. HUESTON:  Nothing.  He gave an honest assessment

19     that there is a possibility a mistake could be made.

20          By the way, the SEC appears to be following his every

21     word.  That was their moment to say, wait a minute, Mr. Musk

22     and Tesla, are you saying he has some ability to decide in the

23     first instance?  It was right there in the first transcript.

24          THE COURT:  It was before the policy.

25          MR. HUESTON:  Sure, it was in December.  If they say,

J443SECC

wow, that's their intent, they must be closing in on some

different interpretation, that would have been an invitation to

reach out and resolve any issues.

Mr. Musk hasn't been hiding his approach here, and

Tesla has said his approach is appropriate.  What they say in

reply is they say, well, here are 15 different tweets which

show that he is rogue and out of control.  Not one of those 15

is misleading.  Not one is inaccurate.  Almost every one of

them doesn't fit under the illustrative topics and categories.

Most every one repeats or responds or -- either repeats public

guidance or responds directly to a customer, and not one is

material.

So I'll give you a few examples of the 15.  By the

way, he may have tweeted upwards of 80 times arguably in this

time period in something related to Tesla.  Presumably these

are their 15 best examples.

Here's one.  "Model 3 midrange EPA rating is actually

264 miles.  Slightly higher than prior estimate of 260."  Your

Honor, that simply repeats updated and accurate information

that was available the same time from Tesla's website.  That

can't possibly be a basis for finding improper behavior, and it

illustrates that they don't know and even today can't define

what the standard is.

THE COURT:  Ms. Crumpton pointed to one.  It is

escaping me now.  But it was a factory or something?

J443SECC

1          MR. HUESTON:  I'm sorry.  There is one in here about

2    breaking ground on the Gigafactory.

3          THE COURT:  Gigafactory.

4          MR. HUESTON:  Right.  And that was out there for

5    months in terms of there was already an announcement that the

6    Gigafactory was going forward.  There was already information

7    in the press that was moving forward with a timeline, and the

8    actual groundbreaking was being talked about.  That is my

9    understanding, and again, they haven't provided all their

10   positions for that.  That was all publicly available

11   information, nothing new, and not material.

12         Couple of other examples, your Honor, that they put

13   forward as examples of his egregious misconduct.  "Tesla is the

14   safest car per U.S. government testing."  That's repeated old

15   news.  That had been reported by Tesla as recently as October

16   of 2018 and as far back as 2013 with each of the models being

17   regarded as the safest car under U.S. testing.

18         Here's another one.  "By the way, you can buy a Tesla

19   online in less than two minutes and give it back for full

20   refund for any reason."  That was entirely consistent with

21   Tesla's return policy available online.  The policy had been in

22   place as early as October 22, 2018.

23         And then another one.  "Tesla with autopilot engaged

24   is twice as safe and continues to make steady improvements."

25   On that tweet he actually cites in the tweet the Tesla

J443SECC

1    quarterly vehicle safety report, which provides the very

2    figures to say twice as safe.

3              Your Honor, let me just close if I can, because I know

4    my time is short, with the following.  Your Honor, they have

5    not shown that the proof of non-compliance is clear and

6    convincing.  There is the Tesla policy itself, and Tesla's

7    judgment that he did not violate.  We have the 600,000 cars

8    that is in the total mix of information, that when he says

9    around 500, in a tweet sequence that is celebratory and forward

10   looking, with every hallmark of immateriality, that can't

11   possibly be clearly material, and something that is appropriate

12   for sanction.

13             One thing that has been glossed over is that we had a

14   Professor Christopher Noe of MIT do an assessment of what the

15   market did.  The SEC waves that off and says that's not

16   appropriate to consider.  But the case law in this district,

17   U.S. v. Hatfield, U.S. v. Bilzerian, says, although not

18   dispositive, stock price movement afterwards is a consideration

19   for whether it is material or not.  The trading volume didn't

20   move, it was lower than normal.  The stock price moved less

21   than it did on a usual daily occurrence.

22             If it was material what he did, the corrected tweet

23   should have been material, and it was not.  He looked at

24   analyst reports.  No one noted it.

25             Conclusion, your Honor:  Tesla was right that it was

J443SECC

1    immaterial.  Mr. Musk was right that it was immaterial.  And

2    the market gave the judgment immaterial.  That can't be a basis

3    for declaring it is material and contempt under these ambiguous

4    standards.

5          Your Honor, one last thing I will say.  If the SEC is

6    right, and Mr. Musk, according to them, made some kind of

7    mistake, that's not a place to bring down contempt.  They ran

8    in here because Mr. Musk -- this is the facts -- did something

9    he believed was right.  The original 7:15 tweet, it's not

10   material.  Tesla says, then and now, not material.  Disclosure

11   counsel says put out and repeat some other numbers guidance.

12   Mr. Musk doesn't agree, but does it anyway.

13         This is not someone who is wantonly saying I don't

14   care about processes and procedures in place.  He actually does

15   what he is told.  And in that situation, your Honor, when

16   someone does make an error, if it is an error, and promptly

17   corrects it, that's not the kind of wanton behavior that merits

18   contempt finding.  That is somebody who is trying his best to

19   comply, and who has been diligent.  And for the SEC to outline

20   broad ambiguous areas they now say gotcha without an effort to

21   meet and confer earlier, really takes us well outside the area

22   of contempt.

23         THE COURT:  I'll give you a couple minutes, if you

24   want, if I do determine that Mr. Musk is in contempt, do you

25   want to respond to what's been suggested as appropriate

J443SECC

1    sanctions?

2              MR. HUESTON:  Your Honor, obviously, we do not believe

3    there should be a contempt finding.  Let me --

4              THE COURT:  I wasn't clear on that, so thank you.

5              MR. HUESTON:  And also, your Honor, I think there can

6    be -- we've talked about and I see your Honor's, yes, why did

7    you rush in.

8              There is another pathway if your Honor is concerned

9    about where things are moving forward.  It can order the

10   parties to meet and confer and come back if there is a material

11   dispute.  If we're going to go down another pathway, that

12   should be not a hammer on Mr. Musk, with his ears ringing, told

13   to go ahead and retool the policy that is ambiguous.  We don't

14   believe that's appropriate, your Honor.

15             We think the right approach here would be, look, there

16   has been a lot of disagreement.  There should not be any sort

17   of rewarding of somebody running into court and claiming the

18   sky is falling without some sort of good faith efforts to try

19   to meet and confer and work it out.

20             That's where I think we expected the SEC to come from.

21   And frankly, if there is an action, that should be the nature

22   of the action here, and nothing more.  Because Mr. Musk acted

23   in good faith, he was diligent.  And even under the worst of

24   characterizations, promptly corrected what -- or clarified an

25   earlier tweet, even though it wasn't material by anyone's

J443SECC

1   assessment nor the market's.

2          THE COURT:  Thank you, Mr. Hueston.

3          Ms. Crumpton, you have five minutes if you want it.

4          MS. CRUMPTON:  Thank you, your Honor.

5          I'd like to correct a couple of things that have been

6   mischaracterized by the SEC's position.  First of all, we have

7   not ever said that the materiality law doesn't apply.  What we

8   have said is that right standard of the court's order is

9   broader, because it has the "reasonably could contain"

10  language.  But if the Court decides that that reasonably could

11  contain language is ambiguous, it doesn't have to throw out the

12  baby with the bathwater, because this was material, even under

13  the broader materiality standard.

14         THE COURT:  But then aren't we just going to be back

15  here again?  Even if that's right, and again, I'm not

16  expressing my view, but if you were to prevail on that, it

17  seems to me we still need to solve the potential problem of an

18  unclear aspect of that.

19         MS. CRUMPTON:  That may be so.  We can propose a

20  modification.  But I really do think this argument is a bit

21  disingenuous.  This is the second time that Mr. Musk's counsel

22  has brought up settlement communications to argue that his

23  interpretation of this order is correct and that the SEC's is

24  wrong.

25         But he has omitted other very relevant settlement

J443SECC

1    communications we would offer now that would explain what the

2    parties understood when they negotiated this --

3           THE COURT:  I don't think we need to -- I don't think

4    we need to get into that.  I have the understanding of the

5    history of the negotiation of this provision.  At the end of

6    the day, I'm not sure that matters at all.

7           To the extent Mr. Hueston is saying that failure to

8    negotiate prior to the contempt is somehow relevant.  Whether

9    or not I think that's right as to how I would expect folks to

10   act, I don't know that it comes into the analysis at all.  But,

11   I'm going to give a speech on how that's going to happen going

12   forward.

13          MS. CRUMPTON:  I would like to give the Court a little

14   history of how we came to be standing here.  It is not we

15   rushed in to court at the first opportunity.  As I said before,

16   there had been a number of tweets over time, Mr. Houston went

17   through some of them.  There were others that we attached.  As

18   he said, Mr. Musk has tweeted upward of 80 times about Tesla,

19   and the SEC thought nothing of it.  We assumed that everyone

20   was proceeding in good faith.  That's even after the 60 Minutes

21   interview.

22          We haven't abandoned the 60 Minutes interview.  We

23   offered additional evidence.  We didn't feel it necessary to

24   repeat the same points we made in our opening brief.

25          I would like to point the Court to some particular

J443SECC

1    language that give us trouble about the 60 Minutes interview.

2    It's the question of Does someone to have to read your tweets

3    before they go out?  And Mr. Musk says No.  And so then he's

4    asked, So your tweets are not supervised?  And he says, Well,

5    the only tweets that would have to be say reviewed would be if

6    a tweet had a probability of causing a movement in the stock.

7              THE COURT:  I hear you.  And that's not the only

8    question.  As Mr. Houston said, that's not dispositive.  But

9    that is before the policy.  So it's hard to know how that's

10   supposed to move the needle as to Mr. Musk's approach to the

11   policy.

12             MS. CRUMPTON:  I would suggest that he was saying on

13   national television, before the policy even went into effect,

14   that he didn't intend to comply with it as it was written.  He

15   intended to comply with it -- at the time we didn't reach out,

16   because we hoped that was just Mr. Musk saying what he wanted

17   to say on television, and that he was going to actually comply

18   with the policy, and we assumed that that's what happened,

19   until February 19, when designated securities counsel for Tesla

20   had to swoop in, and correct what was unquestionably a material

21   statement that was wrong.

22             And Mr. Houston has said that he's diligently tried to

23   comply, that the Court shouldn't look at these prior tweets

24   because they're not misleading and they're not inaccurate.

25   That's not the standard.  We haven't sued Mr. Musk for

J443SECC

securities fraud.  We have brought this action to say he is not

seeking preapproval of tweets that if you were a prudent person

seeking to seriously comply with this Court's order, you would

have submitted for preapproval.

He has just decided that he doesn't have to do that.

He can just have his securities counsel read the tweets at the

same time as the rest of us do, and if he gets something wrong,

well, securities counsel will fix it.

That's not what the Court ordered, that's not the

policy, and it's not what the SEC negotiated in this case.

And the last thing I want to address is what weight we

should give Tesla, or Tesla's opinion about this policy.  The

language that is operative here doesn't come from the Tesla

policy, it comes from the Court's order.  If this is a

communication that contains or reasonably could contain

material information, the Court ordered him to comply with the

preapproval requirement.  And Tesla has, for whatever reason,

thrown its lot in with Mr. Musk.  It has refused to let there

be any daylight between him, between their CEO and them.  And

that is the problem.  The reason --

THE COURT:  If that's right, has Tesla done what's

required of them?

MS. CRUMPTON:  We would submit that Tesla's conduct is

very troubling, and we're still evaluating whether Tesla has

complied with the policy.  But we will say that we believe that

J443SECC

1   the gravamen of the problem is with Mr. Musk's conduct.  But

2   there is also a problem that you have a company who undertook

3   to take certain actions to provide oversight of the CEO that

4   appears to have just completely abrogated that responsibility.

5           Thank you, your Honor.

6           THE COURT:  The motion is submitted.  But I did want

7   to make a few points in closing, and, as I've alluded, to a

8   call to action.

9           Point number one, I must and I will ensure that court

10  orders are followed.  It's not optional; it is not a game.  I

11  don't care if you're a small potato or a big fish.  If you are

12  you under a court order, you proceed cautiously, you follow it,

13  or you seek relief pursuant to available process, period.

14  That's the rule of law.

15          And point number two, contempt of court is serious

16  business.  It is a serious charge to be made, and it is a

17  serious conclusion for a Court to reach.  I don't take it

18  lightly, and the SEC carries a significant burden here.  In my

19  view, government lawyers should take all available steps to

20  work out disputed issues, be reasonable, come to an agreed-upon

21  resolution if possible, before invoking the significant Court's

22  contempt powers.

23          Point number three.  I have serious concerns that no

24  matter what I decide here, this issue will not be finally

25  resolved.  For example, from the SEC's perspective, and again,

J443SECC

1    I intimate no view, but the SEC could prevail here because I

2    conclude that the relevant tweet was material, but this may not

3    resolve whether the "reasonably could contain" language is

4    clear and unambiguous, and that may open up finality of this

5    consent judgment.  Or the SEC may lose here, because they

6    haven't met their burden on one or more the grounds, and that

7    may undermine the enforcement efforts going forward.

8            The same is true for Mr. Musk, and again, I'm giving

9    no view, but I may conclude that he prevails because I think

10   the judgment or the policy lacked the requisite clarity for

11   contempt purposes.  What then happens?  Judicial orders must be

12   clear and unambiguous.  That would raise the question of

13   whether the judgment needs to be modified or potentially

14   vacated.  Or, of course, he may lose and face a contempt

15   determination and sanctions.

16           So with those points in mind, my call to action is for

17   everybody to take a deep breath, put your reasonableness pants

18   on, and work this out.

19           I am requiring you within the next two weeks to meet

20   and confer for at least an hour, to make a good faith effort to

21   resolve this matter, both for the immediate contempt motion,

22   and to ensure absolute clarity moving forward so we are not

23   back here again.

24           So within two weeks from today, I will require a joint

25   letter to the Court confirming that the meet and confer has

J443SECC

1    taken place, and indicating whether you've reached resolution

2    or are on the cusp of doing so.  If not, you'll hear from me in

3    due course with my decision.

4              I thank counsel for their briefing and argument.  We

5    are adjourned.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25