## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**

        **Plaintiff,**

  **v.**

**ELON MUSK,**

        **Defendant.**

**Civil Action No. 1:18-cv-08865-AJN**

---

## DEFENDANT ELON MUSK'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO QUASH & TO TERMINATE CONSENT DECREE

**TABLE OF CONTENTS**

I.      INTRODUCTION.............................................................................................. 1

II.     BACKGROUND ............................................................................................. 2

III.    LEGAL STANDARD....................................................................................... 4

        A.      Motion To Quash. .............................................................................. 4

        B.      Motion To Terminate Consent Decree............................................ 6

IV.     ARGUMENT.................................................................................................. 6

        A.      The Challenged Requests Should Be Quashed Because The SEC
                Lacks Authority To Issue A Subpoena Based On The Consent Decree
                Rather Than The Securities Laws............................................... 7

                1.      An Administrative Subpoena Must Be Supported By A
                        Legitimate Investigatory Purpose............................................ 8

                2.      The Securities Laws Do Not Supply A Legitimate Basis For
                        The Challenged Requests......................................................... 9

                3.      The SEC Cannot Issue Administrative Subpoenas To
                        Investigate Compliance With The Judgments In This Case............. 14

        B.      The Challenged Requests Should Be Quashed Because The Subpoena
                Was Issued In Bad Faith. .................................................................... 16

        C.      The Consent Decree Should Be Terminated Or At Least Modified.............. 20

                1.      The SEC's Exploitation Of The Consent Decree Has Made
                        Compliance Onerous And Unworkable. ............................................ 20

                2.      The SEC Has Used The Consent Decree To Police First
                        Amendment Speech. .......................................................... 21

                3.      The Equities Strongly Favor Termination....................................... 24

V.      CONCLUSION .............................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>CASES</u>

*Ayers v. SEC,*
    482 F.Supp. 747 (D. Mont. 1980).................................................................................. 17

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ....................................................................................................... 22

*Carson v. Simon,*
    978 F.3d 1051 (8th Cir. 2020) ..................................................................................... 21

*Coffey v. Braddy,*
    834 F.3d 1184 (11th Cir. 2016) ..................................................................................... 6

*Cohen v. California,*
    403 U.S. 15 (1971) ....................................................................................................... 23

*Consumer Health Info. Corp. v. Amylin Pharms., Inc.,*
    54 F. Supp. 3d 1001 (S.D. Ind. 2014) ......................................................................... 25

*EEOC v. Federal Home Loan Mtg. Corp.,*
    37 F. Supp. 2d 769 (E.D. Va. 1999) ............................................................................ 14

*EEOC v. Hearst Corp.,*
    103 F.3d 462 (5th Cir. 1997) ........................................................................................ 14

*EEOC v. Tire Kingdom, Inc.,*
    80 F.3d 449 (11th Cir. 1996) ......................................................................................... 5

*EEOC. v. Loc. 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Joint Apprenticeship Comm., Iron Workers Locs. 40 & 361 & Allied Bldg. Metal Indus.,*
    76 F.3d 76 (2d Cir. 1996) ............................................................................................ 24

*FDIC v. Garner,*
    126 F.3d 1138 (9th Cir. 1997) ....................................................................................... 5

*Frew ex rel. Frew v. Hawkins,*
    540 U.S. 431 (2004) ..................................................................................................... 16

*Grenda v. SEC*, 2017 WL 4053821 (W.D.N.Y. Sept. 14, 2017)............................................. 17

*Hampton v. Steen,*
    No. 2:12-cv-00470-SU, 2014 WL 2949302 (D. Or. June 27, 2014) .............................. 5

*In re Anonymous Online Speakers*,
   661 F.3d 1168 (9th Cir. 2011)...................................................................... 21

*In re Proquest Sec. Litig.*,
   527 F. Supp. 2d 728 (E.D. Mich. 2007) ....................................................... 10

*In the Matter of Altaba Inc., f/d/b/a Yahoo! Inc.*,
   Release No. 3937 (S.E.C., Apr. 24, 2018) ........................................... 10, 12

*In the Matter of China-Biotics, Inc.*,
   Release No. 70800 (S.E.C., Nov. 4, 2013) .................................................. 10

*In the Matter of First Am. Fin. Corp.*,
   Release No. 92176 (S.E.C., June 14, 2021) ................................................ 12

*In the Matter of Talon Real Est. Holding Corp.*,
   Release No. 87614 (S.E.C., Nov. 25, 2019) ................................................ 10

*Int'l Waste Controls, Inc. v. SEC*,
   362 F. Supp. 117 (S.D.N.Y. 1973) ............................................................... 19

*Kaufman and Broad–South Bay v. Unisys Corp.*,
   822 F.Supp. 1468 (N.D. Cal. 1993)............................................................. 25

*Lorain NAACP v. Lorain Bd. of Educ.*,
   979 F.2d 1141 (6th Cir. 1992) ..................................................................... 24

*Mallory v. Eyrich*,
   922 F.2d 1273 (6th Cir. 1991) ..................................................................... 24

*Nehmer v. U.S. Dep't of Veterans Affs.*,
   494 F.3d 846 (9th Cir. 2007) ....................................................................... 16

*Oklahoma Press Pub. Co. v. Walling*,
   327 U.S. 186 (1946) ....................................................................................... 8

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) ................................................................................. 21

*Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*,
   13 F.3d 33 (2d Cir. 1993) ............................................................................... 6

*Philippine Export v. Chuidian*,
   218 Cal.App.3d 1058 (1990).......................................................................... 25

*Resol. Tr. Corp. v. Walde*,
   18 F.3d 943 (D.C. Cir. 1994) ......................................................................... 8

*Rich & Whillock, Inc. v. Ashton Dev., Inc.*,
   157 Cal.App.3d 1154 (1984).......................................................................... 25

*RNR Enters., Inc. v. SEC*,
   122 F.3d 93 (2d Cir. 1997) ............................................................................. 5

*RTC v. Thornton*,
   41 F.3d 1539 (D.C. Cir. 1994) ........................................................................ 15

*Rufo v. Inmates of the Suffolk Cty Jail*,
   502 U.S. 367 (1992) ........................................................................ 6, 20, 21, 22

*SEC  v. ESM Gov't Sec., Inc.*,
   645 F.2d 310 (5th Cir. 1981) ............................................................................ 5

*SEC v. Brigadoon Scotch Distrib.*,
   480 F.2d 1047 (2d Cir. 1973) ................................................................... 5, 8, 17

*SEC v. Facebook, Inc.*,
   3:19-cv-04241 (N.D. Cal. Aug. 22, 2019) ...................................................... 12

*SEC v. Jerry T. O'Brien, Inc.*,
   467 U.S. 735 (1984) ...................................................................................... 4, 7

*SEC v. Musk*,
   1:18-cv-8865 (S.D.N.Y.) ............................................................................. 3, 17

*SEC v. Sears*,
   No. 05-728-JE, 2005 WL 5885548 (D. Or. July 28, 2005) ............................... 5

*SEC v. Tesla*,
   1:18-cv-8947 (S.D.N.Y.) ................................................................ 2, 3, 17, 18

*SEC v. Waymack*,
   358 F. Supp. 3d 56 (D.D.C. 2019) .................................................................... 5

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
   648 F.2d 118 (3d Cir. 1981) ..................................................................... 13, 17

*U.S. for Use and Benefit of Reed v. Callahan*,
   884 F.2d 1180 (9th Cir. 1989) ........................................................................ 25

*United States v. Constr. Prod. Rsch., Inc.*,
   73 F.3d 464 (2d Cir. 1996) ............................................................................. 16

*United States v. Eastman Kodak Co.*,
   63 F.3d 95 (2d Cir. 1995) ............................................................................... 20

*United States v. Fensterwald*,
   553 F.2d 231 (D.C. Cir. 1977) ........................................................................ 19

*United States v. Morton Salt Co.*,
   338 U.S. 632 (1950) .......................................................................................... 8

*United States v. Powell*,
   379 U.S. 48 (1964) .................................................................................... 4, 5, 7

*United States v. Quattrone*,
   402 F.3d 304 (2d Cir. 2005) ........................................................................... 22

*United States v. Sec'y of Hous. & Urban Dev.*,
   239 F.3d 211 (2d Cir. 2001) ....................................................................... 6

*Waste Mgmt. of Ohio, Inc. v. City of Dayton*,
   132 F.3d 1142 (6th Cir. 1997) .................................................................. 24


**STATUTES**

15 U.S.C. § 78a ............................................................................................... 10

15 U.S.C. §§ 78u(a), (b) .................................................................................... 8


**RULES**

17 C.F.R. § 240.13a-15(e) ............................................................................ 9, 10

Fed. R. Civ. P. 60(b) .................................................................................. 6, 20

The Commission's Guidance on the Use of Company Web Sites,
   73 Fed. Reg. 45862-01 (Aug. 1, 2008) ...................................................... 11


**OTHER AUTHORITIES**

Dave Michaels, *SEC Probes Trading by Elon Musk and Brother in Wake of Tesla CEO's Sales*,
   Wall St. J. (Feb. 24, 2022 2:22 pm ET), https://www.wsj.com/articles/sec-probes-trading-by-elon-musk-and-brother-in-wake-of-tesla-ceos-sales-11645730528 .............. 19

Elon Musk (@elonmusk), Twitter (Feb. 26, 2019, 4:25 am PT),
   https://twitter.com/elonmusk/status/1100371207491248128 ........................................ 23

Elon Musk (@elonmusk), Twitter (July 2, 2020, 11:50 am PT),
   https://twitter.com/elonmusk/status/1278762916326649863 ........................................ 23

Elon Musk (@elonmusk), Twitter (July 2, 2020, 11:57 am PT),
   https://twitter.com/elonmusk/status/1278764736876773383 ........................................ 23

Elon Musk (@elonmusk), Twitter (Oct. 4, 2018, 1:16 pm PT),
   https://twitter.com/elonmusk/status/1047943670350020608 ........................................ 23

Molly Ball, Jeffrey Kluger & Alejandro De La Garza, *2021 Person of the Year: Elon Musk*,
   Time (Dec. 13, 2021), https://time.com/person-of-the-year-2021-elon-musk/ .............. 22

SEC Div. of Enforcement,
   Enforcement Manual 3.1.3 ........................................................................ 15

v

I.      **INTRODUCTION**

On February 24, 2022, this Court invited Defendants to move to quash the Securities and Exchange Commission's ("SEC" or "Commission") subpoena. *See* Dkt. No. 65.[1]  Mr. Musk now respectfully does so.

Through its subpoena dated November 29, 2021, the SEC demands Mr. Musk produce documents pertaining to (1) the review or pre-approval of statements he posted on Twitter and (2) his sale of Tesla stock or options. *See* Exhibit A (Elon Musk Subpoena, *In the Matter of Tesla, Inc.* (SF-4496)).  Mr. Musk respectfully moves this Court to quash the subpoena with respect to the first category of requests pertaining to the review or pre-approval of his tweets (the "Challenged Requests").  These demands have no basis in the securities laws and, insofar as they seek information pertaining to the consent judgment issued by Your Honor, the SEC has no authority to act absent this Court's authorization.  Moreover, the SEC issued the Challenged Requests in bad faith as part of a concerted campaign to target and silence Mr. Musk's speech on matters of public concern.  Accordingly, Mr. Musk respectfully requests that this Court quash the Challenged Requests.

Mr. Musk further moves to terminate the consent decree entered in this case.  Dkt. No. 14.  The equities strongly favor terminating the consent decree, which the SEC has used to trample on Mr. Musk's First Amendment rights and to impose prior restraints on his speech. Contrary to the SEC's conception, the consent decree is not a charter for subjecting Mr. Musk to unwarranted scrutiny for exercising his constitutional right to speak his mind in public.  The SEC is using its near limitless resources to further chill Mr. Musk's First Amendment rights via

---

[1]   Unless otherwise indicated, docket references refer to the docket in this case, *SEC v. Musk.*

endless investigations outside the bounds of law.  It follows that the consent decree should be terminated, or, at a minimum, modified to remove the prior restraint on Mr. Musk's free speech.

## II.     BACKGROUND

Over the past four years, the SEC has subjected Tesla, Inc. ("Tesla") and Mr. Musk to unrelenting investigation into Mr. Musk's First Amendment expression.  In 2018, the SEC brought actions for securities fraud against Mr. Musk and Tesla regarding statements Mr. Musk made on his Twitter account.  Dkt. No. 1; *SEC v. Tesla*, 1:18-cv-8947 (S.D.N.Y.), Dkt. No. 1. Mr. Musk felt "forced to sign the consent decree in 2018 [when] Tesla was a less mature company and the SEC's action stood to jeopardize the company's financing.  Defending against the SEC's action through protracted litigation was not in the interests of the company and its shareholders."  Declaration of Elon Musk, filed concurrently herewith, at ¶ 4.

On October 16, 2018, this Court issued a final judgment requiring Mr. Musk to obtain pre-approval of any written communications that contain, or reasonably could contain, information material to Tesla or its shareholders.  Dkt. No. 14.  Tesla, for its part, agreed to implement mandatory procedures and controls to provide oversight of Mr. Musk's communications about the company and require pre-approval by Mr. Musk, of communications that contain or reasonable could contain, information material to Tesla or its shareholders.  *Tesla*, Dkt. Nos. 3, 14.  On April 30, 2019, pursuant to a consent motion from both parties, this Court issued an amended judgment delineating specific topics for which Mr. Musk is required to obtain preapproval before issuing a written communication.  Dkt. No. 47.  The Amended Judgment further provided "that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of the Final Judgment, as amended by this Order."  *Id.* at 2; *Tesla*, Dkt. No. 17 at 2.

On November 6, 2021 at 12:17 pm PT, in direct response to well-publicized proposals for revising the federal tax code and criticism directed at him, Mr. Musk tweeted a question: "Much is made lately of unrealized gains being a means of tax avoidance, so I propose selling 10% of my Tesla stock.  Do you support this?"  Elon Musk (@elonmusk), Twitter (Nov. 6, 2021, 12:17 pm PT), https://twitter.com/elonmusk/status/1457064697782489088 [hereinafter "12:17 pm Tweet"].  At 12:23 pm PT, he tweeted, "I will abide by the results of this poll, whichever way it goes."  Elon Musk (@elonmusk), Twitter (Nov. 6, 2021, 12:23 pm PT), https://twitter.com/elonmusk/status/1457066048944066565 [hereinafter "12:23 pm Tweet"].  Ultimately, 57.9% of the votes (3,519,252 in total) voted "yes."  *See supra*, 12:17 pm Tweet.

On November 16, 2021, the SEC served Tesla with a subpoena.  Exhibit B (Tesla Subpoena, *In the Matter of Tesla, Inc.* (SF-4496)).  In part, the Tesla Subpoena seeks information relating to whether Mr. Musk sought and obtained approval from Tesla before he posted the November 6, 2021 tweets, and if and how Tesla has complied with the judgment and amended judgment in this case.  For example, Demand 7 of the Tesla Subpoena requires:

> From April 30, 2019 to the present, all Documents and Communications Concerning Elon Musk's compliance or non-compliance with Tesla's disclosure controls and procedures, executive communications policy, external communications policy, other policies or procedures relating to public statements or communications by Tesla executives, or the final judgment or amended final judgment in *SEC v. Musk*, 1:18-cv-8865-AJN (S.D.N.Y.).

Ex. B at 5.  Demand 10 similarly requires "From April 30, 2019 to the present, all Documents and Communications Concerning Tesla's compliance or non-compliance with the final judgment or amended final judgment in *SEC v. Tesla*, 1:18-cv-8947-AJN (S.D.N.Y.)."  *Id.*

On November 29, 2021, the SEC issued a similar subpoena to Mr. Musk.  Ex. A. Demand 3 of the Musk Subpoena directs Mr. Musk to produce "All Documents and Communications Concerning" the 12:17 and 12:23 tweets.  Ex. A. at 4.  Demand 4 requests

"Documents related in any way to submission of the 12:17 tweet and/or the 12:23 tweet to Tesla's General Counsel or Securities Counsel, or any counsel acting in either capacity, for pre-approval or review before they were published." *Id.*

The next day, through counsel, Mr. Musk and Tesla produced to the SEC a privilege log addressing these requests. Exhibit C (Privilege Log sent from A. Spiro to R. Andrews Nov. 30, 2021). Nevertheless, over the following months the SEC has continued to demand the production of further documents, even as Tesla has produced approximately 1,000 documents in response to the SEC's investigation. Mr. Musk has not produced any documents personally.

This subpoena is but one in a winding parade of investigations into Mr. Musk and companies in which he holds leadership roles or financial stakes, conducted seriatim and without factual basis by the SEC. *See infra* at 17–18. The SEC's previous attempts to obtain information from Tesla and Mr. Musk have not yielded a shred of evidence that either violated the securities laws. The SEC has nevertheless repeatedly attempted to tarnish Tesla's and Mr. Musk's records with repeated, unfounded investigations. As the SEC returns again and again to seek the same information relating to compliance with the consent decree entered by this Court, it has become all too clear that it is trying to end-run the Court's supervision.

## III.  LEGAL STANDARD

### A.  Motion To Quash.

In a proceeding to quash an administrative subpoena, the district court's role is limited. *See SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741 (1984).[2] However, because "[i]t is the court's process which is invoked to enforce the administrative summons[,] a court may not permit its process to be abused." *United States v. Powell*, 379 U.S. 48, 58 (1964). Accordingly,

---

[2]  Unless otherwise indicated, this brief omits from quotations and citations all internal quotation marks, footnotes, and citations.

the court must satisfy itself "(1) that the investigation will be conducted pursuant to a legitimate purpose, (2) that the inquiry may be relevant to the purpose, (3) that the information sought is not already within the Commissioner's possession, and (4) that the administrative steps required . . . have been followed." *RNR Enters., Inc. v. SEC*, 122 F.3d 93, 96–97 (2d Cir. 1997) (quoting *Powell*, 379 U.S. at 57–58); *see also EEOC v. Tire Kingdom, Inc.*, 80 F.3d 449, 450 (11th Cir. 1996) (requiring that the administrative agency's investigation is within the agency's authority); *FDIC v. Garner*, 126 F.3d 1138, 1142 (9th Cir. 1997) (same).

Moreover, a court may quash or refuse to enforce an administrative subpoena if the target demonstrates that the agency has issued the subpoena for an improper purpose or in bad faith, such as to harass the individual from whom information was sought, to pressure the party to settle a collateral dispute, or "for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58; *see also SEC v. Brigadoon Scotch Distrib.*, 480 F.2d 1047, 1056 (2d Cir. 1973) ("[W]hile the SEC is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects."); *SEC v. ESM Gov't Sec., Inc.*, 645 F.2d 310, 315 (5th Cir. 1981) (rejecting the view that agency "abuse of process" should be "rigidly defined" and denying improper enforcement of SEC subpoena); *SEC v. Waymack*, 358 F. Supp. 3d 56, 65 (D.D.C. 2019) (finding it "unreasonable to require production of all documents with [overbroad] terms even for a limited time period"); *SEC v. Sears*, No. 05-728-JE, 2005 WL 5885548, at *1 (D. Or. July 28, 2005) ("harassment or to pressure [a] person to settle a collateral dispute" are improper purposes); *cf. Hampton v. Steen*, No. 2:12-cv-00470-SU, 2014 WL 2949302, at *5–10 (D. Or. June 27, 2014) (subpoena under Federal Rule of Civil

Procedure 45 may be quashed when "served for the purpose of annoying and harassment and not really for the purpose of getting information").

B.       **Motion To Terminate Consent Decree.**

A district court has inherent authority to terminate or modify a consent decree. *See Rufo v. Inmates of the Suffolk Cty Jail*, 502 U.S. 367, 381, 381 n. 6 (1992). "[A] district court may modify or terminate a consent decree, subject to abuse-of-discretion review, if changed circumstances have caused compliance with the decree to become substantially more onerous, have rendered the decree impracticable, or have caused its continued enforcement to be inimical to the public interest." *Coffey v. Braddy*, 834 F.3d 1184, 1193 (11th Cir. 2016); *see also Rufo*, 502 U.S. at 381. "[A]ny showing of a significant change in factual conditions or law would justify a modification of a decree." *Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*, 13 F.3d 33, 37 (2d Cir. 1993) (applying a "flexible standard"). "[A] court of equity [is entitled] to focus on the dominant objective of the decree and to terminate the entire decree once that objective has been reached." *Id.* at 39; *see also* Fed. R. Civ. P. 60(b) (a "court may relieve a party or its legal representative from a final judgment . . . [if] the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable"); *United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211, 216–17 (2d Cir. 2001) (documenting the "significant relaxation of the restrictions imposed on District Courts seeking to modify consent decrees").

IV.     **ARGUMENT**

The SEC has spent the past five months devoting its formidable resources to investigating Mr. Musk and Tesla, much as it has spent the past four years doing the same under varying auspices. The November 29, 2021 subpoena's requests for Mr. Musk to produce information

solely regarding the judgments overseen by this Court cross the line.  The Challenged Requests seek information not pursuant to any legitimate enforcement of the securities laws, but rather information solely under the purview of this Court.  Worse yet, the SEC's unrelenting stream of investigations into Mr. Musk and companies in which Mr. Musk holds leadership roles or financial stakes demonstrates that the SEC has been proceeding in bad faith.  The Challenged Requests should be quashed.

What is more, the consent decree should be terminated because compliance with it has become impossible under the SEC's skewed conception of its authority.  Nothing less than First Amendment freedoms are imperiled.  The more the SEC monitors Mr. Musk's Twitter activity, and forces others to do the same, the more Mr. Musk's freedom of expression is infringed.  Especially considering that Mr. Musk had no choice but to sign the consent as he did in 2018, the equities now compel termination of the consent decree.

A.    **The Challenged Requests Should Be Quashed Because The SEC Lacks Authority To Issue A Subpoena Based On The Consent Decree Rather Than The Securities Laws.**

To defeat a motion to quash an administrative subpoena, the SEC "must show that the investigation will be conducted pursuant to a legitimate purpose."  *Powell*, 379 U.S. at 57–58.  It cannot do so here.  It is black-letter law that the SEC "has statutory authority to conduct nonpublic investigations into possible violations of the securities laws and, in the course thereof, to issue subpoenas to obtain relevant information."  *Jerry T. O'Brien*, 467 U.S. at 737.  What the SEC may not do is use its status as a powerful regulatory body to harass individuals.  Nor may the agency expand its investigatory authority by invoking the orders issued by this Court, even as it simultaneously evades this Court's jurisdiction to enforce those orders.  The SEC's interpretation of its authority under the securities laws would give it license to evade court supervision of every consent decree it enters—a reading that is untenable.

7

### 1.   An Administrative Subpoena Must Be Supported By A Legitimate Investigatory Purpose.

"[A] governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).  And "while the SEC is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects." *Brigadoon Scotch Distrib. Co.*, 480 F.2d at 1056.  As the Supreme Court has made clear, "[p]ersons from whom [an agency] seeks relevant information are not required to submit to [the agency's] demand, if in any respect it is unreasonable or overreaches the authority Congress has given." *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 217 (1946).  The D.C. Circuit has recognized that this principle applies with even greater force when an agency issues a subpoena to an individual, rather than a corporation. *See Resol. Tr. Corp. v. Walde*, 18 F.3d 943, 949 (D.C. Cir. 1994) (recognizing that cases that have permitted "agencies the greatest latitude in seeking the information they deem relevant to their duties . . . involve corporations rather than individuals," and noting that "[t]he Supreme Court reminds us that 'corporations can claim no equality with individuals in the enjoyment of a right to privacy'") (quoting *Morton Salt*, 338 U.S. at 652).

The Exchange Act empowers the SEC only to "make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter [or] the rules or regulations thereunder" and only to demand to see any papers "the Commission deems relevant or material to the inquiry."  15 U.S.C. §§ 78u(a), (b). To compel a person or entity to provide documentary or testimonial evidence in an investigation, the Commission must first authorize its staff to issue subpoenas by entering a formal order of

investigation.  A formal order of investigation outlines the scope of the investigation that the Commission has authorized and identifies the relevant statutes and rules that might have been violated.  As such, any legitimate investigatory purpose must be identified in a formal order.

> **2.      The Securities Laws Do Not Supply A Legitimate Basis For The Challenged Requests.**

The formal order of investigation in this case provides no basis for the Challenged Requests.  The formal order identifies that the judgments in this case enjoined Tesla from violating Rule 13a-15 of the Exchange Act.  Exhibit D at 1 (Formal Order of Investigation, SF-4496) (citing Dkt. Nos. 14, 17).  It then lists three possible securities laws violations, only one of which, Rule 13a-15, the SEC asserts relates to review or pre-approval of Mr. Musk's Twitter activity.  *Id.* at 1–2.  In our communications with SEC staff, they have insisted that Rule 13a-15 provides a basis for their investigation into Mr. Musk's tweets.  But Rule 13a-15 does not provide a general license to the SEC to investigate communications beyond those related to reports filed or submitted under the Exchange Act.  Nor does the rule allow the SEC to monitor compliance with the consent decree absent court supervision.

> **a)      Rule 13a-15 Applies To Disclosures In Securities Act Reports, Not Any And All Public Communications.**

Rule 13a-15 concerns "disclosure controls and procedures" specifically relating to reports filed or submitted under the Exchange Act.  17 C.F.R. § 240.13a-15(e).  It has nothing to do with review or pre-approval of executive communications.  While both the judgments in this matter and Rule 13a-15(e) use the phrase "disclosure controls and procedures," the securities laws limit the Rule 13a-15 requirement to companies' policies and procedures specifically ensuring accuracy of the reports a company submits under the Exchange Act.  Rule 13a-15(e) states:

> For purposes of this section, the term *disclosure controls and procedures* means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer *in the reports that*

*it files or submits under the Act* is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.

*Id.* (first emphasis in original) (citing 15 U.S.C. 78a *et seq.*).

Courts have applied this definition uniformly.  *See, e.g.*, *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 742 n.8 (E.D. Mich. 2007) (citing SEC Rule 13a–15(e)) ("The Sarbanes-Oxley Act provides the following definition of disclosure controls and procedures:  Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer *in the reports that it files or submits under the Act* is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures.") (emphasis added); *In the Matter of China-Biotics, Inc.*, Release No. 70800, at *10 n.40 (S.E.C., Nov. 4, 2013) ("Exchange Act Rule 13a-15(e), 17 C.F.R. § 240.13a-15(e), defines 'disclosure controls and procedures' as controls and procedures 'designed to ensure that information required *to be disclosed by an issuer in [its Exchange Act] reports* . . . is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.'") (emphasis added); *In the Matter of Altaba Inc., f/d/b/a Yahoo! Inc.*, Release No. 3937, at *8 (S.E.C., Apr. 24, 2018): (similar); *In the Matter of Talon Real Est. Holding Corp.*, Release No. 87614, at *6 n.30 (S.E.C., Nov. 25, 2019) (similar).

Rule 13a-15 does not bestow a roving license for the SEC to investigate any and all "disclosure controls and procedures" it identifies.  As the SEC has repeatedly recognized in its own proceedings, *see supra*, Rule 13a-15 concerns "disclosure controls and procedures" specifically relating to reports filed or submitted under the Exchange Act—quite different from all the countless instances in which information may be disclosed, via Twitter or otherwise.

Indeed, the 12:17 and 12:23 tweets did not include any information that Tesla would be required to disclose under the securities laws.  In the 12:17 tweet, Mr. Musk commented on a hot-button political issue, then posed a question.  12:17 pm Tweet ("Much is made lately of unrealized gains being a means of tax avoidance, so I propose selling 10% of my Tesla stock. Do you support this?").  In the 12:23 tweet, Mr. Musk simply confirmed "I will abide by the results of this poll, whichever way it goes."  12:23 pm Tweet.  A public poll is a way to gather information; it is not a disclosure of information, much less information a company would have to report in SEC filings.  To the extent that the ultimate sale of the shares required that Mr. Musk file a Form 4, that obligation fell on Mr. Musk personally, not on Tesla.  In sum, Rule 13a-15 has no conceivable application to the tweets in question.

Lest there be any doubt, SEC guidance expressly provides that disclosure controls and procedures requirements do *not* apply to online disclosures of information that are not disclosures pursuant to the Exchange Act.  That is, the Commission itself recognizes that disclosure controls and procedures are required only for Exchange Act reporting.  The Commission's Guidance on the Use of Company Web Sites, 73 Fed. Reg. 45862-01, 45873 at *17 (Aug. 1, 2008), explains that companies may post Exchange Act disclosure information on their websites instead of supplying it directly to the SEC.  If they do so, disclosure controls and procedures apply to that information, because "it is information required to be disclosed by the company in Exchange Act reports."  *Id*.  But "disclosure controls and procedures do not apply to other disclosures of information on a company's Web site.  This means that the principal executive officer and principal financial officer will not be disclosing their conclusions regarding the effectiveness of any controls that a company may have in place regarding its Web site

disclosure of information, other than those controls with respect to information that is posted as an alternative to being provided in an Exchange Act report." *Id.* at 45874.

The SEC's history of enforcement under Rule 13a-15 confirms that the Rule applies solely to weaknesses in controls or procedures that are tied directly to public SEC filings and/or a dearth of company policies to guard against the risk of misrepresentations or omissions in those filings. *See, e.g., In the Matter of Altaba Inc., f/d/b/a Yahoo! Inc.*, at *8 (Yahoo violated Rule 13a-15 when it learned of a data breach and did not disclose the breach in its public filings for nearly two years); *SEC v. Facebook, Inc.*, 3:19-cv-04241, Dkt. No. 11 (N.D. Cal. Aug. 22, 2019) (SEC alleged Facebook violated Rule 13a-15 with a misleading characterization of the risk of misuse of users' data in its 10-K and 10-Q filings following Facebook's work with Cambridge Analytica); *In the Matter of First Am. Fin. Corp.*, Release No. 92176, at *6 (S.E.C., June 14, 2021) (First American violated Rule 13a-15 when it learned about a cybersecurity vulnerability in its title and escrow document management software, but did not remedy the vulnerability before a major data leak and failed to disclose the leak in its Form 8-K). The rule simply does not apply to disclosures outside of public Exchange Act filings.

> **b)  The Commission's Attempt To Recast Rule 13a-15 As A Tool To Avoid Court Supervision Of The Consent Decree Is Unpersuasive.**

In an attempt to justify its continued investigation of Mr. Musk's constitutionally protected speech without coming to this Court, the Commission turns to the argument that it may investigate compliance with the consent decree under auspices of investigating Tesla's statements in SEC filings to the effect that Tesla is complying with the consent decree. That is, the Commission believes it may invoke the securities laws to subpoena information from Mr. Musk simply because Tesla has made statements about the consent decree in its 10-Qs and 10-Ks. Yet all Tesla has ever said in its filing is that it will "continue to comply with the terms

and requirements of the settlement." *See, e.g.*, Tesla, Annual Report (Form 10-K) (Feb. 4, 2022) at 26; Tesla, Quarterly Report (Form 10-Q) (Oct. 25, 2021) at 56; Tesla, Quarterly Report (Form 10-Q) (Jul. 27, 2021) at 56; Tesla, Quarterly Report (Form 10-Q) (Apr. 27, 2021) at 52; Tesla, Annual Report (Form 10-K) (Feb. 8, 2021) at 25; Tesla, Annual Report (Form 10-K) (Feb. 13, 2020) at 31.  That statement does not give rise to the SEC's claimed authority to therefore investigate any and all facts concerning Mr. Musk's compliance with the decree.

First, whether or not *Tesla* preapproved Mr. Musk's tweet has nothing to do with Tesla's compliance with the consent decree in its matter, *Tesla*, Dkt. Nos. 3, 14.  Indeed, the judgment and amended judgment Tesla agreed to merely require the company to undertake certain tasks— all of which were done years ago—including *implement* mandatory procedures and controls to oversee Mr. Musk's communications and require preapproval.  *Id.* at 4.  If *Mr. Musk* fails to seek preapproval of a tweet, Tesla's compliance is not impugned.

Second, this amounts to a telling admission that the SEC believes it can make an end-run around this Court and unilaterally investigate compliance specifically with this decree whenever it feels the urge to do so, without ever checking with the Court.  Indeed, the SEC's theory of its authority threatens to render meaningless the Court's essential role in superintending its decree.  *See Roberson v. Giuliani*, 346 F.3d 75, 80 (2d Cir. 2003) ("[C]ourts have inherent power to enforce the terms of such a decree because they constitute court orders."); *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir. 1981) (observing that while "courts must not interfere unduly in the administrative process . . . our primary concern is with the integrity of the judicial process").  Because companies in Tesla's position must regularly update investors on their compliance efforts, the SEC is arrogating to itself unilateral, unchecked license to investigate the particulars of consent-decree compliance however it pleases by the simple

expedient of claiming to be investigating such compliance *as set forth in one or another SEC filing*.

In sum, Mr. Musk's tweets at issue here are not Exchange Act financial reports—they were a public poll, indeed, a question—and the SEC cannot properly invoke Rule 13a-15 to monitor Mr. Musk's Twitter activity based on the mere fact the consent decree is referenced in SEC filings.

### 3. The SEC Cannot Issue Administrative Subpoenas To Investigate Compliance With The Judgments In This Case.

Nor can the Commission invoke the consent decree itself as imbuing it with authority to issue its own administrative subpoenas to investigate compliance. Your Honor's previous orders "retain jurisdiction of this matter for the purposes of enforcing the terms of the Final Judgment." ECF 47; *see also* ECF 14 ("[T]his Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment."). By specifically referring to the judgments in this case in its subpoena to Tesla and seeking documents from Mr. Musk pertaining to review or pre-approval of his tweets, the SEC seeks to circumvent the jurisdiction of this Court as it unilaterally grasps for documents pertaining specially to the consent decree.

The Commission may not use an administrative subpoena to investigate matters that relate only to the consent decree and do not concern the securities laws. Were the Commission able to bypass the limitations, discussed above, of Section 13(a) of the Exchange Act under the mistaken assumption that every violation of a consent decree is a violation of the securities laws themselves, it would render the concept of a court-supervised settlement a nullity.

Moreover, agencies are not authorized to use their investigative power in aid of litigation that has already commenced. *See EEOC v. Hearst Corp.*, 103 F.3d 462 (5th Cir. 1997); *EEOC v. Federal Home Loan Mtg. Corp.*, 37 F. Supp. 2d 769, 772–74 (E.D. Va. 1999). In *RTC v.*

*Thornton*, the D.C. Circuit stated clearly:  "We must emphasize that a subpoena is a tool of investigation." 41 F.3d 1539, 1546 (D.C. Cir. 1994).  Absent clear authorization from Congress that an agency may use a tool in ongoing litigation, such authority would "bestow a power that conflicts with two long-standing principles limiting the use of legal process to investigate, and discover."  *Id.*  Analogizing to the grand jury, the D.C. Circuit reasoned that the authority to issue a subpoena in connection with litigation "conflicts with the general principle that an investigation terminates once suit has been filed" and explained that "the [] far-reaching power asserted by the RTC here—a power that effectively would allow the RTC to use subpoenas in aid of ongoing litigation—is utterly foreign to the law defining the traditional scope of investigative authority."  *Id.* at 1546–47 (collecting cases).  *See also* SEC Div. of Enforcement, Enforcement Manual 3.1.3, at 33 ("[S]taff should not use investigative subpoenas solely to conduct discovery with respect to claims alleged in the pending complaint.  A court might conclude that the use of investigative subpoenas solely to conduct discovery is a misuse of the SEC's investigative powers and circumvents the court's authority and the limits on discovery in the Federal Rules of Civil Procedure.").

The Commission itself recognized that this Court, not the agency, wields ongoing authority to monitor compliance with the consent decree when, in 2019, the Commission submitted briefing to this Court under the heading "Authority to Enforce [The Consent] Order Is Vested with the Court, Not the SEC."  ECF 30 at 13.  The Commission continued, "[e]nforcement of the provisions of the Court's order does not depend on the SEC's statutory authority to bring injunctive action or on any authority of the SEC at all.  Rather, this Court has broad equitable powers to enforce the terms of its order . . . ."  *Id.* (collecting sources).  Nothing has changed between 2019, when the SEC relied on this Court's authority to enforce the consent

15

decree rather than its statutory authority, and now, when it seeks to enforce the decree without so much as apprising the Court.

The Supreme Court has made clear that "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance.  Once entered, a consent decree may be enforced." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004).  In 2007, the Ninth Circuit properly rebuffed an attempt by the Veterans' Affairs agency to enforce terms of a consent decree by regulation because it divested the district court of jurisdiction.  *Nehmer v. U.S. Dep't of Veterans Affs.*, 494 F.3d 846, 860 (9th Cir. 2007).  Explaining that a district court has "inherent authority" over a consent decree it has issued, such jurisdiction "presupposes that it, and not a party before it, is the principal and proper arbiter with the responsibility to interpret the decree and oversee the litigation.  Although a party may *ask* the district court to issue an order clarifying, enforcing, or modifying a decree and *suggest* a favored interpretation, a party—whether a private or public entity—cannot dictate the meaning of the decree to the court or relieve itself of its obligations under the decree without the district court's approval."  *Id.* (collecting cases).

To the extent Mr. Musk remains bound by the terms of the consent decree, so should the SEC.  If the SEC seeks information about Mr. Musk's compliance, it must come before Your Honor rather than pursue an end-run around the jurisdiction of this Court through improper administrative subpoenas.  Because it has not done so, and because it may not "conduct any investigation it may conjure up," *United States v. Constr. Prod. Rsch., Inc.*, 73 F.3d 464, 471 (2d Cir. 1996), the Challenged Requests should be quashed.

### B.    The Challenged Requests Should Be Quashed Because The Subpoena Was Issued In Bad Faith.

The motion to quash should further be granted because the subpoena was issued in bad faith by the SEC.  This bad faith is evidenced by the long string of investigations into

16

Mr. Musk's online speech. "[W]hile the SEC is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects. For example, if a subpoena were not issued in good faith but to harass or pressure the subject of an investigation, or for any other improper purpose, then the court would be bound not to enforce the subpoena as issued." *Brigadoon Scotch Distrib. Co.*, 480 F.2d at 1056; *see also Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 125 ("[T]he presence of SEC bad faith is only one of several possible reasons for the ultimate conclusion; a determination that the court's process would be abused if the subpoena were to be enforced is the ultimate conclusion."); *Ayers v. SEC*, 482 F.Supp. 747, 751 (D. Mont. 1980) ("While recognizing that the SEC has great latitude and freedom from undue judicial interference in conducting agency investigations, the agency discretion is not unfettered."). Indeed, "[a] court may quash an administrative subpoena if the target demonstrates that the subpoena was issued in bad faith—to harass, to pressure the person subject to investigation, or for some other 'improper purposes.'" *Grenda v. SEC*, 2017 WL 4053821, at *2 (W.D.N.Y. Sept. 14, 2017) (quoting *Brigadoon Scotch Distrib.*, 480 F.2d at 1056).

Improper purposes are evident here and the SEC's pursuit of Mr. Musk has crossed the line into harassment, which is quintessential bad faith. Over the past four years, the SEC has engaged in successive investigations of Mr. Musk and his tweets without cease. Below is a brief summary of the SEC's hovering attention to Mr. Musk's online speech:

- August 7, 2018: Subpoena to Tesla regarding August 7, 2018 Take Private tweet (SF-4082)

- August 9 and 15, 2018: Subpoena to Musk and other individuals regarding the August 7, 2018 Take Private tweet (SF-4082)

- September 27, 2018: Complaint filed in *SEC v. Musk*, 1-18-cv-8865-AJN

- September 29, 2018: Complaint filed in *SEC v. Tesla*, 1-18-cv-8947-AJN

17

    ⋆   October 16, 2018:  Final Judgment on Consent Decree in *Musk* and *Tesla*, settling Take Private Investigation (SF-4082)

- February 26, 2018:  SEC correspondence to Tesla expressing concerns with compliance with the Final Judgment

    ⋆   April 30, 2019:  Amended Final Judgment on Consent Decree in *Musk* and *Tesla* (SF-4082)

- December 4, 2019:  Take Private Investigation terminated (SF-4082)

- May 1, 2020:  Voluntary subpoena to Tesla regarding *SEC v. Tesla*, 1-18-cv-8947-AJN

- May 14, 2020:  Document retention request to Tesla regarding tweets and the Disclosure Controls Committee

- November 16, 2021:  Investigation opened regarding November 6, 2021 Stock Sale Poll Tweet (SF-4496)

- November 16, 2021:  Subpoena to Tesla regarding Stock Sale Poll (SF-4496)

- November 29, 2021:  Subpoena to Elon Musk and others regarding Stock Sale Poll (SF-4496)

The sheer number of these demands raises an inference that the SEC is targeting Mr. Musk and acting in bad faith.  And the pattern of demands is similarly telling, reflecting the Commission's bottomless appetite for pursuing Mr. Musk while lacking any evidence that Mr. Musk violated the securities laws.[3]  The SEC was not satisfied when Mr. Musk agreed to settle the investigation that led to the first judgment in this case, or when Mr. Musk agreed to settle the investigation that led to the amended judgment in this case.  Instead, the SEC has used its subpoena power to continue investigating matters that were subject to settlements, and then serially to start new investigations with no end in sight.  As discussed *supra* at 14–15, the former

_____

    [3]  *See* Exhibit E (Letter from A. Spiro to S. Buchholz (May 22, 2020)) ("In the end, the current dispute appears to be nothing more than yet another attempt to harass Tesla and silence Mr. Musk.  Over the course of many years, SEC investigations have overlapped endlessly with one another such that there has been no reprieve from the SEC's intense, and meritless, focus on Mr. Musk and his businesses.  The serial nature of these investigations leaves us gravely concerned that the SEC is targeting Mr. Musk for an improper purpose.").

is impermissible; the SEC may not use an administrative subpoenas to investigate a matter once litigation has been brought.  And the latter is still amounts to bad faith prohibited by law.[4]

The SEC has offered no indication that it will subside from its campaign against Mr. Musk absent judicial intervention.  It falls to courts to check such governmental abuses, as they have in the past.  *See generally United States v. Fensterwald*, 553 F.2d 231, 232 (D.C. Cir. 1977) (authorizing limited discovery in light of allegations of agency bad faith); *Int'l Waste Controls, Inc. v. SEC*, 362 F. Supp. 117, 120 (S.D.N.Y. 1973) (finding jurisdiction to enjoin SEC investigations predicated on allegations that the SEC "has plainly exceeded its statutory authority or threatens irreparable injury in clear violation of an individual's rights").

As detailed above, whether and how Mr. Musk's tweets were pre-screened does not bear on his or Tesla's compliance with securities laws.  The SEC is heedlessly intruding on Mr. Musk's privacy and into the companies' affairs, a pattern of behavior that shows no sign of

---

[4]    The SEC's bad faith toward Mr. Musk and Tesla is further evidenced by the Commission's leak to the media of information regarding its investigation.  As explained in counsel's February 21, 2022 letter to this Court, after counsel filed the February 17, 2022 letter to this Court regarding the Commission's conduct, at least one member of the SEC staff responded by leaking to the press certain information regarding its investigation.  In the wake of that, Mr. Musk and Tesla sought "on-the-record assurance that the Commission has not leaked investigative details in violation of its own rules and policies, and is otherwise acting in accordance with the law."  Dkt. No. 64 at 2–3.

In the week since, the SEC has provided no such assurance, nor has the Commission made any attempt to deny it leaked information about its investigation.  By letter dated February 19, 2022, we respectfully requested that specific SEC staff members preserve their records and devices.  We also reported the matter to the SEC Office of Inspector General.  Still, we have received no denial of the leak.

On February 24, 2022, this Court denied Mr. Musk and Tesla's request for intervention.  One hour later, the Wall Street Journal ran an article titled, "SEC Probes Trading by Elon Musk and Brother in Wake of Tesla CEO's Sales," based on the leaked information.  *See* Dave Michaels, *SEC Probes Trading by Elon Musk and Brother in Wake of Tesla CEO's Sales*, Wall St. J. (Feb. 24, 2022 2:22 pm ET), https://www.wsj.com/articles/sec-probes-trading-by-elon-musk-and-brother-in-wake-of-tesla-ceos-sales-11645730528.

Retaliation of this nature is impermissible and further evidence of bad faith.

abatement.  The SEC's vendetta against Mr. Musk should be put to a stop, and Mr. Musk respectfully requests that this Court quash the Challenged Requests.

### C.      The Consent Decree Should Be Terminated Or At Least Modified.

Even assuming arguendo that the judgments in this case could conceivably support the Challenged Requests, the consent decree should be terminated.  The equities strongly favor terminating the consent decree, which intrudes on Mr. Musk's First Amendment right to be free of prior restraints and has been misused to launch endless, boundless investigation of his speech. At a minimum, the consent decree should be modified to remove the prior restraint on Mr. Musk's speech.

"*Rufo* teaches that the power of a court to modify or terminate a consent decree is, at bottom, guided by equitable considerations." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995).  That is, a party may seek to modify or terminate a consent decree by demonstrating "a significant change in circumstances." *Id.* (citing *Rufo*, 502 U.S. at 383 n.7; F.R.C.P. 60(b)(5)).  *Rufo* further provides "a number of situations that may constitute a showing of changed circumstances, including: where changed factual conditions make compliance with the decree 'substantially more onerous'; where the decree proves unworkable because of unforeseen obstacles; or where enforcement of the decree would be detrimental to the public interest." *Eastman Kodak*, 64 F.3d at 101 n.3 (citing *Rufo*, 502 U.S. at 383 n.7).

### 1.      The SEC's Exploitation Of The Consent Decree Has Made Compliance Onerous And Unworkable.

The SEC's conduct under the auspices of the consent decree threatens to invite more and more governmental abuse moving forward.  As the SEC has understood the consent decree and its ability to issue administrative subpoenas thereunder, it has assumed powers it would not otherwise have and used those powers to conduct never-ending investigations.  As detailed

20

above, Mr. Musk and companies in which he holds leadership roles or financial stakes have been subject to one investigation after another, accompanied by round after round of demands for voluminous, costly document productions, with no signs of abatement.  This pattern continues despite extensive prior cooperation by Mr. Musk, and despite the absence of any evidence of any securities law violation.  Compliance with improper document requests and now this subpoena has become substantially more onerous—and indeed utterly impractical—than the settlement to which the parties consented.  The SEC's failure to uphold its side of the bargain alone provides sufficient basis to terminate or modify the decree.  *Rufo*, 502 U.S. at 383 n.7.  Mr. Musk entered into the consent decree on the understanding it would establish peace and keep the Commission within reasonable, principled bounds.  Certainly there was no expectation that this Court's oversight would disappear even while the Court's orders and judgments were specially leveraged by the SEC, or that the SEC would be resolved to harass Mr. Musk without check.

> **2.     The SEC Has Used The Consent Decree To Police First Amendment Speech.**

Enforcement of the decree in the present circumstances also poses a grave threat to Mr. Musk's First Amendment rights.  Courts are especially attentive "when a party seeks modification of a . . . consent decree that arguably relates to vindication of a constitutional right," *Rufo*, 502 U.S. at 383 n. 7, and "it is always in the public interest to protect constitutional rights," *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020) (citation omitted).

Mr. Musk's tweets are, of course, protected speech.  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) ("[S]ocial media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought."); *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) ("Although the Internet is the latest platform for anonymous speech, online speech stands on the same footing as other

speech—there is 'no basis for qualifying the level of First Amendment scrutiny that should be applied' to online speech."[5]

When Mr. Musk and the SEC entered into the consent decree, important constitutional questions about the imposition of prior restraints and the chilling effect of government-mandated preauthorization were placed to one side. We are aware of no other consent decree that calls for the imposition of a government-sanctioned monitor who can dictate precisely what Mr. Musk does or does not say. *See, e.g.*, *United States v. Quattrone*, 402 F.3d 304, 310 (2d Cir. 2005) (Sotomayor, J.) ("Any imposition of a prior restraint . . . bears 'a heavy presumption against its constitutional validity.'") (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)); *see also* Dkt. No. 27 at 20–25. In this sense, the peculiar contours and concerns of the consent decree make it especially problematic and susceptible to abuse.

Over the course of the past four years, the Commission has doubled down on its prior attempts to control Mr. Musk's speech. It has done so without any ostensible regard for core First Amendment rights, amidst heavy-handed investigation that seems destined, and perhaps calculated, to chill exercise of those rights. Unlike other consent decrees, the SEC interprets the agreement in this case to permit it to micro-manage Mr. Musk's Twitter activity. Indeed, the SEC believes it may police speech that falls outside the bounds of Section 10(b) of the Securities Exchange Act of 1934, which prohibits fraud in the purchase or sale of securities and statements or omissions of material fact, 15 U.S.C. § 78j(b). But any attempt to censor speech that is not

---

[5]   Mr. Musk has more than 75-million followers on Twitter. Indeed, a recent article by Time Magazine referenced Mr. Musk's tweets half a dozen times and quoted a source's observation that, "He's probably the most viral social influencer ever." Molly Ball, Jeffrey Kluger & Alejandro De La Garza, *2021 Person of the Year: Elon Musk*, Time (Dec. 13, 2021), https://time.com/person-of-the-year-2021-elon-musk/. Government attempts to shut down individuals' speech are always wrong, but attempts to limit the speech of public figures such as Mr. Musk are also undoubtedly detrimental to the public interest. *Rufo*, 502 U.S. at 383 n.7.

and cannot be considered fraudulent or otherwise violative of the securities laws impermissibly infringes on First Amendment rights.

The 12:17 and 12:23 tweets illustrate this point.  Mr. Musk's poll is not a statement or omission of material fact or a scheme to defraud.  If anything, it is behavior the SEC should encourage: a CEO's transparency with the public and shareholders about a proposed stock sale.

Of course, Mr. Musk is an outspoken and much-followed critic of the government generally, and the SEC specifically; it should not be lost on anyone that the SEC has shown a preoccupation with investigating Mr. Musk for what he tweets at the SEC's expense.[6]

To the extent that the SEC is exploiting the consent decree to punish protected expression that rubs it wrong, such retaliation is patently unconstitutional.  "The constitutional right of free expression is . . . designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us"—not into the hands of the Securities and Exchange Commission.  *Cohen v. California*, 403 U.S. 15, 24 (1971).

The consent decree should be terminated, or, at a minimum, the Court should modify the consent decree to remove the prior restraint on Mr. Musk's speech.  If the SEC wants this Court to maintain authority over Mr. Musk's conduct, it can do so through the injunction it entered

---

[6]     *See, e.g.*, Elon Musk (@elonmusk), Twitter (Oct. 4, 2018, 1:16 pm PT), https://twitter.com/elonmusk/status/1047943670350020608 ("Just want to [note] that the Shortseller Enrichment Commission is doing incredible work. And the name change is so on point!"); Elon Musk (@elonmusk), Twitter (Feb. 26, 2019, 4:25 am PT), https://twitter.com/elonmusk/status/1100371207491248128 ("Something is broken with SEC oversight."); Elon Musk (@elonmusk), Twitter (July 2, 2020, 11:50 am PT), https://twitter.com/elonmusk/status/1278762916326649863 ("Will send some to the Shortseller Enrichment Commission to comfort them through these difficult times"); Elon Musk (@elonmusk), Twitter (July 2, 2020, 11:57 am PT), https://twitter.com/elonmusk/status/1278764736876773383 ("SEC, three letter acronym, middle word is Elon's").

prohibiting Mr. Musk from violating Section 10(b). Mr. Musk is willing (and the federal securities laws otherwise require him) to abide by the Court's injunction.

### 3. The Equities Strongly Favor Termination.

The circumstances under which Mr. Musk was forced to sign the consent decree only compound the inequitable nature of the present arrangement. A consent decree has attributes of both a contract and a judicial act and is essentially "'a settlement agreement subject to continued judicial policing.'" *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992); *cert. denied*, 509 U.S. 905 (1993); *see also EEOC. v. Loc. 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Joint Apprenticeship Comm., Iron Workers Locs. 40 & 361 & Allied Bldg. Metal Indus.*, 76 F.3d 76, 79 (2d Cir. 1996) ("Consent decrees are interpreted according to principles of contract law."). Because consent decrees are also contracts negotiated by the parties, state law claims such as "mutual mistake, fraud, misrepresentation, etc." may also serve as a basis for modification. *See Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1146 n.4 (6th Cir. 1997); *see also Mallory v. Eyrich*, 922 F.2d 1273, 1280 (6th Cir. 1991) (mutual mistake of fact may warrant relief from consent decree).

At the time Mr. Musk signed the consent in this case, Tesla was in no position to weather a fight with the SEC. Mr. Musk felt "forced to sign the consent decree in 2018. Tesla was a less mature company and the SEC's action stood to jeopardize the company's financing. Defending against the SEC's action through protracted litigation was not in the interests of the company and its shareholders." Declaration of Elon Musk at ¶ 4. Mr. Musk "wanted to settle to help Tesla, but [he] did not wish to cause harm to the other companies," which would have been inevitable absent a settlement because the SEC's allegation risked the companies' "future ability to raise money through Regulation D offerings." *Id.* at ¶¶ 5–6. In that posture, Mr. Musk "entered into the consent decree for the immediate survival of Tesla." *Id.* at ¶ 8.

"Under California law, economic duress can serve as a basis for invalidating a release or waiver." *U.S. for Use and Benefit of Reed v. Callahan*, 884 F.2d 1180, 1184 (9th Cir. 1989) (applying California law); *see also Kaufman and Broad-South Bay v. Unisys Corp.*, 822 F.Supp. 1468, 1475 (N.D. Cal. 1993). Economic duress is an equitable doctrine which "come[s] into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal.App.3d 1154, 1158 (1984); *accord Philippine Export v. Chuidian*, 218 Cal.App.3d 1058 (1990). For Mr. Musk, "the only other alternative [was] financial ruin" for Tesla and other companies in which Mr. Musk holds leadership roles or financial stakes, and that was simply not a consequence he could force on the shareholders. *Consumer Health Info. Corp. v. Amylin Pharms., Inc.*, 54 F. Supp. 3d 1001, 1006 (S.D. Ind. 2014), *aff'd*, 819 F.3d 992 (7th Cir. 2016).

In 2018, the SEC took advantage of the position in which it put Mr. Musk. Ever since, the SEC has used the consent decree to repeatedly target Mr. Musk's First Amendment activity for governmental investigation and to thereby chill his expression. Therefore, Mr. Musk respectfully requests that this Court terminate the consent decree, or at the least modify the decree consistent with the First Amendment rights and principles at stake, and monitor the SEC's further enforcement efforts under it.

## V.   CONCLUSION

For the foregoing reasons, Elon Musk, by and through his undersigned attorney, respectfully requests that this Court grant his motion quash the Challenged Requests and to terminate the consent decree.

Dated: New York, New York
        March 8, 2022

Respectfully submitted,

/s/ Alex Spiro
Alex Spiro
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com

*Attorney for Elon Musk*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Motion to be filed with the Court's CM/ECF system this 8th day of March, 2022, thereby causing it to be served on all counsel of record.

Dated: New York, New York
       March 8, 2022

Respectfully submitted,

/s/ Alex Spiro
Alex Spiro
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com

*Attorney for Elon Musk*