## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br>**v.**<br><br>**ELON MUSK,**<br><br>**Defendant.** | **Civil Action No. 1:18-cv-08865-LJL** |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Elon Musk, Defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Second Circuit from the Court's Opinion and Order entered on April 27, 2022 denying relief from judgment under Fed. R. Civ. P. 60(b).

Dated:  June 15, 2022

Respectfully submitted,

/s/ Alex Spiro
Alex Spiro
QUINN EMANUEL
    URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com

*Attorney for Elon Musk*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Notice to be filed with the Court's CM/ECF system this 15th day of June, 2022, thereby causing it to be served on all counsel of record.


Dated: New York, New York
      June 15, 2022

Respectfully submitted,

/s/ Alex Spiro
Alex Spiro
QUINN EMANUEL
  URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com

*Attorney for Elon Musk*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                  :

UNITED STATES SECURITIES AND     :
EXCHANGE COMMISSION,            :
                                                  :
                   Plaintiff,       :              18-cv-8865 (LJL)
                                                  :
                 -v-               :            OPINION AND ORDER
                                                    :
ELON MUSK,                       :
                                                  :
                   Defendant.     :
------------------------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED: _04/27/2022_ |

LEWIS J. LIMAN, United States District Judge:

Defendant Elon Musk ("Musk") moves for an order quashing certain portions of an

administrative subpoena issued by Plaintiff, the United States Securities and Exchange

Commission ("SEC") and terminating the consent decree he previously entered into with the

SEC.  Dkt. No. 70.

For the following reasons, the motion is denied.

**BACKGROUND**

I.      **The SEC Action and the Consent Decree**

Defendant Musk is a party to a final judgment entered by the Court on October 16, 2018,

Dkt. No. 14, after the SEC charged him in a complaint filed on September 27, 2018 with

violating Section 10(b)(5) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15

U.S.C. § 78u, and Rule 10b-5 promulgated thereunder, Dkt. No. 1.  The complaint alleged that

Musk published a series of false and misleading statements to millions of people, including

members of the press, using the social media platform Twitter.  In particular, the SEC alleged

that in August 2018, Musk tweeted to his then over twenty-two million Twitter followers that he

could take Tesla, Inc. ("Tesla") private at $420 per share (a substantial premium to its trading price at the time), that funding for the transaction had been secured, and that the only remaining uncertainty was a shareholder vote.  The tweet allegedly was false:  Musk had not discussed specific deal terms with any potential financing partners, and he knew the potential transaction was uncertain and subject to numerous contingencies.  His tweets caused Tesla's stock price to jump by over six percent on August 7, 2018 and led to significant market disruption.

The judgment, which was filed with Musk's consent, permanently enjoined him from violating Section 10(b) of the Exchange Act and Rule 10b-5 and ordered him to pay a civil penalty of $20 million.  Dkt. No. 14 (the "Musk Consent") ¶¶ 2(a)–(b).  It also ordered him to comply with a series of undertakings.  *Id.* ¶ 2(c).  In particular, Musk agreed to resign from his role as Chairman of the Board of Directors of Tesla and not to seek or accept an appointment as Chairman for a period of three years thereafter, *id.* ¶ 5(a); to comply with all mandatory procedures implemented by Tesla regarding (i) the oversight of communications relating to Tesla made in any format including posts on social media (*e.g.*, Twitter) and on Tesla's website; and (ii) the pre-approval of any such written communications that contain, or reasonably could contain, information material to Tesla or its shareholders, *id.* ¶ 5(b); and to certify in writing his compliance with the first undertaking set forth above, *id.* ¶ 5(c).[1]  The judgment recited that Musk "enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the [SEC] or any member, officer, employee, agent, or representative of [the SEC] to induce [Musk] to enter into this Consent."  *Id.* ¶ 8.  The Musk Consent reflected the mutual understanding that it "resolve[d] only the claims asserted against

---

[1] The judgment also permits the SEC to "make reasonable requests for further evidence" that Musk has complied with his obligations and requires Musk to provide such evidence.  *Id.* ¶ 5(c).

[Musk] in th[e] civil proceeding." *Id.* ¶ 12.  Further, as part of the settlement, Musk agreed not to "take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis" as well as not to "make or permit to be made any public statement to the effect that [Musk] d[id] not admit the allegations of the complaint, or that th[e] Consent contains no admission of the allegations, without also stating that [Musk] d[id] not deny the allegations." *Id.* ¶ 13.  In the common vernacular, Musk agreed not to deny the allegations of the complaint.

At the same time, Tesla agreed to a consent judgment against it (the "Tesla Consent"). *Securities and Exchange Commission v. Tesla, Inc.*, 18-cv-08947-LJL (S.D.N.Y.), ECF No. 14. The Tesla Consent contained the requirement that Tesla implement mandatory procedures to oversee and pre-approve Musk's Tesla-related written communications made in any format including but not limited to Twitter posts that reasonably could contain information material to the company or its shareholders. *Id.* ¶ 6(d).  The judgment further required that Tesla set forth in its disclosure policies and procedures "the definition of, and the process to determine, which of [Musk's] communications contained or reasonably could contain, information material to [Tesla] or its shareholders." *Id.*

In February 2019, within months of the entry of the consent judgments and on the SEC's application, the Court issued an order requiring Musk to show cause why he should not be held in contempt of the Court's judgment, Dkt. No. 19, after Musk tweeted: "Tesla made 0 cars in 2011, but will make around 500k in 2019," without seeking or receiving pre-approval, Dkt. No. 18 at 5.  The tweet had to be corrected by a second, pre-approved tweet several hours later: "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week.  Deliveries for year estimated to be about 400k." *Id.*  The SEC alleged that the first

statement was inaccurate and that it was disseminated to over twenty-four million people.  *Id.* at

1.  Approval of the tweet was required by Tesla's Senior Executives Communications Policy

(Dec. 11, 2018), which defined the written communications requiring approval to include

"projections, forecasts, or estimates regarding Tesla's business."[2]  Dkt. No. 18-1 at 1.  The Court

ordered the parties to meet and confer in an effort to resolve the pending motion and to agree

upon modifications to the consent judgment and Tesla's Senior Executives Communications

Policy, Dkt. No. 39; the parties then submitted a consent motion to modify the final judgment to

require Musk to obtain pre-approval by an experienced securities lawyer employed by the

Company of any one of a series of types of written communications, including "events regarding

the Company's securities (including Musk's acquisition or disposition of the Company's

securities)" and "any event requiring the filing of a Form 8-K by the Company with the

Securities and Exchange Commission."  Dkt. No. 46.

## II.    The Instant Dispute

On November 6, 2021, Musk tweeted several times concerning his potential sale of a

large portion of his holdings in Tesla without obtaining pre-approval for the tweets.  The first

tweet, at 12:17 pm PT, asked:  "Much is made lately of unrealized gains being a measure of tax

avoidance, so I propose selling 10% of my Tesla stock.  Do you support this?"  Dkt. No. 71 at 3.

Six minutes later, at 12:23 pm PT, he tweeted:  "I will abide by the results of this poll, whichever

way it goes."  *Id.*  Ultimately, over seven million votes were cast—57.9% of the votes, or

---

[2] Musk took the position that his tweet was immaterial and was merely "celebratory"—"a
statement of pride and optimism."  Dkt. No. 27 at 11.  The position bordered on the risible.  A
reasonable observer could certainly conclude that when the CEO of a Fortune 100 company tells
millions of followers that his company "will make" a specific production volume in the next
year, the statement is not a casual one.

3,519,252 in total, answered yes.  *Id.*  The record does not reflect whether Musk abided by his public commitment.

The SEC served subpoenas on Musk and Tesla seeking, among other things, information about the tweets and the process that was employed before they were disseminated to the public. Specifically, on November 16, 2021, the SEC served a subpoena on Tesla requiring it to produce ten categories of documents, including all documents and communications concerning the two tweets as well as documents sufficient to determine whether the two tweets were submitted to Tesla's General Counsel or Securities Counsel for pre-approval or review before they were published.  Dkt. No. 69-2.  On November 21, 2021, the SEC served a subpoena on Musk requiring him to produce five categories of documents, including all documents and communications concerning the two tweets as well as documents related in any way to the submission of the tweets to Tesla's General Counsel or Securities Counsel for pre-approval or review before they were published.  Dkt. No. 69-1.  Both were served pursuant to a SEC Formal Order of Investigation (the "Formal Order") dated November 16, 2021, which stated that the SEC had information that tended to show violations of the federal securities laws.  In particular, the Formal Order, entitled "*In the Matter of Tesla, Inc.* (SF-4496)," and labeled with a non-public SEC filing number, recited that the SEC had information that tended to show that from at least November 5, 2021, Tesla and its officers engaged in conducted that violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Rule 13a-15 of the Exchange Act.  Dkt. No. 69-3.  It therefore ordered and authorized its staff to conduct a private investigation to determine whether any persons or entities had violated those provisions of the federal securities laws and to subpoena

witnesses and compel the production of "books, papers, correspondence, memoranda, or other evidence deemed relevant or material to the inquiry."  *Id.*

On March 8, 2022, Musk filed this motion to quash certain portions of the SEC subpoena and to terminate the consent decree.  Dkt. No. 70.  The SEC filed a memorandum in opposition on March 22, 2020, Dkt. No. 78, and Musk filed a reply memorandum in further support of his motion on March 29, 2022, Dkt. No. 80.[3]

## DISCUSSION

Musk moves for two forms of relief: (1) an order quashing the subpoena served upon him, and (2) an order terminating the consent decree.  The Court discusses each in turn.

## I.    Motion to Quash the Administrative Subpoenas

Musk moves to quash portions of the subpoena served upon him, arguing that the SEC lacks legal authority to issue those demands under the purview of either the securities laws or the judgments in this case and arguing that the subpoena was issued in bad faith.  Dkt. No. 70.  This proceeding, however, is not the proper forum for such a motion.

The SEC enjoys broad power under Section 21(b) of the Exchange Act, 15 U.S.C. § 78u, to "make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate" any provision of the federal securities laws, and to "require the production of any books, papers, correspondence, memoranda, or other records

_____

[3] Musk's motion followed a series of letters filed by Musk and the SEC, beginning with a February 17, 2022 letter filed by Musk in which his counsel state that they "write to alert the Court to a pattern of conduct by the [SEC] that has gone beyond the pale," including "devoting its formidable resources to endless, unfounded investigations into Mr. Musk and Tesla," and argue that Musk and Tesla "never agreed to a settlement that allows the SEC to issue subpoenas absent oversight and approval from this Court."  Dkt. No. 61.  The Court issued an Order responding that "to the extent that the Defendants have a non-frivolous basis to quash a subpoena in light of the Court's prior orders in this case, the Defendants may make a motion, supported by briefing, that requests specific relief from the Court," Dkt. No. 65.  Tesla apparently is cooperating with the subpoena issued to it.  *See* Dkt. No. 78 at 5.

which the Commission deems relevant or material to the inquiry."  Under Section 78u(c), if

someone refuses to obey a subpoena issued by the SEC, it "may invoke" judicial aid "in

requiring the attendance and testimony of witnesses and the production of books, papers,

correspondence, memoranda, and other records."  A parallel provision exists under Section 19 of

the Securities Act of 1933.  *See* 15 U.S.C. § 77s.

      The review authorized by Section 78u(c) is limited precisely to preserve the SEC's

investigative prerogatives and to ensure that it can accomplish its investigative goals on a timely

basis.  First, the process can be initiated only by the SEC and only in the case of "contumacy by,

or refusal to obey a subpoena issued to," a person.  15 U.S.C. § 78u(c).  If the SEC chooses not

to enforce a subpoena, the recipient of the subpoena cannot demand what is, in effect, an

advisory opinion.  Second, "[c]ommission enforcement proceedings may be summary in nature."

*Securities and Exchange Commission v. Knopfler*, 658 F.2d 25, 26 (2d Cir. 1981).  The court

need not grant the opponent of a subpoena an evidentiary hearing and he or she "has a heavy

burden if he [or she] seeks denial of enforcement on the ground that the subpoena is sought for

an invalid purpose."  *Id.*  The opponent of the subpoena "must prove that the improper purpose is

that of the Commission, not merely that of one of its investigators, and the burden may not be

met by the presentation of conclusory allegations.  An evidentiary hearing is not required in the

absence of a meaningful and substantial factual showing."  *Id.*  Section 78u(c) grants the SEC

wide-ranging investigative discretion.  15 U.S.C. § 78u(a).  It endows the SEC with "broad

powers to conduct investigations in support of its statutory mandate to protect the public interest

through prompt and effective enforcement of the federal securities laws."  *Treats Int'l Enters.,*

*Inc. v. Securities and Exchange Commission*, 828 F. Supp. 16, 18 (S.D.N.Y. 1993) (internal

quotation marks omitted) (quoting H. Rep. No. 1321, 96th Cong., 2d Sess. 4 (1980), *reprinted in*

1980 U.S.C.C.A.N. 3874, 3878).  The Section 78u(c) summary proceeding is designed to allow

some judicial review without "contraven[ing] . . . Congress's decision to confide the

investigative determination to the SEC."  *Id.*; *cf. Securities and Exchange Commission v. Jerry T.*

*O'Brien, Inc.*, 467 U.S. 735, 750–51 (1984) (declining to impose a notice requirement on the

SEC for investigations because such a requirement "'would cast doubt upon and stultify the

Commission's every investigatory move,'" and because imposing such a requirement would

mean that, if someone objected to such notification, "a district court would be obliged to conduct

some kind of hearing to determine the scope and thrust of the ongoing investigation," which

"would drain the resources of the judiciary as well as the Commission" (quoting *Donaldson v.*

*United States*, 400 U.S. 517, 531 (1971))).  As *Knopfler* makes clear, except in very limited

circumstances, the SEC, when it is conducting an investigation, is not subject to the time-

consuming procedures of discovery and a hearing incident to ordinary litigation.

 The Second Circuit has squarely held "that Section 78u(c) is the exclusive method by

which the validity of SEC investigations and subpoenas may be tested in the federal courts."

*Sprecher v. Graber*, 716 F.2d 968, 975 (2d Cir. 1983).  "The exclusive method for testing the

validity of the SEC's investigatory motives or methods is a contested subpoena enforcement

proceeding under 15 U.S.C. § 78u(c)."  *Sprecher v. Von Stein*, 772 F.2d 16, 18 (2d Cir. 1985).  In

other words, the only mechanism for a party to challenge a subpoena issued to him by the SEC is

a proceeding brought by the SEC under Section 78u(c) to enforce that subpoena.  The SEC has

not commenced any such proceeding to date to compel Musk's compliance with the subpoena.

Dkt. No. 78 at 5.  While "[p]arties who are the subject of such subpoenas are free in a proceeding

under [Section 78u(c)] to raise claims of abuse of process," they are barred by the doctrine of

sovereign immunity from bringing their own actions against the SEC.  *Graber*, 716 F.2d at 974.

That principle has been applied time and again in this Circuit as well as elsewhere in response to efforts to circumvent the summary procedures authorized under the federal securities laws. *See, e.g.*, *Arjent LLC v. SEC*, 7 F. Supp. 3d 378, 383 (S.D.N.Y. 2014) (holding that Section 702 did not waive sovereign immunity in collateral suit for injunctive relief against SEC, reasoning that "[b]ecause . . . the subpoena enforcement proceeding provides an opportunity for judicial review of both an investigation's legitimacy, and a subpoena's legitimacy, the proceeding [pursuant to Section 78u(c)] 'is the exclusive method by which the validity of SEC investigations and subpoenas may be tested in the federal courts'" (quoting *Graber*, 716 F.2d at 975)); *Finazzo v. SEC*, 2008 WL 3521351, at *3 (S.D.N.Y. Aug. 8, 2008) (Sullivan, J.) (same); *Treats*, 828 F. Supp. at 19 (denying plaintiff's motion for a preliminary injunction and granting SEC's motion to dismiss for lack of subject matter jurisdiction, concluding that the "complaint seeking to enjoin the SEC's investigation is beyond the limited scope of review available in this court"); *see also, e.g.*, *Gentile v. Securities and Exchange Commission*, 2019 WL 2098832 (D.N.J. May 14, 2019); *Cook v. SEC*, 664 F. Supp. 2d 997, 999 (D. Minn. 2009) (denying motion to stay SEC investigation for lack of subject matter jurisdiction, explaining that "[a] subpoena enforcement action is the exclusive method by which the validity of [an SEC] investigation may be challenged").

In *Graber*, as here, the defendant, Sprecher, had been a party to a prior action where he was sued by the SEC for securities fraud; that action that was settled pursuant to a written stipulation in which he agreed not to engage in certain securities transactions for specific periods of time. *Graber*, 716 F.2d at 970. Just one year later, the SEC entered a Formal Order of Investigation authorizing the issuance of subpoenas, pursuant to which a subpoena was issued to him. Sprecher initiated a separate proceeding against the SEC, arguing, much like Musk does

here, that the investigation "was improperly motivated by . . . bias"—in his case by religious bias and in Musk's case allegedly by political bias—"and a desire to harass him, that the subpoena violated [the agreement he reached in connection with the earlier SEC action], and that it sought to compel him to divulge materials protected by the attorney-client privilege." *Id.* Judge Winter made short shrift of those arguments. Sprecher's "complaint allege[d] actions which are either committed to the SEC's discretion or are subject to a statutory provision [Section 78u(c)] which provides the exclusive relief available." *Id.* at 974. While it is true "that the procedures and scope of judicial security under Section 78u(c) differ considerably from those which would be available" in an alternative judicial proceeding, *Graber*, 716 F.2d at 975, the nature of a Section 78u(c) proceeding is summary by design, *see id.* (stating that the differences in the scope of judicial scrutiny is "of little moment" because Congress in passing Section 78u(c) intended subpoena enforcement to be "the exclusive method by which the validity of SEC investigations and subpoenas may be tested in the federal courts").

Musk seeks to avoid the impact of *Graber* and the long line of cases applying the same principle on the theory that, because he is a party to a SEC consent judgment that restricts him from violating various provisions of the federal securities laws and because the subpoena refers to the judgments in this case, the SEC is limited as a matter of law to following the procedures for enforcement of the judgment in this case, including obtaining permission of the Court for discovery in connection with a contempt proceeding. He argues that the *Graber* line of cases is distinguishable because the SEC, having initiated this lawsuit, has waived any argument based on sovereign immunity.

But *Graber* is not so easily distinguished. It may be that in *Graber* and the cases that followed it, a subpoena recipient sought to avoid the summary procedures under Section 78u(c)

by the expedient of filing a new lawsuit, whereas here Musk seeks to limit the SEC's authority by making a motion in a lawsuit that the SEC has already filed, but that is a distinction without a difference. *Graber* did not turn alone or even primarily on the extent of the waiver of sovereign immunity granted under Section 702 of the Administrative Procedure Act ("APA")—which provides for a limited waiver of sovereign immunity—but instead on the Circuit's conclusion that Section 78u(c) of the Exchange Act, and the parallel provision under the Securities Act, expressed a "limitation on judicial review" and that therefore, as a result of the proviso to Section 702 stating that the waiver of immunity does not affect other limitations on judicial review, that restriction remained intact. *Graber*, 716 F.2d at 974. In other words, the Circuit concluded that Congress intended in Section 78u(c) itself, as it preexisted and survived the APA, to channel all challenges to SEC investigations and subpoenas to subpoena enforcement proceedings under that Section and not to allow any alternative channels for judicial review. The Circuit, honoring congressional intent, concluded without reservation that Section 78u(c) is the only mechanism to bring motions like this.

Moreover, the mere fact that SEC brought an action against Musk and a related action against Tesla for Musk's tweets in August 2018 does not waive the SEC's sovereign immunity with respect to an investigation the SEC launched in late 2021 regarding conduct that occurred in late 2021, after the 2018 case was settled. Courts repeatedly have held that the filing of a lawsuit by the federal government or one of its agencies does not waive sovereign immunity with respect to counterclaims that the defendant might assert against the government or one of those agencies. There must be an independent basis to infer the waiver of sovereign immunity. *See, e.g.*, *United States v. All Right, Title & Interest*, 82 F. Supp. 893, 899 (S.D.N.Y. 1993) ("It is well established that the United States Government has sovereign immunity and, consequently, can be sued only

to the extent it consents to be sued, and only in the manner established by law.  Thus, counterclaims against the United States can be maintained only where the Government has consented or waived its immunity from suit on that claim."); *United States v. $10,000.00 in U.S. Funds*, 863 F. Supp. 812, 816 (S.D. Ill. 1994) ("[T]he mere fact that the government is the plaintiff and has brought the forfeiture action does not constitute a waiver of sovereign immunity and authorize the bringing of a counterclaim."); *United States v. Krieger*, 773 F. Supp. 580, 589 (S.D.N.Y. 1991) ("[A]ny counterclaim in an action brought by the United States must show the authority by which the claim against the United States may be maintained in order for the court to be able to exercise its jurisdiction.").

It follows necessarily that the fact that the SEC previously brought an action against Musk (that was settled in a judgment filed with the court) also does not effect a waiver as to the sovereign immunity conferred by Section 78u(c) or give him an alternative means to challenge a SEC administrative subpoena issued pursuant to a formal Order of Investigation.  The judgment against Musk expressly stated that it was to settle "only the claims asserted against [Musk] in th[e] civil proceeding."  Musk Consent ¶ 12.  It did not give Musk any broader immunity from other SEC investigations or proceedings—including related ones.  It thus preserved the SEC's authority to investigate Musk for additional securities violations or to ask for documents and records from him in connection with an investigation of others should the SEC receive information that suggested he or others violated the securities laws again.  Musk may wish it were otherwise, but he remains subject to the same enforcement authority—and has the same means to challenge the exercise of that authority—as any other citizen.  Indeed, to conclude otherwise would be to hold that a serial violator of the securities laws or a recidivist would enjoy greater protection against SEC enforcement than a person who had never even been accused of a

securities law violation.  Musk points to nothing in the law or the language of the statute that would suggest that Congress intended such a perverse result.

The additional fact that the SEC subpoena calls for documents regarding Musk's adherence to the judgment and, in particular, information regarding whether his communication was pre-approved by counsel, does not entitle him to the independent judicial review in this proceeding that would be denied to any other person who had not been a defendant in a prior SEC enforcement action or the subject of a consent decree with the SEC.  The administrative subpoena was issued pursuant to authority granted the SEC under a Formal Order of Investigation.  The Formal Order recites that the SEC has information tending to show a violation of the securities laws and authorizes the SEC to investigate potential violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Rule 13a-15 under the Exchange Act, not possible violations of the Musk Consent or the Tesla Consent.

That the consent decree permits the SEC to make "reasonable requests" of Musk to investigate his compliance, that Musk is required to comply with those, and that the production of such evidence might support a finding of contempt in this Court does not limit the SEC's power to independently investigate whether Musk's activity in 2021 violated securities laws— even if the same activity could constitute a violation of the consent decree—nor does it undermine the validity or lawfulness of its current investigation.  *See, e.g.*, *Grenda v. SEC*, 2017 WL 4053821, at *3 (W.D.N.Y. Sept. 14, 2017) (holding that the SEC's investigation of a potential violation of a prior settlement was "a legitimate inquiry, plain and simple").  It is not uncommon, for example, that the SEC will issue so-called "obey the law" injunctions.  *See U.S. S.E.C. v. Amerindo Inv. Advisors, Inc.*, 2013 WL 1385013, at *11 n.12 (S.D.N.Y. Mar. 11, 2013)

13

(citing David M. Weiss, Reexamining the SEC's Use of Obey-the-Law Injunctions, 7 U.C. Davis

Bus. L.J. 6 (2006)).  It also might issue more tailored injunctions.  But the provisions in the

consent decree for the SEC to investigate noncompliance with that decree and to seek a contempt

order against Musk if there is such a violation are provided as enforcement mechanisms for the

consent decree itself, not for the securities laws writ large.  They do not replace or derogate from

the power that the SEC has with respect to every person—whether or not that person was the

subject of any previous SEC action—to investigate whether that person has violated the laws

intended to protect investors and—if the facts support that the person has violated the law—the

right to bring an action against them.  Were it otherwise, the SEC could never settle with a

wrongdoer nor could the courts ever safely issue an injunction even in a case that did not reach a

settlement.  The incorrigible securities violator could readily buy a form of protection from

future investigation.  By agreeing to settle at the earliest hint of a first violation and perhaps on

the cheap, he would limit the SEC's ability independently to use its investigative tools to

investigate any future wrongdoing.[4]

    The Court has concluded that Section 78u(c) prevents it from reviewing whether the

subpoena was properly issued pursuant to that Formal Order.  But even if it were within this

Court's province to address the issue, the Court would not find that the information sought is

irrelevant to the SEC investigation.  Documents that would address whether Musk followed

---

[4] Musk argues that "[b]y specifically referring to the judgments in this case in its subpoena to
Tesla and seeking documents from Mr. Musk pertaining to review or pre-approval of his tweets,
the SEC seeks to circumvent the jurisdiction of this Court as it unilaterally grasps for documents
pertaining specially to the consent decree."  Dkt. No. 71 at 14.  But if the SEC engages in
misconduct in its investigation and if that misconduct prejudices Musk's litigation rights, Musk
can bring that challenge to the use of the evidence in a contempt proceeding—if the SEC brings
one.  The argument does not establish Musk's entitlement to any greater protection with respect
to a new SEC action than that enjoyed by any other person whose conduct is being investigated
by the SEC.

corporate policies with respect to the pre-approval of his tweet and received advice of counsel

bear directly on his culpability.  If he disseminated the tweets only after following Tesla's

corporate policies, including those demanded by the consent decree, he might have powerful

defenses at least at to some of the potential violations the SEC is investigating.  If, on the other

hand, he willfully bypassed those procedures, that evidence too would suggest a far greater level

of culpability.  The SEC plainly is entitled to probe the issue.  As to Tesla, whether it followed

its own internal practices in the case of these tweets and otherwise bears on whether its

representation in its SEC filings to investors that it had policies and procedures that were

addressed to all senior executives was truthful or whether, instead, that representation had a

material and significant omission.

## II.     Motion to Terminate the Consent Decree

Musk also asks the Court to terminate the consent decree pursuant to Federal Rule of

Civil Procedure 60(b)(5).  That rule permits a court to relieve a party from a final judgment if

"applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  It does not permit a

court to relieve a party of the burden of a consent decree on the theory that "it is no longer

convenient to live with the terms of a consent decree."  *Rufo v. Inmates of Suffolk County Jail*,

502 U.S. 367, 383 (1992).  "Accordingly, a party seeking modification of a consent decree bears

the burden of establishing that a *significant* change in circumstances warrants revision of the

decree."  *Id.* at 383.  This "initial burden" may be met by showing "a significant change either in

factual conditions or in law."  *Id.* at 384.  For example, "[m]odification of a consent decree may

be warranted when changed factual conditions make compliance with the decree substantially

more onerous" or "when a decree proves to be unworkable because of unforeseen obstacles."  *Id.*

In addition, a consent decree must be modified if "as it later turns out, one or more of the

obligations placed upon the parties has become impermissible under federal law" and

modification also "may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Id.* at 388. "If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 383; *see also id.* at 391. "A motion for relief from judgment is generally not favored," and "[t]he burden of proof is on the party seeking relief from judgment." *United States v. International Brotherhood of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001); *see also Horne v. Flores*, 557 U.S. 433, 447 (2009) ("The party seeking relief bears the burden of establishing that changed circumstances warrant relief."). Particularly in a context involving a judgment against a private party, the Second Circuit has emphasized that the standard applied by courts should "promot[e] adherence to settlement agreements voluntarily entered into by parties to a litigation and ensur[e] that consent decrees are not so easily modifiable as to discourage parties from reaching constructive settlements." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 102 (2d Cir. 1995).

Thus, the party seeking relief must establish "'either a significant change in factual conditions or in law,'" including changes such as "'(1) changed factual conditions [which] make compliance with the decree substantially more onerous;' (2) 'a decree [which] proves to be unworkable because of unforeseen obstacles;' or (3) [a circumstance in which] 'enforcement of the decree without modification would be detrimental to the public interest.'" *Calderon v. Wambua*, 2012 WL 1075840, at *3 (S.D.N.Y. Mar. 28, 2012) (quoting *Rufo*, 502 U.S. at 383–84).

Musk argues that the consent decree in this case should be terminated because (1) it "intrudes on Mr. Musk's First Amendment right to be free of prior restraints," Dkt. No. 71 at 20; (2) "has been misused to launch endless, boundless investigation of his speech," *id.*; and (3) was

extracted from Musk through the exercise of economic duress, *id.* at 24.  None of the arguments hold water.

With regard to the First Amendment argument, it is undisputed in this case that Musk's tweets are at least presumptively "protected speech."  *Id.* at 21; *see also* Dkt. No. 78 at 13–14. At the same time, however, even Musk concedes that his free speech rights do not permit him to engage in speech that is or could "be considered fraudulent or otherwise violative of the securities laws."  Dkt. No. 71 at 22–23.  The consent decree thus does not impose obligations that have "become impermissible under federal law."  *Rufo*, 502 U.S. at 384.

Moreover, to the extent that the consent decree imposes an additional restriction on Musk's speech by requiring him to obtain pre-approval of his communications about Tesla,[5] "parties can waive their First Amendment rights in consent decrees and other settlements of judicial proceedings."  *SEC v. Romeril*, 15 F.4th 166, 172 (2d Cir. 2021).  In *Romeril*, the SEC brought a civil enforcement action against Romeril; the case ended in a settlement.  *Id.* at 169. As part of that settlement, Romeril entered into a consent agreement with the SEC where he agreed "not to take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis."  *Id.* at 170 (internal quotation marks omitted) (quoting J. App'x at 70).  Years later, Romeril moved for relief from the judgment; he argued that "the judgment was void because the provision barring public denials of the allegations against him – in his words a 'gag order' – constituted a prior restraint that infringes his First Amendment rights

---

[5] The parties dispute whether this pre-approval requirement burdens Musk's First Amendment rights.  For the reasons that follow, the Court need not reach the question whether the requirement that Musk's statements that may be material to Tesla's stockholders go through some form of review before they are disseminated to the public, including the investing public, would pass muster under the First Amendment.

and violated his right to due process." *Id.* The Circuit denied his motion, stating that "[t]he Judgment does not violate the First Amendment because Romeril waived his right to publicly deny the allegations of the complaint." *Id.* at 172. The Court added:

> In the course of resolving legal proceedings, parties can, of course, waive their rights, including such basic rights as the right to trial and the right to confront witnesses. The First Amendment is no exception, and parties can waive their First Amendment rights in consent decrees and other settlements of judicial proceedings. To the extent that Romeril had the right to publicly deny the SEC's allegations against him, he waived that right by agreeing to the no-deny provision as part of a consent decree.

*Id.* at 172–73 (citations omitted).[6] *Romeril*'s reasoning is squarely applicable here. Musk, by entering into the consent decree in 2018, agreed to the provision requiring the pre-approval of any such written communications that contain, or reasonably could contain, information material to Tesla or its shareholders. He cannot now complain that this provision violates his First Amendment rights.

Musk's argument that the SEC has used the consent decree to harass him and to launch investigations of his speech is likewise meritless and, in this case, particularly ironic. The Supreme Court has instructed that "modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385. Musk could hardly have thought that at the time he entered the decree he would have been immune from non-public SEC investigations. The SEC has a historic mission to "achieve a high standard of business ethics in the securities industry," *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963), and to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation, *see* U.S. Securities and Exchange Commission, What We Do, *available at* https://www.sec.gov/about/what-we-do

---

[6] Musk argues that a petition for certiorari has been filed in *Romeril*, but it remains the law in this Circuit.

(last accessed Apr. 26, 2022); *see also* Statement of Robert J. Jackson, Jr., *Nominations of David J. Ryder, Hester M. Peirce, and Robert J. Jackson, Jr.: Hearing Before the S. Comm. On Banking, Housing and Urban Affairs*, 115th Cong. 74 (2017) ("[T]he SEC's three-part statutory mandate requires the agency to protect investors, maintain fair and efficient markets, and facilitate capital formation.").  That mission is essential to the protection of shareholders.  *See Capital Gains Research Bureau*, 375 U.S. at 186 ("The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's. . . .  A fundamental purpose, common to these statutes [including the Securities Act of 1933 and the Securities Exchange Act of 1934] was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 150–51 (1972) (citing *Capital Gains Research Bureau* for the same proposition).

Particularly against that backdrop, the SEC cannot be faulted for the limited requests it has issued.  Far from the "sheer number of demands" that Musk claims the SEC has made, *see* Dkt. No. 71 at 17–18, the SEC has in fact made only limited requests.  It has made only three sets of inquiries: inquiries related to the original enforcement actions that led to the consent decree here; inquiries related to the investigation that led to the amended final judgments; and the inquiries at issue in the investigation here, which arose after Musk tweeted about selling ten percent of his shares.  *See* Dkt. No. 78 at 10–11.  It is unsurprising that when Musk tweeted that he was thinking about selling ten percent of his interest in Tesla and that he planned to relinquish control over that decision to the majority opinion expressed by voters on his Twitter poll (or those who could muster control over the majority), the SEC would have some questions.

Finally, Musk's claim that he was the victim of economic duress is wholly unpersuasive. Musk argues that "[a]t the time [he] signed the consent in this case, Tesla was in no position to weather a fight with the SEC," because it "was a less mature company and the SEC's action stood to jeopardize the company's financing." Dkt. No. 71 at 24.  But, even accepting as true that Musk—who was already a multibillionaire in 2018 and one of the wealthiest individuals in the world, *see* Deniz Çam & Jennifer Wang, *The Biggest Billionaire Winners and Losers of 2018*, Forbes (Dec. 21, 2018), https://www.forbes.com/sites/denizcam/2018/12/21/the-biggest-billionaire-winners-and-losers-of-2018/?sh=1e88d2d8526e, as well as the CEO of Tesla, which was already a Fortune 500 company, *see* Mike Sorrentino, *Tesla Leaps Up Fortune 500 and Apple Slips, But Walmart Beats Them All*, CNET (May 21, 2018), https://www.cnet.com/culture/tesla-leaps-up-fortune-500-and-apple-slips-but-walmart-beats-them-all/—was truly worried that engaging in a protracted litigation with the SEC would be financially ruinous for Tesla and felt that settling the lawsuit was the best thing for the company, that does not establish a basis for him to get out of the judgment he voluntarily signed.

It is a known fact that the commencement of a SEC lawsuit—just like any major litigation—can cause the distraction of management, lead to litigation costs, and ultimately be considered an undesirable event from the perspective of the subject company's shareholders and other stakeholders.  That is perhaps a reason why no single SEC attorney can authorize a lawsuit; it requires Commission approval.  *See* Office of Chief Counsel, Securities and Exchange Commission Division of Enforcement, *Enforcement Manual* §§ 2.5.1–.2 (Nov. 28, 2017), *available at* https://www.sec.gov/divisions/enforce/enforcementmanual.pdf.  The lawsuit is a consequence of our federal securities regulator having information that the defendant has violated the securities laws.  But the fact that a settlement can avoid those costs, and the negative

reaction by shareholders, does not mean that it is coercive or unenforceable.  It may simply mean

that the executive is acting in the best interests of those for whom he is a fiduciary.  Were it

otherwise, the SEC could never accept a settlement and a defendant thus would never be able to

get the advantages of settlement.  The agreement by a company or its senior executive would

always be subject to the option by the executive or the company—when obligation no longer was

convenient or when executive or the company believed that the SEC might be hobbled in its

litigative capabilities—to simply claim that they felt "forced" to agree to a settlement because

they "perceived that the company and its shareholders would be placed at undue risk unless

[they] settled the matter promptly."  *See* Dkt. No. 72 ¶ 4.

       The doctrine of economic duress is far more limited.  As Musk states, "[e]conomic duress

is an equitable doctrine which 'comes into play upon the doing of a *wrongful act* which is

sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to

succumb to the perpetrator's pressure.'"  Dkt. No. 71 at 25 (alteration adopted and emphasis

added) (quoting *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 1154, 1158 (1984)).[7]

But Musk's argument that the SEC acted wrongfully amounts to one sentence:  "In 2018, the

SEC took advantage of the position in which it put Mr. Musk."  *Id.* at 25.  That conclusory

assertion is insufficient to sustain a finding of economic duress.  Musk was not forced to enter

into the consent decree; rather, "for [his] own strategic purposes, [Musk], with the advice and

assistance of counsel, entered into these agreements voluntarily, in order to secure the benefits

thereof, including finality."  *Securities and Exchange Commission v. Conradt*, 309 F.R.D. 186,

187–88 (S.D.N.Y. 2015).  Musk cannot now seek to retract the agreement he knowingly and

---

[7] The parties assume that California law applies.  *See id.*; *see also* Dkt. No. 78 at 14.  The Court
has no occasion to consider that issue.

willingly entered by simply bemoaning that he felt like he had to agree to it at the time but now—once the specter of the litigation is a distant memory and his company has become, in his estimation, all but invincible—wishes that he had not.

## CONCLUSION

The motion to quash the subpoena and to terminate the consent decree is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 70.


SO ORDERED.


Dated: April 27, 2022
       New York, New York                     _____
                                                        LEWIS J. LIMAN
                                                  United States District Judge